**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAKE CHARLES DIVISION**

| | |
|---|---|
| THE STATE OF LOUISIANA,<br>By and through its Attorney General,<br>Elizabeth B. Murrill;<br><br>THE LOUISIANA OIL & GAS<br>ASSOCIATION;<br><br>THE STATE OF MISSISSIPPI,<br>By and through its Attorney General, Lynn<br>Fitch;<br><br>THE STATE OF TEXAS,<br>By and through its Attorney General, Ken<br>Paxton;<br><br>THE GULF ENERGY ALLIANCE;<br><br>THE INDEPENDENT PETROLEUM<br>ASSOCIATION OF AMERICA; and<br><br>THE U.S. OIL & GAS ASSOCIATION,<br><br>                      PLAINTIFFS,<br><br>v.<br><br>DEB HAALAND, in her official capacity as<br>Secretary of the Interior;<br><br>THE U.S. DEPARTMENT OF THE<br>INTERIOR;<br><br>BUREAU OF OCEAN ENERGY<br>MANAGEMENT;<br><br>ELIZABETH KLEIN, in her official capacity<br>as Director of the Bureau of Ocean Energy<br>Management;<br><br>STEVE FELDGUS, in his official capacity as<br>Principal Deputy Assistant Secretary for Land<br>and Minerals Management;<br><br>JAMES KENDALL, in his official capacity as<br>Gulf of Mexico Regional Director, | CIVIL ACTION No. _____ |

DEFENDANTS.

## COMPLAINT

The State of Louisiana, the Louisiana Oil & Gas Association, the State of Mississippi, the State of Texas, the Gulf Energy Alliance, the Independent Petroleum Association of America, and the U.S. Oil & Gas Association bring this civil action against the above-listed Defendants for declaratory and injunctive relief and allege as follows:

## INTRODUCTION

1.      This case arises from the Biden Administration's newest front in its war on oil and gas production in the Gulf of Mexico. As part of what it calls the "most ambitious climate agenda in history," the Administration has tried to throttle that production on multiple fronts since day one. It unilaterally imposed a moratorium on all oil and natural gas leasing activities on public lands and offshore waters, it systematically required agencies to elevate factors such as "the social cost of green-house gases" over statutory considerations, and it prohibited issuing new export licenses for liquified natural gas products. Those moves have come overwhelmingly by executive decree—not by cooperation with Congress. Courts have found those efforts unlawful again and again. E.g., *Louisiana v. Biden*, 622 F. Supp. 3d 267 (W.D. La. 2022). None of that matters to the President. In Mr. Biden's own words, "I want to stop all the drilling on the east coast, and the west coast, and in the Gulf. But I lost in court. But, we're still pushing very hard." Breslin, *President Biden Calls Climate Change 'Existential Threat' in TWC Interview*, TWC (Aug. 9, 2023), perma.cc/NEG6-XDLW.

2.      The Administration's latest gambit is a new Final Rule from the Bureau of Ocean Energy Management ("BOEM") that seeks to put small and mid-size independent oil and gas companies out of business. *See Risk Management and Financial Assurance for OCS Lease and Grant Obligations*, 89 Fed. Reg. 31,544 (Apr. 24, 2024). As a condition of

1

exercising their lease rights, BOEM's Rule requires small and mid-size oil and gas lessees in the Gulf of Mexico to obtain billions of dollars' worth of "financial assurance" bonds to cover the cost of potential future liability for decommissioning offshore oil and gas infrastructure. But BOEM knows—or should know—that nobody will be able to provide those bonds, so the lessees will be unable to meet the Rule's requirement. The upshot? Those small and mid-size lessees—which produce over a third of the oil and natural gas from the Outer Continental Shelf—will face potentially existential consequences. When they cannot meet the government's demand for additional bonds, they can be subjected to civil penalties, forced to stop oil and gas production, and banned from operating in the Gulf. The Rule goes into effect June 29.

3.      Oil and gas leasing in the Gulf of Mexico has been a success story. The federal government has long leased Gulf parcels with oil and gas reserves to companies that have drilled wells, installed platforms, and produced hundreds of billions of barrels of oil and gas that has helped make America the energy superpower it is today. Gulf leasing has generated over $208 billion in royalties and related revenue to the U.S. Treasury over the past 40 years. For the first several decades, the oil and gas lessees in the Gulf were all major companies or large independent companies. When those companies obtained their leases, they agreed to perform or remain responsible for the eventual costs of "decommissioning" the infrastructure they installed—that is, removing platforms, facilities, and pipelines; plugging wells; and clearing the seafloor of debris. Eventually, the original major companies moved to deeper waters and—in negotiated commercial transactions—sold and assigned their offshore leases to small and mid-size independent companies.

4.     The major companies remained jointly and severally liable for decommissioning the infrastructure after they made these assignments to small and mid-size companies. Under the common law and federal regulations, if the small or mid-size companies went bankrupt, the majors would have to pay for decommissioning as predecessors in title on the lease. After all, the majors were the ones who originally accepted that liability, and their assignments to small and mid-size companies took account of that continuing liability. Sometimes, the small and mid-size companies would agree to guarantee the later decommissioning costs as part of the assignment deal, by providing surety bonds or other financial guarantees to the major selling companies. The purchase price baked in the risk to the majors: it went up when the smaller companies declined to provide financial assurance. The majors knew that if for any reason the small or mid-size companies became insolvent and had not provided a financial guarantee, the majors were obligated to pay, just like in any other circumstance where multiple parties share liability in a common endeavor. And because the majors all have investment-grade credit ratings and therefore are sure bets to stay solvent, their continuing liability meant that the government could freely approve assignments to smaller companies while resting assured that someone in the chain of title would always be able to pay for decommissioning. This system of joint and several liability has worked smoothly since its inception: thousands of structures and tens of thousands of wells have been successfully decommissioned over the decades. Either the majors or small and mid-size lessees have paid for that decommissioning, with the federal government bearing virtually none of those costs. And today, the risk of liability is even lower because most Gulf infrastructure has already been decommissioned.

5.     Most of the existing Gulf of Mexico leases with decommissioning obligations have a company with an investment-grade credit rating in the chain of title. The only exceptions involve leases that were leased directly to small and mid-size companies and never held by a major company. In those situations, BOEM can require bonding from the lessee. So if a lessee becomes insolvent and cannot pay decommissioning costs, and no other solvent company shares liability for those decommissioning costs, those costs can then fall on surety companies that have guaranteed the performance of later decommissioning. In extremely rare cases where all of these backstops fail—where (1) no solvent company shares liability, either as a present lessee or predecessor in the chain of title, and (2) no surety companies have provided surety bonds to the lessees because such surety bonds weren't required by the government—the cost of decommissioning the infrastructure can fall on the government.

6.     The government has almost never paid these decommissioning liabilities. The available evidence suggests that in the entire 75-year history of offshore leasing, the government has assumed only $58 million in decommissioning liability, which it may not have even yet paid. See Hebert & Schube, *Biden's Unnecessary Regulations on Offshore Oil Rigs Threaten Jobs in Gulf States*, Miss. Bus. J. (May 24, 2024), perma.cc/ASJ6-FBQJ. That $58 million is less than 0.03% of the $208 billion in royalties and related revenues that the government has received in the past 40 years from allowing the same Gulf production to go forward. It is 0.3% of the $17 billion in decommissioning costs associated with lessee bankruptcies since 2009, with the other remaining 99.7% having been assumed by co-lessees, predecessor lessees, or sureties. And it is less than the Biden Administration spent last month on decommissioning oil and gas infrastructure in California and New Mexico. See Dep't of Interior, *Acting Dep. Sec'y Daniel-Davis Announces $25 Mil. from Pres. Biden's*

*Investing in America Agenda to Clean Up Legacy Pollution in N.M.* (May 16, 2024), perma.cc/YD2L-M56U; Dep't of Interior, *Sec'y Haaland Announces $35 Mil. from Pres. Biden's Investing in America Agenda to Clean Up Orphaned Wells in Cal.* (May 17, 2024), perma.cc/X28E-XV2A. Every penny of that $58 million has resulted exclusively from those uncommon leases in which no major company ever held title, and for which the government failed to require sufficient financial assurance from the lessee, despite its right to do so.

7.    And yet, the Biden Administration has invoked the uncommon occurrence of unpaid decommissioning liabilities to justify a singularly illogical "solution." BOEM's new Rule applies to lessees without an investment-grade credit rating—meaning the small and mid-sized independent companies, but not the majors. It thus requires those small and mid-sized companies to obtain staggering levels of new financial assurance— bonds guaranteeing later payment of decommissioning costs—from sureties for their current leases. But here's the hitch: the Rule requires these companies to obtain the new financial assurance regardless of whether an investment-grade rated company, like the major predecessors, is already in the chain of title and therefore jointly and severally liable *for precisely the same decommissioning costs*. The new Rule therefore requires the small and mid-size companies to duplicate the financial assurance that they have provided privately or the majors already represent. It "uses a nonexistent problem to heap more unnecessary costs on American energy producers." Bennett & Isaac, *Big Oil Teams Up with Big Green and Biden to Restrict Offshore Oil Production*, The Dallas Express (May 14, 2024), perma.cc/TEM3-YH5U.

8.    The newly required bonds will cost at least $6.2 billion and be impossible to obtain. Surety companies told BOEM that they would not provide those bonds.

According to the sureties, "[i]t is doubtful that there is unsecured surety capacity for $650 million in new bonds for non-investment grade operators as contemplated in the Rule, much less $6.5 billion." Providing the required bonds is financially infeasible because the cost and risk is enormous. It is also infeasible because BOEM will demand payment from the surety companies who provide these bonds once a current lessee goes insolvent, even where it could demand decommissioning from majors in the chain of title who assumed liability in the first place. In other words, BOEM is asking small and mid-size companies to acquire financial assurance from surety companies to bail out the majors from liability that the majors already assumed.

9.      Because the surety companies will not provide the newly required bonds on those terms, the small and mid-size independent companies will be unable to comply with the Rule's demands. BOEM is well aware of this fact. As a result, "[t]he new regulations are likely to put many small oil companies out of business, and the people who work for them are also likely to find themselves without jobs." Hebert & Schube, *supra*. And because this Rule puts these companies' businesses in jeopardy, surety companies that have sold them preexisting bonds or other financial assurances will demand increased collateral from them immediately. The Rule will thereby decimate oil production in the Gulf. And it will cause more bankruptcies of small and mid-sized independent companies in the industry, which will *increase* the unpaid decommissioning obligations that the Rule is supposed to mitigate.

10.     The unrebutted evidence shows the Rule will destroy 36,000 American jobs, take away $10 billion in Gross Domestic Product, and cost the government over $500 million in royalties in just ten years.

11.     The Biden Administration's financial assurance Rule is unlawful and must be stayed or enjoined until it is vacated. The Rule is contrary to law and exceeds statutory authority. In the Outer Continental Shelf Lands Act, Congress directed BOEM to promote the "expeditious and orderly development" of oil and gas reserves in the Gulf. 43 U.S.C. §1332(3). By BOEM's own admission, the Rule will do the opposite—it will cut off that development. And although Congress expressly authorized financial assurance requirements under other circumstances and under other laws, it nowhere authorized demanding the financial assurance required by the Rule.

12.     The Rule is also arbitrary and capricious for several independent reasons. It significantly overstates the amount of decommissioning liability in the Gulf of Mexico. It incorrectly assumes that sufficient surety capacity exists to support the Rule's massive additional financial assurance requirements. It disregards, but does not alter, the government's decades-long—and unquestionably successful—joint-and-several liability regime in which the government issues decommissioning orders to predecessor owners rather than calling bonds that exist on properties for which decommissioning defaults have occurred. It violates the Regulatory Flexibility Act's protections for small businesses by uniquely burdening small companies with onerous new bonding requirements when the existing joint-and-several liability regime already protects taxpayers in most circumstances. It will lead to delays in decommissioning, fails to structure bonding requirements to fit each affected company's unique risks, and inequitably benefits the major oil companies—as opposed to protecting taxpayers.

13.     The Rule does far more harm than good. It seeks to solve a problem that does not exist and, ironically, instead creates the very problem that it seeks to solve. By decreasing the financial stability of some of the Gulf's biggest producers and investors

while potentially driving some into insolvency, a greater number of decommissioning obligations would be incurred by the Federal Government. Each of these flaws independently makes the Rule invalid.

14.     A preliminary injunction is particularly appropriate in these circumstances. Plaintiffs are the State of Louisiana, the Louisiana Oil & Gas Association, the State of Mississippi, the State of Texas, the Gulf Energy Alliance, the Independent Petroleum Association of America, and the U.S. Oil & Gas Association. The Industry Plaintiffs' members are the small and mid-size independent companies whom the Rule will crush. They face irreparable harms. These harms include immediate demands by surety companies necessitated by the Rule's new paradigm, a bevy of compliance costs to acquire the additional unnecessary required surety instruments, and immediate harms to the Industry Plaintiffs' members' businesses. As for the State Plaintiffs, BOEM itself admits that the Rule will cause injury because it will eliminate royalty revenues from drilling and production that the Rule forecloses. Plaintiffs' harms are per se irreparable because the federal government enjoys sovereign immunity from any later damages action to recover them. On the other hand, BOEM has no compelling reason to force the Rule into effect before it receives proper judicial review. BOEM itself provided a "gradual" implementation period, admitting that there is no urgency in implementing the Rule.

15.     Although BOEM's approach comports with the Administration's war on domestic energy, the Rule is squarely foreclosed by the statutory regime for the expeditious development in the Gulf that Congress set out in the Outer Continental Shelf Lands Act and the statutory regime for reasoned decisionmaking that it set out in the

Administrative Procedure Act. In our nation of laws, the Executive's goals cannot trump the requirements Congress enshrined in statute. BOEM's Rule must be vacated.

## PARTIES

16.     Plaintiff State of Louisiana is a sovereign State of the United States of America. Elizabeth B. Murrill is the Attorney General of the State of Louisiana. She is authorized by Louisiana law to sue on the State's behalf. LA. CONST. art. IV, §8. Her offices are located at 1885 North Third Street, Baton Rouge, Louisiana 70802.

17.     Plaintiff Louisiana Oil & Gas Association is a trade association that was organized to represent the independent and service sectors of the oil and gas industry in Louisiana. LOGA's primary goal is to provide the industry with a working environment that will enhance it by creating incentives; warding off tax increases; changing existing, burdensome regulations; and educating the public and government of the importance of the oil and gas industry. LOGA confronts and deals directly with the many issues that are causing harm to Louisiana's oil & gas industry. The Association's members are directly regulated by the Rule. They will either have to meet the exceptions to the Rule's financial assurance requirements or post supplemental financial assurance. The vast majority of the Association's members do not meet the requirements for an exception. LOGA's headquarters are located in Baton Rouge. LOGA's members include companies in the Western District of Louisiana, including in Lake Charles.

18.     Plaintiff State of Mississippi is a sovereign State of the United States of America. Lynn Fitch is the Attorney General of the State of Mississippi. She is authorized by Mississippi law to sue on the State's behalf. Her offices are located at 550 High Street, Jackson, Mississippi 39205.

19.     Plaintiff State of Texas is a sovereign State of the United States of America. Ken Paxton is the Attorney General of the State of Texas. He is authorized by Texas law to sue on the State's behalf. Tex. Const. art. IV, §22; Tex. Gov't Code, ch. 402. His offices are located at 300 W. 15th Street, Austin, TX 78701.

20.     Plaintiff Gulf Energy Alliance is a coalition of leading independent oil and natural gas producers and allied organizations supporting policies and regulations that encourage sustainable investment, innovation, and job creation in the Gulf of Mexico. Almost all of the Alliance's members are focused exclusively on producing oil and natural gas from the Gulf. Independent oil and gas companies may not be household names, but independents are responsible for approximately 35% of the total Outer Continental Shelf ("OCS") oil and natural gas production. Independent oil and natural gas companies are small businesses that also support a host of other small businesses and professions across the Gulf South and throughout the country, including steel manufacturers, longshoremen, vessel providers, seamen, laborers, construction workers, shipyard workers, and equipment manufacturers. The Alliance's members are directly regulated by the Rule. They will either have to meet the exceptions to the Rule's financial assurance requirements or post supplemental financial assurance. The vast majority of the Alliance's members do not meet the requirements for an exception. GEA's headquarters are located in the Woodlands, Texas.

21.     Plaintiff Independent Petroleum Association of America is a national upstream trade association representing thousands of independent oil and natural gas producers and service companies across the United States. Independent producers develop 90% of the nation's oil and natural gas wells. These companies account for 54% of America's oil production, 85% of its natural gas production, and support over 2.1

million American jobs. The Association's members are directly regulated by the Rule. They will either have to meet the exceptions to the Rule's financial assurance requirements or post supplemental financial assurance. The vast majority of the Association's members do not meet the requirements for an exception. IPAA's headquarters are located in Washington, D.C.

22.     Plaintiff U.S. Oil & Gas Association is the Nation's oldest oil and gas trade association, founded in 1917. USOGA's mission is to promote national public policy that supports exploration and production for the domestic oil and natural gas industry. The Association's members are directly regulated by the Rule. They will either have to meet the exceptions to the Rule's financial assurance requirements or post supplemental financial assurance. The vast majority of the Association's members do not meet the requirements for an exception. USOGA has members in Louisiana, including in Lake Charles. USOGA's headquarters are located in Washington, D.C.

23.     Defendant United States Department of the Interior is an executive department of the United States government headquartered in Washington, D.C.

24.     Defendant Deb Haaland is the Secretary of the Interior. She is sued in her official capacity.

25.     Defendant Bureau of Ocean Energy Management is an agency within the Department of the Interior, headquartered in Washington, D.C.

26.     Defendant Elizabeth Klein is the Director of the Bureau of Ocean Energy Management. She is sued in her official capacity.

27.     Defendant Steve Feldgus is the Principal Deputy Assistant Secretary for Land and Minerals Management. He is sued in his official capacity.

28.     Defendant James Kendall is the BOEM Gulf of Mexico Regional Director. He is sued in his official capacity.

## JURISDICTION AND VENUE

29.     This Court has subject-matter jurisdiction over this case because it arises under the laws of the United States. *See* 28 U.S.C. §§1331, 1346, 1361; 5 U.S.C. §§701-06. An actual controversy exists between the parties within the meaning of 28 U.S.C. §2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief under 28 U.S.C. §§2201-02, 5 U.S.C. §§703, 705-06, and its inherent equitable powers.

30.     The Rule is final agency action that is judicially reviewable under the Administrative Procedure Act. 5 U.S.C. §§704, 706.

31.     Venue is proper in this Court under 28 U.S.C. §1391(e)(1) because (1) Defendants are United States agencies or officers sued in their official capacities, (2) the State of Louisiana is a resident of this judicial district, (3) no real property is involved, and (4) a substantial part of the events or omissions giving rise to the Complaint occurs within this judicial district. *See Atlanta & F.R. Co. v. W. Ry. Co. of Ala.*, 50 F. 790, 791 (5th Cir. 1982); *Texas v. Garland*, 2023 WL 4851893, at *2-6 (N.D. Tex. July 28).

## BACKGROUND

### I.    Congress mandated that the Executive Branch lease the Gulf of Mexico's oil and gas reserves to companies that agree to bear the costs of eventually removing infrastructure.

32.     The Gulf of Mexico's oil and gas reserves and production are essential to the American economy and American self-sufficiency. The Gulf is "the nation's primary offshore source of oil and gas, generating about 97% of all U.S. OCS oil and gas production." BOEM, *Oil & Gas - Gulf of Mexico*, perma.cc/9H6F-RCCX. Operations in the Gulf produce about 1.7 million barrels of oil and gas every day. *Gulf of Mexico Fact Sheet*,

U.S. E.I.A. (June 21, 2023), perma.cc/E5LY-TT5P. Independent oil and gas companies like the Industry Plaintiffs' members produce over one-third of Outer Continental Shelf oil and natural gas and offshore revenues to the federal government. *See GEA's Comments on BOEM's Proposed 2023–2028 Nat'l OCS Oil & Gas Leasing Program* (Oct. 6, 2022), perma.cc/82KB-UD3Z.

33.    Gulf offshore oil and gas operations were long conducted by the major companies. In 1938, an ExxonMobil precursor completed the first producing offshore well in the shallow waters off the Louisiana coast. See Opportune, *A Cost-Benefit Analysis of Increased OCS Bonding* 10 (July 13, 2023), perma.cc/Q3TH-GSU8 [hereinafter "Opportune Study"].  From then until the 1990s, major oil and gas companies conducted most offshore drilling in the Gulf. Arena Energy LLC Comment 4 (BOEM-2023-0027-2096). These major companies installed nearly all of the platforms, pipelines, and other infrastructure. *Id*. By law, the same major companies assumed the liability for the eventual costs of decommissioning that infrastructure—that is, for removing platforms, facilities, and pipelines; plugging wells; clearing the seafloor of debris—once the underlying wells were no longer profitable. By the late 1980s, the major companies had already recovered most of the shallow-water resources and made considerable profit. *Id.* at 4-5. They sought to chase larger returns in the Gulf's lucrative deep-water oil and gas fields. *Opportune Study* 10. So they began selling their shallow-water infrastructure to smaller, independent producers. For example, Cantium was established in 2016 as a full-service oil and gas operator with the sole focus of acquiring Chevron's Gulf of Mexico Shelf assets. *See, e.g.*, *Arena Energy LLC Comment* 4-5.



34.     When the major oil and gas companies sold their shallow-water leases, they retained the original decommissioning liability for the oil-and-gas infrastructure that existed on those leases at the time of sale. *See* 30 C.F.R. §250.1701. Because they built the infrastructure, they were jointly and severally liable with their successor lessees for covering decommissioning costs when operations ceased. *See GAO Report 16-40: Offshore Oil & Gas Resources* 10 (Dec. 2015), perma.cc/VY28-S9LQ*.* As BOEM itself put it in the Response to Comments that it published alongside the Final Rule, "[t]he Department's policy on financial assurance has always been that the liability for meeting performance requirements under the lease and the regulations was joint and several." *Response to Public Comments Received on the June 29, 2023 NPRM*, BOEM-2023-0027-2187 (Apr. 23, 2024) [hereinafter "Response"].

35.     Major producers clearly understood their joint and several liability for decommissioning costs: When selling offshore assets, they usually required bonds, trust accounts, or other forms of security from the buyer as part of the sale consideration to

protect against the possibility that a successor would default on its decommissioning obligations. Other times, to maximize the sale price, major companies decided to take more risk of being held jointly and severally liable and did not require such security, choosing instead to take a higher cash consideration. In either event, major producers understood that current *and* former owners who had profited by developing the infrastructure—and *not* the American taxpayer—would bear the costs of removing that infrastructure once it was no longer profitable.

36.     Most decommissioning obligations have already been satisfied under this framework. Since drilling first began in the late 1930s, about 6,900 oil and gas structures have been installed in the Gulf, and about 5,300 structures decommissioned—leaving about 1,600 active structures. Kaiser, *Shallow-water Gulf of Mexico Decommissioning Market Valued at $6.3 billion*, Offshore (Aug. 1, 2022), perma.cc/N6CN-G3FX. In this same period, more than 46,000 wells have been drilled in the Gulf, and 38,000 decommissioned, leaving about 8,000 active wells.

**A.      Congress requires oil and gas development through leasing parcels, gives the Executive Branch authority to promulgate rules governing development, and shares leasing revenues with the States.**

37.     Oil and gas are among "our most important natural resources." *Burford v. Sun Oil Co.*, 319 U.S. 315, 320 (1943). Congress enacted the Outer Continental Shelf Lands Act in 1953 "to meet the urgent need for further exploration and development of oil and gas deposits." Pub. L. 83-212, 67 Stat. 462, 468 (1953). In 1978—following the OPEC oil embargo of the early 1970s, years of declining domestic production, and dissatisfaction with management of the leasing program—Congress amended OCSLA to "establish policies and procedures for managing the oil and natural gas resources of the Outer Continental Shelf." 43 U.S.C. §1802(1). Those policies and procedures "are intended to

15

result in expedited exploration and development of the Outer Continental Shelf in order to achieve national economic and energy policy goals, assure national security, reduce dependence on foreign sources, and maintain a favorable balance of payments in world trade." *Id.*

38.     OCSLA directs the Secretary of the Interior to *promote* offshore oil and gas production. It makes OCS "resources available to meet the Nation's energy needs as rapidly as possible." *Id.* §1802(2). OCSLA accordingly directs the Secretary to make the OCS "available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs." *Id.* §1332(3). Consistent with that command, courts have long recognized that OCSLA enacts an "overriding policy of expeditious development." *Ensco Offshore Co. v. Salazar*, 781 F. Supp. 2d 332, 339 (E.D. La. 2011).

39.     OCSLA awards coastal States 27 percent of bonus bids, ground rent, and production royalties from OCS oil and gas lease sales and production in adjacent waters. 43 U.S.C. §1337(g)(2). And the Gulf of Mexico Energy Security Act ("GOMESA") entitles Gulf States to 37.5 percent of OCS revenues from areas of the Gulf of Mexico. *See* Pub. L. 109-432, §105, 120 Stat. 2922, 3004 (2006) (codified at 43 U.S.C. §1331 note).

40.     OCSLA vests the Secretary with rulemaking authority to promote expeditious development. It authorizes the Secretary to "prescribe such rules and regulations as may be necessary to carry out" the "provisions [of OCSLA] relating to the leasing of the outer Continental Shelf" and to promulgate rules that the Secretary determines to be "necessary and proper in order to provide for the prevention of waste and conservation of the natural resources of the outer Continental Shelf, and the protection of the correlative rights therein." 43 U.S.C. §1334(a). Compliance with those

regulations is a condition on "[t]he issuance and continuance in effect of any lease, or of any assignment or other transfer of any lease" under OCSLA. *Id.* §1334(b).

41.     OCSLA conspicuously does not authorize the Secretary to demand financial assurance. The parallel Mineral Leasing Act, which governs leasing on public *lands*, authorizes the Secretary to "ensure that an adequate bond, surety, or other financial arrangement will be established prior to the commencement of surface-disturbing activities on any lease." 30 U.S.C. §226(g). In OCSLA, Congress chose not to grant that power to the Secretary to demand financial assurance for leases on public *waters*.

**B.     Companies that develop Gulf infrastructure remain jointly and severally liable with later assignees for decommissioning that infrastructure.**

42.     Under current Department of Interior regulations, predecessors in title on offshore infrastructure are jointly and severally liable with current lessees and other predecessor lessees in the chain of title for the cost of decommissioning infrastructure. 30 C.F.R. §250.1701. As Interior itself explains, "[u]nder existing and longstanding regulations, all parties that accrue decommissioning obligations hold those obligations jointly and severally until those obligations are met." 88 Fed. Reg. 23,569, 23,572-73 (Apr. 18, 2023). This joint-and-several liability framework has existed for decades in federal regulations, and preexisted OCSLA as a matter of common law. Joint and several liability protects BOEM and taxpayers from paying decommissioning costs with federal funds if a current lessee cannot pay those costs. Instead of BOEM, the predecessors in title— including the majors who originally built or owned the infrastructure—must pay if the current lessee defaults. For example, Cantium's properties were all purchased from Chevron USA, which remains jointly and severally liable for any decommissioning costs.

Because Chevron USA exists in Cantium's lease's chain of title, the taxpayer is not at risk of bearing any decommissioning cost from its properties.

43.    The joint-and-several liability system is well established. Since leasing began, joint and several liability was the common-law rule. "A lessee cannot escape his duties to perform the covenants of the lease by assignment, even though the assignee may likewise incur the duty of their performance, for the lessee is bound by virtue of his contract with the lessor." Summers, *A Treaty on Oil & Gas* 580 (1927); *accord* Jones, *Problems Presented by Joint Ownership of Oil, Gas & Other Minerals*, 32 Tex. L. Rev. 697, 715 (1954) ("If there are undivided interests in a single leasehold estate, the terms and provisions of the lease are not severable but are joint as among the various undivided owners."); THORNTON ON THE LAW OF OIL AND GAS §341 (5th ed., 1932) (similar). After OCSLA was amended in 1978, Interior codified joint and several liability. By regulation, an "assignor shall be liable for all obligations under the lease accruing prior to the approval of the assignment." 44 Fed. Reg. 38,276, 38,284 (June 29, 1979).

44.    Interior has consistently reaffirmed the joint and several liability rule. In 1993, it explained that "assignors remai[n] responsible for any obligations for which the assignee was obligated[.]" 58 Fed. Reg. 45,255, 45,257 n.1 (Aug. 27, 1993). Interior therefore "hold[s] an assignor jointly liable with an assignee for performing an obligation accruing before the assignment and which continues to be due after the assignment." *Id.* The Minerals Management Service ("MMS"), BOEM's predecessor, emphasized that joint and several liability "merely codifies what has been the law under OCSLA, since enactment and the common law." 62 Fed. Reg. 27,948, 27,950 (May 22, 1997). It explained further that "neither Congress nor the Secretary [of the Interior] ever agreed to limit the liabilities of OCS lessees for operational obligations. The relevant common law rule is that

stated in Restatement of the Law of the Contracts, Second §289(1): Where two or more parties to a contract promise the same performance to the same promisee, each is bound for the whole performance thereof, whether his duty is joint, several, or joint and several[.]" *Id.*; *accord* 60 Fed. Reg. 63,011, 63,014 (Dec. 8, 1995).

45.      Interior has also rejected attempts to remove joint and several liability. As it explained, "we cannot support severance of assignor liability" for multiple reasons, including that it "would create a major increase in administrative burden for industry and Government without an appreciable reduction in risk to the Government." 62 Fed. Reg. at 27,950.

46.      Interior's Board of Land Appeals ("IBLA") has likewise rejected attempts to limit joint and several liability for decommissioning obligations.

    a.  In *EP Energy E&P Company, L.P.*, IBLA rejected a predecessor's argument that Interior must first issue decommissioning orders to current co-lessees before issuing orders to predecessors. 188 IBLA 156 (2016).

    b.  In *Devon Energy Production Co., L.P.*, IBLA rejected a predecessor's argument that Interior must first seek satisfaction of decommissioning obligations from the most recent interest holder and then proceed in reverse chronological order, as each interest holder defaults on its decommissioning obligations. 188 IBLA 268 (2016).

    c.  In *Energen Resources Corporation*, IBLA held that "[u]nder Departmental regulations and Board precedent, former lessees of an OCS lease are jointly and severally liable for decommissioning obligations related to the lease," meaning that "[w]here at least one lessee has failed to carry out decommissioning, [the Bureau of Safety and Environmental Enforcement

("BSEE")] properly orders a former lessee to perform decommissioning. BSEE is not required to proceed in reverse chronological order against the most recent lessees first." 188 IBLA 374, 375 (2016).

    d.  In *Anadarko Petroleum Corp.*, IBLA held that "the language of the joint and several liability regulation, 30 C.F.R. § 250.1701(2015), is written broadly enough to cover former lessees … who accrued obligations as to facilities installed under the authority of a lease." 187 IBLA 77, 92 (2016); *see also, e.g.*, *Fairways Offshore Expl., Inc.*, 186 IBLA 58, 64 n.5 (2015) ("[I]n the present case, the decommissioning obligations that accrued to the lessee that created Well D001 and Platform D under the authority of its lease and also accrued to successive holders of that lease, including Fairways, continues in existence until the well is permanently plugged and the platform is removed.").

47.    Interior now takes joint and several liability as a given. For example, in 2001 guidance, MMS noted that "[o]n each lease the MMS considers all lessees, operators, and operating rights interest owners to be jointly and severally liable for all lease obligations." MMS, *Oil & Gas Leasing Proc. Guidelines*, 2001 WL 36389222, at *17 (Oct. 2001). And in April 2023, BSEE squarely rejected a commentor's argument that a new rule might "diminish[] BSEE's authority to enforce joint and several liability" by clarifying that "[t]his rule does not undermine any aspect of the joint and several liability regime." 88 Fed. Reg. 23569, 23,573 (Apr. 18, 2023); *see also id.* ("Under existing and longstanding regulations, all parties that accrue decommissioning obligations hold those obligations jointly and severally until those obligations are met.").

**C.    Without identifying clear statutory authority, federal agencies have previously adopted rules requiring financial assurance from Gulf developers.**

48.    MMS and BOEM have issued regulations requiring Gulf operators and owners to provide financial assurance to Interior for decommissioning obligations. Those regulations generally require lessees to obtain financial assurance from third-party sureties who would guarantee the performance of the lessees' decommissioning obligations if the lessees defaulted. The regulations took account of joint and several liability, which drastically reduced the need for surety bonds.

49.    MMS established the modern supplemental bonding regime in 1993. 58 Fed. Reg. 45,255. The 1993 regulation required an operator to obtain a $50,000 surety bond before the issuance of a lease, a $200,000 surety bond before starting exploratory activities, and a $500,000 surety bond before starting development and production. *Id.* at 45,261-62. It also granted the Regional Director discretion to require additional security when he deems necessary based on case-by-case factors like financial ability, record of meeting obligations, and projected financial strength. *Id.*

50.    MMS explained it had to "balance" providing an "adequate level of protection in the event lessees default" against its statutory obligation to "encourag[e] the maximum economic recovery of natural gas and oil from Federal offshore leases." *Id.* at 45,256. It recognized "the costs and disincentives to additional production that higher surety bonds would impose." *Id.* Thus, MMS required bonds at a level that would *not* "hinder[] the capability of [OCS] lessees and operators to undertake OCS exploration and development operations" or place "an unnecessary burden on offshore lessees and operators." *Id.*

51.     MMS rejected a proposal to excuse an assignee from furnishing a bond if the assignor agreed to liability because under the joint-and-several liability system, the assignor remained liable regardless of whether it agreed to liability. *Id.* at 45,257. MMS explained that joint and several liability adequately protects Interior because "assignors remain 'liable for all obligations under the lease accruing prior to the approval of the assignment.'" *Id.* Such "obligations, accrued but not yet due for performance," include decommissioning obligations, which "accrue when a well is drilled or used, a platform is installed or used, or an obstruction is created." *Id.* And those decommissioning obligations "remain until" regulatory decommissioning requirements are met. *Id.* Thus, predecessors "continue[] to be jointly liable for the performance of these obligations with respect to wells or structures in existence and not plugged or removed at the time of the assignment." *Id.*

52.     MMS correctly noted that private parties understood this underlying joint-and-several liability regime and contracted accordingly. "Typically an assignment agreement between an assignor and assignee will require the assignee to meet these obligations, and to provide a performance bond or indemnity agreement to protect the assignor from potential liability to the lessor or the regulatory body for their performance." *Id.* Assignees, like Industry Plaintiffs' members, built the predecessors' liability into their deals. For example, because major companies remained jointly and severally liable for their accrued liabilities for decommissioning existing wells and infrastructure at the time of their assignments to Arena, sellers considered Arena's contractual promise to perform the required decommissioning a material part of the overall purchase price. And MMS explained that "alternative security instruments" should "facilit[ate] assignee bonding at a sufficient level to eliminate the assignor's

perceived need for a second bond not payable to the United States." 58 Fed. Reg. at 45,257. Thus, joint and several liability underlay not only the regulatory regime, but also the terms of private parties' transactions. *Id.*

53.    In setting out the financial-assurance regime, MMS considered the ability of "smaller operators or producers" to meet bonding requirements and the effect of its regulation upon competition. *Id.* at 45,258; *cf.* 43 U.S.C. §1332(3) (requiring management of the OCS "in a manner which is consistent with the maintenance of competition"). MMS determined that the limited bonding requirements were practical for smaller operators and thus would not unduly burden competition. 58 Fed. Reg. at 45,258. MMS also concluded that the rule would not "adversely affect a substantial number of small entities." *Id.* MMS also set out a list of objectives against which to measure potential alternatives. Any bonding regime, it said, should "assure lessees' financial capacity to perform lease obligations," "protect the environment" from the harms caused by failure to decommission, "[a]chieve a reasonable degree of protection at a minimum increase in costs to lessees and operators," and attain these goals in a manner that "impacts equitably on all parties who would be affected." *Id.* at 45,259. Accordingly, MMS rejected alternatives and adopted its approach that "provide[s] a greater level of protection where that protection is most needed without adding an undue burden to OCS lessees and operators." *Id.* at 45,261.

54.    This bonding regime was subject to minor amendments throughout the 1990s. For example, MMS authorized regional directors to require bonding for leases and pipeline right-of-way grants. 62 Fed. Reg. 27,948. It also authorized the regional directors to require additional security above the base amounts for lease and areawide bonds and

right-of-way grants. And MMS authorized regional directors to require bonds or other security for right-of-use and easement grants. 64 Fed. Reg. 72,756 (Dec. 28, 1999).

55.     MMS provided occasional guidance on how it would determine if it would require supplemental bonding. Its 2008 Notice to Lessees ("NTL") waived a lessee's obligation to provide additional security to cover its decommissioning liabilities if it satisfied certain financial thresholds. *See* NTL No. 2008-N07 (Aug. 28, 2008), perma.cc/X2L3-PNF9. Regional directors decided whether to require supplemental security by assessing (1) the operator's financial capacity in excess of existing and anticipated obligations, (2) the operator's historical operating record, and (3) current and estimated proven reserves of future production. *Id*. Applying those metrics, most companies were exempt from supplemental bonding if their net worth exceeded $65 million and was at least twice the amount of their estimated decommissioning liabilities, and if the company's total liabilities were no more than two to three times the value of its adjusted net worth. Interior did not fully enforce the 2008 NTL out of concern that it would lead to an increase in bond demands that would, in turn, exacerbate the increase in bankruptcies due to the oil price collapse of the mid-2010s.

**D.     The joint-and-several liability regime, together with prior financial assurance rules, has in practice protected American taxpayers.**

Joint and several liability has protected American taxpayers from bearing decommissioning costs. Most of the time, current lessees remain solvent and pay themselves. They are like USOGA member Arena Energy, which has paid in full every dollar of decommissioning costs for each of its decommissioned wells and platforms and has not passed a single dollar of decommissioning liability to U.S. taxpayers or predecessors in the chain-of-title who sold properties to Arena.

56.     Even when the current lessee goes bankrupt and cannot pay, Interior has borne next to no decommissioning costs itself. When asked how much decommissioning liability it has paid for, BOEM has acknowledged that "the Federal government and taxpayer has not had to [bear] a significant portion of the costs of decommissioning." *See Response* at 216. It did not answer its own Office of Management and Budget's request for "any numbers about how often taxpayers have been left to pay for OCS decommissioning." Since 2009, 32 bankruptcies have occurred involving offshore oil and gas leases. Those bankruptcies involved about $17 billion in decommissioning liabilities. Because of the joint-and-several liability regime, available data suggests less than one half of one percent of that total—around $58 million—was ever assumed by Interior, and it remains unclear if Interior has actually paid even that much. *Arena Energy LLC Comment* 8-9. The rest of the decommissioning liabilities resulting from the bankruptcies—about $16,942,000,000—has been assumed by other lease owners in the chain of title, precisely as the joint-and-several liability system ensures. *Id.*

57.     For example, when Fieldwood Energy, one of the largest Gulf leaseholders, went bankrupt, not a single dollar of its decommissioning liability fell to Interior. Fieldwood held $9 billion in decommissioning obligations. But liability for these obligations devolved to the predecessors in Fieldwood's chain of title, the major and large independent companies from whom Fieldwood purchased its leases. The predecessors knew of their risk of incurring such decommissioning obligations when they sold their assets to Fieldwood. They had privately required $1.5 billion in financial assurances from Fieldwood in those transactions. Once Fieldwood went bankrupt, the sureties and the predecessors—not the government—assumed the decommissioning liability. *See id.* at 9; *In re Fieldwood Energy LLC*, No. 20-33948 (Bankr. S.D. Tex.).

58.     The joint-and-several liability system has allowed Gulf energy producers to generate massive benefits for the American economy. *See Opportune Study* 26. The Gulf produces almost two million barrels of oil equivalent every day. Its oil and gas reserves heat American homes, keep down the prices of gas and other goods, and create hundreds of thousands of high-paying American jobs. *See Gulf of Mexico Oil & Gas Project Lifecycle*, EIAP (2021), perma.cc/DJL3-6CVQ; *accord United States v. Maine*, 420 U.S. 515, 527 (1975) ("The Outer Continental Shelf, since 1953, has yielded over three billion barrels of oil [and] 19 trillion m.c.f. of natural gas[.]").

59.     The approximately $58 million in decommissioning costs that have ever fallen to Interior has been offset over 300,000% by the $208 billion in royalties, bonus payments, and rental revenue that Gulf development has generated for the U.S. Treasury over the past 40 years. *See* Revenue, Dep't of Int., perma.cc/XZ6C-PNLJ. That $58 million in all-time decommissioning costs is less than the Biden Administration spent on decommissioning onshore orphaned wells in California and New Mexico last month. In that context, the Biden Administration bragged that spending taxpayer funds on decommissioning would "help create good-paying union jobs [and] catalyze economic growth and revitalization." Dep't of Interior, *Acting Dep. Sec'y Daniel-Davis Announces $25 Mil.*, *supra*; Dep't of Interior, *Sec'y Haaland Announces $35 Mil.*, *supra*.

## II.     Prior administrations identify and try to fix a discrete problem: Bankruptcies in sole-liability leases.

60.     Every penny of the approximately $58 million that Interior has assumed in decommissioning costs—a full 100%—has arisen from a discrete class of leases: those without an investment-grade party—typically a major company—in the chain of title as either a predecessor or co-lessee. That class is known as "sole liability properties." Joint and several liability does not fully shield Interior from the defaults of sole-liability

properties precisely because no predecessor or co-lessee is guaranteed to be solvent to pick up the tab. This point bears repeating: Joint and several liability has been so effective that the only decommissioning costs Interior has ever assumed—all $58 million—were from sole-liability leases. In other words, under the joint-and-several liability regime, Interior's share of decommissioning costs for leases with an investment-grade co-owner or predecessor jointly and severally liable is the roundest of numbers: Zero.

61.     Recognizing the sole-liability gap, BOEM began to further insulate itself from the risks of sole-liability leases. In light of increased producer bankruptcies in the 2010s due to oil price collapse, and of a Government Accountability Office ("GAO") report noting risks from bankruptcies, Interior began a lengthy process of trying to revise the supplemental bonding regulations. BOEM issued Notice to Lessees regarding how BOEM would determine if it would require additional security. *See* NTL No. 2016-N01 (Sept. 12, 2016), perma.cc/A826-H5WW. That 2016 NTL also proposed to expand financial assurance requirements beyond sole-liability and other high-risk leases. The Obama Administration suspended implementing the 2016 NTL for all but sole liability properties. Given "BOEM's continued assessment that sole liability properties represent the greatest programmatic risk to the American taxpayer," there was no need to go beyond them. *BOEM Prioritizes Implementation of Risk Mgmt. and Fin. Assurance Program* (Jan. 6, 2017), perma.cc/5TNY-F8BA.

62.     Under the Trump Administration, the rest of the 2016 NTL remained suspended. The Administration worked with stakeholders to design a financial assurance system that would minimize risk to BOEM's budget and the American taxpayer without unduly burdening OCS development. *BOEM Withdraws Sole Liability Orders* (Feb. 17, 2017), perma.cc/W7EA-ZPPW. The baseline regulatory regime throughout the Trump

Administration required only "high-risk companies to bond only their sole liability properties." *See Regulatory Impact Analysis: Risk Management and Financial Assurance for OCS Lease and Grant Obligations*, Dep't of Interior, RIN: 1010-AE14, at 14 (Apr. 2024), perma.cc/6YW9-M672 [hereinafter "RIA"]. Under this regime, BOEM required supplemental bonding for a lessee only where "there is no jointly and severally liable party (e.g., a predecessor lessee or co-lessee) on whom BSEE may rely for the performance of decommissioning if the current lessee is unable to do so." *Id.*

63.    The Trump Administration's study and collaboration with stakeholders resulted in a notice of proposed rulemaking issued in October 2020. 85 Fed. Reg. 65,904 (Oct. 16, 2020). The 2020 Proposed Rule targeted the only actual risk to Interior's budget: sole-liability properties. BOEM recognized that it was required by OCSLA to balance its goal of protecting BOEM with its statutory obligation to "ensur[e] that the financial assurance program does not detrimentally affect offshore investment or position American offshore exploration and production companies at a competitive disadvantage." *Id.* at 65,907. To do so, BOEM proposed to "primarily consider a lessee's *or its predecessor's* credit rating," and focus primarily on credit rating instead of net worth. *Id.* (emphasis added). The 2020 Proposed Rule "would be rooted in the joint and several liability of all lessees, co-lessees, and predecessor lessees for all non-monetary obligations." *Id.* After all, for non-sole liability properties, "a predecessor lessee can be called upon to preform required decommissioning." *Id.* The 2020 Proposed Rule thus acknowledged "the larger universe of companies to whom BSEE can look for performance under the law, and so would reduce the circumstances under which BOEM would need to require additional security." *Id.*

64.     Given the foundation of joint and several liability, BOEM proposed to require supplemental financial assurance only for the high-risk leases: those without an investment-grade co-owner or predecessor in the chain of title. *Id.* at 65,910. Under the 2020 Proposed Rule, BOEM would first look to whether the current lessees met certain financial risk requirements. *Id.* at 65,911. If the current lessees did not meet the threshold, BOEM would look to the proved oil and gas reserves on the lease. *Id.* If those did not meet a specified threshold, BOEM "would look to the credit ratings of prior lessees." *Id.* at 65,912. Only if "no predecessor lessee liable for decommissioning any facilities on the lease meets the credit rating or proxy credit ratings criteria" would the Regional Director be able to require additional security. *Id.* The Regional Director would also be authorized to "require the lessee to provide additional security for decommissioning obligations for which [a predecessor who meets the credit rating criteria] is not" jointly and several liable. *Id.*

65.     BOEM's 2020 Proposed Rule protected Interior from the only actual risks— sole-liability properties—while avoiding crippling costs on small and independent oil and gas companies that had companies that met the credit rating criteria in the chain of title that were jointly and severally liable for decommissioning costs. BOEM sought to "balance" protecting Interior from "the cost of meeting the obligations of lessees" against "the costs and disincentives to additional exploration, development and production that are imposed on lessees and grant holders by increased amounts of surety bonds and other security requirements." *Id.* at 65,910.

**III.     The Biden Administration adopts the devastating Final Rule as the next front in its war against Gulf oil and gas development.**

66.     After conducting a climate-change review under President Biden's Executive Order 13990, the Biden Administration abandoned the 2020 Proposed Rule. *See*

E.O. 13990, *Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis*, 86 Fed. Reg. 7,037 (Jan. 25, 2021).

A. **In 2023, BOEM proposed a rule with bonding requirements that disregard seven decades of joint and several liability.**

67.     Late last summer, President Biden confirmed that he is still "pushing really, very hard" to "stop all the drilling … in the Gulf." Breslin, *supra*. Mr. Biden "ran for president on the most ambitious climate action platform of any major presidential candidate in U.S. history." *Tracking Progress: Climate Action Under the Biden Administration*, WRI (Jan. 29, 2024), perma.cc/Y79L-GR9C. He implemented that platform with an onslaught of (usually) unilateral actions intended to eliminate domestic oil and gas production. *See id.* His previous attempts have included a moratorium on lease sales, *see* E.O. 13990, *supra*, an extra-statutory penalty on anything including greenhouse gases, *Fact Sheet: Biden-Harris Administration Announces New Actions to Reduce Greenhouse Gas Emissions and Combat the Climate Crisis* (Sept. 21, 2023), perma.cc/BJ3B-EWUE**,** and a ban on granting liquefied natural gas export licenses, *see Fact Sheet: Biden-Harris Administration Announces Temporary Pause on Pending Approvals of Liquefied Natural Gas Exports* (Jan. 26, 2024), perma.cc/A55Y-D9VL. He has "deployed a sweeping regulatory agenda" to "end America's use of conventional energy." *Biden's Radical, Anti-Fossil Fuel Energy Policy Costs Americans Dearly*, Heritage Foundation (Jun. 28, 2022), perma.cc/F4ZY-C3W5**.**

68.     Last June, the Biden Administration's BOEM issued a Proposed Rule in line with those unilateral actions. *Risk Management and Financial Assurance for OCS Lease and Grant Obligations*, 88 Fed. Reg. 42,136 (Jun. 29, 2023). BOEM knew that, if allowed to go into effect, the Proposed Rule would stop most small and mid-size independent oil and

gas companies from drilling and producing in the Gulf. The Proposed Rule represented an about-face from the 2020 Proposed Rule—and from BOEM's policy since the Obama Administration—of requiring supplemental bonds only for sole-liability properties. It was nothing short of a complete reorganization of financial assurance requirements.

69.     The 2023 Proposed Rule's financial assurance criteria applied even to leases with an investment-grade company in the chain of title jointly and severally liable for decommissioning. Like the 2020 Proposed Rule, it sought to shift the focus of the supplemental bond assessment from a company's net worth to a company's credit rating, albeit imposing a higher credit rating threshold than provided in the 2020 Proposed Rule. BOEM would not require companies with an investment-grade credit rating to provide supplemental bonds; it would exempt such companies from those requirements. Independent producers overwhelmingly do not have the investment-grade credit rating. But the 2023 Proposed Rule looked only to the credit rating of the *current* lessee or co-lessee to determine if supplemental financial assurance was necessary, not the predecessors who shared that liability. The Proposed Rule's disregard for joint and several liability made most independent producers—the majority of OCS operators—liable for supplemental bonds as if they had no investment-grade entities in their chain of title.

70.     The 2023 Proposed Rule concluded that potential defaults by investment-grade companies pose no material risk to the taxpayer. *Id.* at 42,143. It therefore exempted leases in which one or more of the *current* lessees were investment-grade companies. But under the law of joint and several liability, investment-grade companies have the same legal obligation to perform decommissioning as predecessors as they do as current lessees. Therefore, by BOEM's own logic—and as a matter of historical fact—there is no

31

risk to the taxpayer for decommissioning defaults on any property in which an investment-grade company is in the chain of title, regardless of whether it is a current lessee or predecessor. Yet the 2023 Proposed Rule looked only to current lessees.

71.     The 2023 Proposed Rule required that, if no current lessee qualified as investment-grade, then current lessees would be obligated to obtain supplemental financial assurance for the full decommissioning obligations of their leases. It allowed for reductions based only on having a co-lessee with an investment-grade credit rating and the value of oil and gas reserves on a lease, unit, or field basis. It estimated that it would require lessees to obtain billions of dollars in new financial assurance. *Id*. at 42,136.

72.     The new proposed supplemental bonding regime could work in two ways, the second one of which would be far worse. Under Scenario 1, BSEE could call the new supplemental bonds only *after* it attempted to require all predecessor lessees to cover decommissioning costs. In other words, the major predecessors in title would remain jointly and severally liable, and the surety bonds would be merely the last line of defense before Interior would have to bear decommissioning costs. Surety companies would be more likely to provide the bonds under Scenario 1, knowing that they would come last. Under Scenario 2, BSEE could call the new supplemental bonds from surety companies immediately upon the current lessee's default, *before* demanding jointly and severally liable predecessors to pay for decommissioning. In other words, the new surety bonds would bail out major predecessors in title, insulating them from their liability.

73.     Those two alternatives can be depicted graphically by the green (Scenario 1) and red (Scenario 2) dotted lines below:



74.     Current lessees like Industry Plaintiffs' members will not be able to obtain the required bonds under Scenario 2. For obvious reasons, it is easier for surety companies to guarantee payment by the combination of current and predecessor lessees than by the *current* lessees alone. Especially when the chain of title almost always includes investment-grade companies. But the Proposed Rule refused to say which version it was proposing. The surety industry emphasized the need to know. *See CAC Specialty Comment* 3 (BOEM-2023-0027-1201); *SFAA Comment* (BOEM-2023-0027-1998).

75.     The Proposed Rule drew many comments in opposition. Commentators noted the Proposed Rule's devastating impact on industry. *E.g., GEA et al. Comment* 10 (BOEM-2023-0027-1155) ("catastrophic economic damage," including hundreds of millions of dollars in annual compliance costs). Similarly, many commentors noted the irreparable harm the Proposed Rule would impose on the development of OCS resources. *E.g., Opportune LLP Comment* 3 (BOEM-2023-0027-1991) (explaining "dollar-for-dollar reduction of the lessee's borrowing base that would otherwise be used for actual

development, operating and decommissioning costs"). Opportune LLP did an exhaustive cost-benefit analysis of the Proposed Rule that found several fundamental flaws, including that the "perceived benefits of additional bonding requirements remain wholly disproportionate to any potential risk." *Opportune Study* 4. Other commentors emphasized the industry's reliance on the longstanding joint-and-several liability regime. *E.g.*, *W&T Comment* 7 (BOEM-2023-0027-1989) (explaining that the Rule "would upset industry planning founded on the existing regime" because of investments predicated on joint and several liability). And sureties pointed out that the market did not have capacity to meet the bonding requirement if BSEE could call upon the bonds before calling on predecessors for decommissioning costs. *See CAC Specialty Comment* 2-3; *SFAA Comment* 3-4. Several commentors also noted that the Proposed Rule would decrease the royalties due to BOEM and the States. *State of Louisiana Comment* 3; *Opportune LLP Comment* 7; *GEA et al. Comment* 5, 21. And the industry explained that the Rule would re-trade decades of commercial transactions and benefit only predecessors, harming competition. *See GEA et al. Comment* 8-9. Finally, the Small Business Administration offered a scathing assessment, noting that "only small businesses are harmed by the proposal," which "jeopardizes taxpayers and the environment by making future abandonments and bankruptcy more likely." *SBA Comment* 4 (BOEM-2023-0027-1699).[1]

**B.    BOEM adopts the Final Rule with no meaningful changes from its Proposed Rule, imposing unprecedented bonding requirements.**

76.    BOEM forged ahead with its ill-considered revisions to decades of settled policy by publishing the Final Rule on April 24, 2024. *See* 89 Fed. Reg. 31,544.

---

[1] The Office of Information and Regulatory Affairs also passed the Proposed Rule back to BOEM *three times*. The passbacks were made publicly available then later deleted, but Plaintiffs retained the versions that were made publicly available.

Notwithstanding the comments pointing out fundamental flaws with the Proposed Rule and its underlying analysis and justification, the Final Rule tracks the major provisions of the Proposed Rule. The Rule demands, upon determination by the Regional Director, "supplemental financial assurance." *Id.* at 31,594. BOEM claims it needs the supplemental financial assurance to assure that it does not assume decommissioning costs from defaulting operators. *Id.* at 31,544.

77.     The Rule authorizes the Regional Director to demand new financial assurance from a lessee if the current lessee or co-lessee does not have (1) an investment-grade credit rating or (2) a 3-to-1 ratio of value of proved reserves to associated decommissioning liability. *Id.* at 31,545. First, it exempts from this additional requirement cases where a lessee (or its present co-lessee) has "an investment grade credit rating" or its equivalent. *Id.* In effect, the credit-rating provision essentially exempts only major and very large independent companies. *Id.* Second, it exempts leases with "proved oil and gas reserves" worth three times the value of their associated decommissioning. *Id.* That condition is not met with respect to a substantial number of leases that are otherwise covered.

78.     For everyone else, BOEM may now demand that lessees and grant holders provide new financial assurance that will "ensure compliance with your lease obligations, including decommissioning obligations." 89 Fed. Reg. at 31,545. BOEM estimates that the new financial assurance costs will be on the order of $6.9 *billion*. *Id.* at 31,544. BOEM will not discount them for present value, even though most decommissioning will take place well into the future. The Rule conditions BOEM's approval of "any new transfer or assignment of any lease interest" on meeting these new "financial assurance demands." *Id.* at 31,556.

79.   BOEM expressly rejects commentors' requests to exempt lessees from the new financial assurance requirements if they have an investment-grade company in the chain of title jointly and severally liable for any decommissioning costs. *Id.* at 31,554. Despite recognizing that a lease is not high-risk if it is covered by the joint and several liability of an investment-grade co-lessee, BOEM refuses the same conclusion for leases that are covered by this precise same protection from a predecessor lessee. *Id.*

80.   The Rule also forecloses any meaningful ability to obtain review of a financial assurance demand letter through the IBLA. It requires a lessee to post an appeal bond in the amount of the demanded decommissioning liability should it wish to appeal a financial assurance demand. *Id.* at 31,560. Appeal bonds are provided by the same market that supports surety bonds generally. So for the same reasons surety capacity does not exist, appeal bond capacity will not exist.

81.   BOEM admits that the Rule "could have a significant financial impact on affected companies" who "will realize an increased compliance cost in the form of bonding premiums." *Id.* at 31,546. BOEM itself estimated that "small companies could incur $421 million (7 percent discounting) in annualized compliance costs from [the Rule's] changes." RIA 70; 89 Fed. Reg. at 31,564. BOEM also admits that the Rule's "higher compliance costs could make the U.S. OCS less competitive in a global oil market." 89 Fed. Reg. at 31,564.

82.   Though BOEM relies on taxpayer protection as its main rationale for the Rule, BOEM nowhere quantifies the amount of decommissioning liability the taxpayer has had to bear in the history of OCS energy production. *See generally* 89 Fed. Reg. 31,544. Nor does it attempt to estimate how much realistic risk the taxpayer faces from decommissioning. Instead, BOEM relies on the fact of bankruptcies alone to justify the

full sweep of the Rule. 89 Fed. Reg. at 31,548. But it never acknowledges that for almost all cited bankruptcies, there was an investment-grade predecessor in title, so taxpayers bore none of the decommissioning costs. Rather, BOEM relies on the hypothetical that a bankruptcy "*could* result in the American taxpayer paying the cost to plug those wells and decommission that abandoned infrastructure," *id.* at 31,548 (emphasis added)— without explaining why given jointly and severally liable predecessors and other existing financial security.

83.    The only explanation BOEM gives in the Rule for rejecting the common-sense solution of focusing on leases without a financially strong predecessor is that such an approach "would not sufficiently protect the taxpayer." *Id.* at 31,553. According to BOEM, "there are approximately $14.6 billion in decommissioning liabilities associated with leases without an investment grade predecessors in the chain of title, of which only $460 million is associated with sole liability properties." *Id.* But this response is misleading and ignores what commentors actually proposed. It overstates the decommissioning liabilities of leases without investment grade predecessors in the chain of title, which is in fact $1.2 billion, about $761 million of which has *already* been covered by previous bonding to BOEM. *Opportune Study* 6. And it ignores that commentors proposed that financial assurance requirements should focus on leases "for which there are no financially strong co-owners or predecessors in the chain of title." *Arena Energy LLC Comment* 10. BOEM itself proposed this same approach in the 2020 Proposed Rule. *See* 85 Fed. Reg. at 65,910. So the supposed $14.6 billion of decommissioning costs involving no investment-grade company in the chain of title would be covered by commentors' position that supplemental bonds could be appropriate when no financially strong co-owner or predecessor exists in the chain of title, but not otherwise.

84.    What benefits did BOEM calculate would result from the billions in monetizable costs the Rule imposes on the industry? None. That's right: BOEM admits that it was unable to come up with any quantifiable benefit of the Rule whatsoever. 89 Fed. Reg. at 31,575; RIA 56-57. As the GAO report to Congress about the Rule put it, although the Rule will lead to at least $559 million annually in quantifiable costs, "BOEM did *not* provide quantified benefits." *Report Under 5 U.S.C. §801(a)(2)(A) on a Major Rule*, GAO (May 14, 2024), perma.cc/6YY9-A6ZB (emphasis added).

85.    Making matters worse, BOEM admits that beside the quantifiable $559 million annual costs, the Rule will result in additional unquantifiable costs from "foregone [sic] production and royalties." 89 Fed. Reg. at 31,576. BOEM acknowledges who will bear the brunt of those quantifiable costs: "small entities" will be "responsible" for most of the compliance costs. *Id.* Small entities, it continues, "are responsible for $11.6 billion, or approximately 80 percent, of the current $14.6 liability of non-investment-grade owners." *Id.* Similarly, it notes that the Rule "could negatively impact the competitiveness of the OCS against other opportunities for investment and development." *Id.*

86.    Despite relentless demands from commentors that BOEM clarify whether it would adopt Scenario 1 or Scenario 2, BOEM refused to explicitly answer. *See* 89 Fed. Reg. at 31,564. As a result, surety companies must assume Scenario 2—that their bonds can be called *before* predecessors. Then, after publication of the Rule, BOEM confirmed to Congress that it implicitly adopted Scenario 2. When Representative Garret Graves asked whether BOEM would demand the newly required bonds "before going after the predecessor lessees," Acting Director Klein said yes. "We would be going to those financial assurance requirements before we went to predecessors." H. Comm. Nat. Res.,

*Examining the President's FY 2025 Budget Request for BOEM, BSEE, and ONRR* (May 23, 2024), perma.cc/5FFX-K7HM [1:02:15 in video].

87.    So BOEM has adopted Scenario 2. It has replaced the joint and several liability system with a system that effectively puts all liability on current lessees. Its new system bails out the major predecessors from sharing the decommissioning liability that they agreed to and can share. In practice, it will jeopardize the operations of small and mid-size companies because surety companies will not be willing to provide these unnecessary increased bonds. The Rule does not directly outlaw the small and mid-size oil and gas industry, but it accomplishes the same end by "cutting off [its] oxygen supply." *NRA v. Vullo*, 2024 WL 2751216, at *10 (U.S. May 30).

## IV.    The Final Rule causes immediate and devastating harms across all parts of the OCS production chain that an order vacating the Rule would redress.

88.    The Rule imposes devastating and immediate effects on Gulf drilling. The Rule expects that independent oil and gas companies have immediate access to capital to meet the requirements. Nothing could be further from the truth. The surety market has been crystal clear that it cannot provide the coverage required under the Rule without exacting crippling levels of collateral from independent producers. As they explained, surety market availability does not exist for the $6.9 billion in supplemental financial assurance under the parameters set out by, and for the types of companies in the oil and gas industry subject to, the Rule.

89.    The Rule overwhelmingly targets small businesses who are least able to take on those costs. And it hits at a time when the surety market for OCS development is already on the ropes. *E.g.*, CAC Specialty Comment 2-3 ("Markets have withdrawn, capacity is low, reinsurance expenses and losses have driven up rates, and the carriers

have some very negative case law concerning their product," so taking on the additional bonds would be a "potentially futile exercise"); SFAA Comment.

90.    If allowed to take effect, the Rule will force lessees to obtain financial assurance for approximately $6.9 billion in additional decommissioning liabilities. The surety industry will not be able to provide anything close to that amount. *See CAC Specialty Comment* 2-3. If they were to provide bonds to cover the new amount, they would require prohibitive levels of cash collateral. As a result, Interior will be entitled to stop operations and production on the basis of noncompliance, putting operators out of business. Before then, surety companies will be entitled to demand additional collateral from lessees on their existing bonds. They will demand that additional collateral immediately because the Rule makes sureties less able to guarantee that the lessees will remain solvent, which in turn requires greater collateral. Even if the surety capacity existed and companies could comply with the Rule, compliance would cost $559 million to $573 million every year. RIA at 7-8.

91.    If allowed to take effect, the Rule will result in a decrease in production of about 55 million barrels of oil from the Gulf of Mexico over a ten-year period. *Opportune Study* 7. Over that same timeframe, the Rule will destroy 36,000 jobs, prevent the payment of $573 million in royalties to the U.S. Treasury, divest the States of their statutorily entitled royalties, and cause a GDP decline of $9.9 billion, concentrated in the Gulf Coast States. *Id.*

92.    Not only will the Rule undermine OCS development, but it will also undermine its own extra-statutory objective of preventing decommissioning costs from being passed on to Interior. By throttling independents' capital, the Rule will slow their current decommissioning activities, increasing the potential universe of orphaned properties.

"Diverting [hundreds of millions of dollars] of capital per year to unnecessary bonds will reduce the capital available for decommissioning campaigns which will prolong the presence of wells and platforms in the Gulf which increases the potential decommissioning liability that is present in the event the current owner defaults or files for bankruptcy protection." *GEA et al. Comment* 19. "Like a Greek Tragedy," the sureties warned, "the BOEM's actions could expedite the outcomes it wished to avoid." *CAC Specialty Comment* 2. The Final Rule imposes devastating and immediate effects on Gulf drilling. The Rule assumes that independent oil and gas companies have access to unlimited capital at low annual rates. Nothing could be further from the truth. The surety market has been crystal clear that it cannot provide the coverage required under the Rule without exacting crippling levels of collateral from independent producers. The Rule overwhelmingly targets small businesses who are least able to take on those costs. And it hits at a time when the surety market for OCS development is already on the ropes. *See CAC Comment*; *SFAA Comment*.

93.    The Rule directly regulates the members of all Industry Plaintiffs. When "the plaintiff is himself an object of the action (or forgone action) at issue … there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561-62 (1992); *accord Contender Farms v. Dep't of Agric.*, 779 F.3d 258, 266 (5th Cir. 2015). Under the Rule, the Regional Director can directly subject Industry Plaintiffs' members to demands for supplemental bonds. Those members are unlikely to qualify for the Rule's exemptions based on their credit ratings or proven reserves. Thus, BOEM can call upon them at any time to provide the crushing supplemental bonds. And because those bonds will be impossible to obtain, BOEM can bring enforcement actions against

them and prevent them from operating their assets. An order vacating the Rule would redress this injury because without the Rule's authorization, the Regional Director would lack authority to impose those new bonding requirements.

94.     Industry Plaintiffs' members also suffer a barrage of monetary harms. *See, e.g., TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021) ("[C]ertain harms readily qualify as concrete injuries under Article III. The most obvious are traditional tangible harms, such as … monetary harms."). The Rule will immediately cause surety companies to demand additional collateral from the members on their *existing* bonds. The Rule makes them less able to guarantee that the lessees will remain solvent, which in turn requires greater collateral. The members will therefore either lose money by paying more collateral or lose those guarantees and thereby the right to continue their operations.

95.     The Rule also harms the Industry Plaintiffs through immediate compliance costs for their members. BOEM itself estimated that "small companies could incur $421 million (7 percent discounting) in annualized compliance costs from [the Rule's] changes." *Id.* at 31,564. It is already imposing immediate compliance costs. "An increased regulatory burden typically satisfies the injury in fact requirement." *Contender Farms*, 779 F.3d at 266. The Rule is also depriving members of access to funds. And it is torpedoing their business plans. For example, Cantium is currently going through a sales process. The Final Rule has already scared potential purchasers from moving forward with a bid because of the uncertainty, the unknown future cost, and the potential to severely impact liquidity. Any one of these injuries satisfies Article III.

96.     Additionally, Industry Plaintiffs have standing because the Rule singles their members out for increased regulatory burdens while exempting their competitors. *See Time Warner Cable, Inc. v. Hudson*, 667 F.3d 630, 636 (5th Cir. 2012) ("There can be no

dispute that the plaintiffs are the object of the government action here where [the challenged law] singles out certain incumbent operators as ineligible for the benefit of a statewide franchise."). The Rule exempts the major oil and gas companies that Plaintiffs' members compete with because they have investment-grade credit ratings. *See* Richards, *supra.*

97.     Plaintiffs suffer "not only imminent, but actual injury." *Am. Fed'n of Lab. v. Chertoff*, 552 F. Supp. 2d 999, 1014 (N.D. Cal. 2007). "The new rule presents [lessees] with the Hobson's choice of complying with [BOEM's] 'safe harbor' procedures or confronting liability" for being unable to post the required financial assurance. *Id.* at 1013.

98.     Industry Plaintiffs have standing to bring these claims on behalf of their members. Their members independently satisfy Article III because the Rule directly regulates them, and they are injured directly. *See infra*. Industry Plaintiffs seek to protect interests that are germane to their purposes because Industry Plaintiffs exist precisely to protect their members from unreasonable financial assurance requirements. *See, e.g.*, Gulf Energy Alliance, gulfenergyalliance.com (describing mission to "develop a reasonable framework for financial assurance requirements which protects the U.S. taxpayer and allows for a viable and thriving offshore oil & gas industry"). And "there's no reason to believe that [Industry Plaintiffs are] unable to represent [their] members' interests without their individual participation." *Texas v. NRC*, 78 F.4th 827, 837 (5th Cir. 2023).

99.     The Rule also harms Plaintiffs Louisiana, Mississippi, and Texas. States have standing to challenge actions that cause them "a direct injury in the form of a loss of specific tax revenues." *Wyoming v. Oklahoma*, 502 U.S. 437, 448 (1992); *accord Gladstone, Realtors v. Vill. of Bellwood*, 441 U.S. 91, 110-11 (1979), *limited on other grounds by Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 175 (2011); *Bank of Am. Corp. v. City of Miami*, 581 U.S.

189, 197 (2017). When a party "entitled to ... revenues derived from [leasing]" challenges an agency action likely to reduce those revenues, it "[c]learly" has standing. *Arkla Expl. Co. v. Texas Oil & Gas Corp.*, 734 F.2d 347, 354 & n.9 (8th Cir. 1984). Here, Louisiana, Mississippi, Texas, and their political subdivisions receive a share of proceeds from the leases covered by the Rule, which they use for coastal restoration and other important projects. The Rule increases the cost of oil and gas operations, making them prohibitively costly in some circumstances. Reducing oil and gas operations necessarily will reduce the States' royalty revenue. The Rule is projected to prevent the payment of $573 million in royalties to the U.S. Treasury and thereby divest the States of their statutorily entitled royalties. *Opportune Study* 24. Because of the Rule, Louisiana alone is projected to lose $521 million in GOMESA revenue over the next decade. Because of the Rule, Mississippi is projected to lose $178 million in GOMESA revenue over the next decade. And Texas is projected to lose $320 million.

100.   The Rule's publication itself directly causes those harms. And vacatur would redress Plaintiffs' harms. As noted, the Rule's publication itself sent shockwaves through the surety industry, and will force sureties to demand crushing levels of collateral from the Industry Plaintiffs' members. *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019) (courts can take into account "the predictable effect of Government action on the decisions of third parties"). The Regional Director's new authority to require this unprecedented level of supplemental bonding is having transformational effects on the surety market, investment decisions, and lessees' economic outlook. Immediately, sureties will demand increased collateral, lessees will incur compliance costs, and States will lose revenue. Lessees are scrambling to come up with the increased collateral that sureties will demand to cover the required new supplemental bonds. Because most

lessees do not have this collateral, they will immediately have to begin to wind down operations if the Rule is not enjoined. So even before the government has issued a demand letter, the Rule is devastating Industry Plaintiffs' members.

101.   Nor can lessees wait to receive a demand letter and then challenge the Rule through such an enforcement action. Sureties will flee the market and demand impossible levels of collateral to provide the newly required bonds long before the government issues a demand letter. Beyond that, the Rule itself makes challenging a demand letter impossible by requiring a demand letter's recipient to post an appeal bond in the amount of the estimated decommissioning liability set forth in the demand letter. 89 Fed. Reg. at 31,560. Appeal bonds are provided by the same market that supports surety bonds generally. Lessees cannot post that appellate bond. So that forecloses any meaningful avenue for review.

102.   The whole point of APA preenforcement review is to avoid such bet-the-farm propositions. *See, e.g., Abbott Lab'ys v. Gardner*, 387 U.S. 136, 150 (1967); *see also, e.g., Free Enter. Fund v. PCAOB*, 561 U.S. 477, 490 (2010) ("We normally do not require plaintiffs to 'bet the farm ... by taking the violative action.'"); *Contender Farms*, 779 F.3d at 267. And the Court has been clear that regulated parties "need not assume such risks while waiting for [an agency] to 'drop the hammer' in order to have their day in court." *U.S. Army Corps of Engineers v. Hawkes Co.*, 578 U.S. 590, 600 (2016).

103.   Vacatur would redress Plaintiffs' injuries. The Rule vests the Regional Director with authority to demand the new crushing levels of supplemental bonds. Without that authority, the Regional Director could not issue demand letters for the crushing levels of financial assurance authorized by the Rule, which in turn causes Plaintiffs' other injuries. *See Contender Farms*, 779 F.3d at 266; *see also Lujan*, 504 U.S. at

561-62 (when "the plaintiff is himself an object of the action (or forgone action) at issue … there is ordinarily little question … that a judgment preventing or requiring the action will redress it").

104.    Plaintiffs have a cause of action under the APA because the Rule constitutes final agency action. It was "promulgated through a formal, notice-and-comment rulemaking process after announcement in the Federal Register," so it is final and reviewable. *Texas*, 497 F.3d at 499. It is the "consummation" of BOEM's "decision making process," *Hawkes Co.*, 578 U.S. at 597, because it finally determines that BOEM can demand new surety bonds from Industry Plaintiffs' members. And legal consequences flow from this action: The Rule gives the Regional Director new authority to demand bonds under new criteria, and sets new criteria to exclude entities from supplemental financial assurance demands. *Texas v. EEOC*, 933 F.3d 433, 441-42 (5th Cir. 2019). It also "creates safe harbors protecting private parties from adverse action," *id.* at 442, because it exempts certain major and investment-grade companies, 89 Fed. Reg. at 31,545.

105.    The Rule immediately and irreparably harms Plaintiffs. "To show irreparable injury if threatened action is not enjoined, it is not necessary to demonstrate that harm is inevitable and irreparable." *Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*, 804 F.2d 1390, 1394 (5th Cir. 1986). Instead, Plaintiffs need only "demonstrate 'a substantial threat of irreparable injury' if the injunction is not issued." *Louisiana*, 622 F. Supp. 3d at 297 (quoting *Texas v. United States*, 809 F.3d 134, 186 (5th Cir. 2015)). "For the injury to be sufficiently 'irreparable,' plaintiffs need only show they 'cannot be undone through monetary remedies.'" *Id.* (quoting *Burgess v. FDIC*, 871 F.3d 297, 304 (5th Cir. 2017))). "Even purely economic costs may count as irreparable harm 'where they cannot be recovered in the ordinary course of litigation.'" *Rest. Law Ctr. v. DOL*, 66 F.4th 593, 597

(5th Cir. 2023). That means financial harm is irreparable where federal agencies "enjoy sovereign immunity for any monetary damages" and plaintiffs lack a "guarantee of eventual recovery." *Wages & White Lion*, 16 F.4th at 1142 (quotation omitted). And courts have consistently found that the harms caused by agency actions that throttle oil and gas production on the Gulf are irreparable. *See Louisiana v. Haaland*, 2023 WL 6450134, at *9 (W.D. La. Sept. 21); *Louisiana*, 622 F. Supp. 3d at 297; *Ensco Offshore Co.*, 781 F. Supp. 2d at 340; *Hornbeck*, 696 F. Supp. 2d at 638-39.

106.    Don't take Plaintiffs' word for it. BOEM itself admits that the Rule will create immediate and devastating effects. The final regulatory impact analysis states that the Rule will impose immediate compliance costs on industry of between $81.4 million and $84.5 million in 2024 alone. RIA at 52. It also states that the Rule's "higher compliance costs could make the U.S. OCS less competitive in a global oil market." 89 Fed. Reg. at 31,564. BOEM also admits that the Rule imposes an "immediate regulatory burden on lessees and grant holder," and seeks to "reduc[e]"—but not entirely eliminate—such "immediate" burden by providing for a three-tiered compliance approach and giving further flexibility to the Regional Director. *Id*. at 31,570. But such an approach gives industry cold comfort. Immediately upon the Rule's effective date, lessees could be required to submit to crushing supplemental bond demands. More to the point, mitigated harms are still harms—and BOEM would have no need to mitigate the harms to industry if the Rule didn't cause them from Day One.

107.    A wide range of irreparable harms flow just from the Rule's publication. Those harms affect the surety market, investment decisions, and lessees' economic outlook. For example, sureties have already informed Industry Plaintiffs' members that they will be demanding increased collateral on existing bonds due to the Rule. Plaintiffs'

members have already received partial collateral demands on existing bonds. Because of the Rule, Industry Plaintiffs' members have lost access to funds and potential purchases of their property.

108.     Because most lessees cannot meet demands for as much as 100% collateral on new bonds, they may be required to immediately begin winding down operations if the Rule is not enjoined. In short, "[t]he rights involved here are more than economic: the plaintiff's operations in the Gulf of Mexico are threatened with endless disability." *Ensco Offshore Co.*, 781 F. Supp. 2d at 340. They will cause premature shutdowns and bankruptcies. Already, Plaintiffs' contracts and investments have been thrown into disarray. *Cf. Hornbeck*, 696 F. Supp. 2d at 638-39 ("Some of the plaintiffs' contracts have been affected; the Court is persuaded that it is only a matter of time before more business and jobs and livelihoods will be lost.").

109.     Finally, Industry Plaintiffs' members already have to invest time and money into compliance measures. Plaintiffs' members are spending enormous amounts of time and money in ongoing compliance costs as they prepare to attempt to navigate this Rule. Plaintiff States also face irreparable harm to their statutorily-entitled revenue from leases under OCSLA and GOMESA. The Rule is projected to prevent the payment of $573 million in royalties to the U.S. Treasury and thereby divest Louisiana of its statutorily entitled revenue. *Opportune Study* 24. Louisiana alone is projected to lose $521 million in GOMESA royalty payments from the Rule. Mississippi is projected to lose $178 million from the Rule. *Id.* Texas is projected to lose $320 million from the Rule. *Id.* Such compliance costs and lost revenue are irreparable. "[C]omplying with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs." *Texas v. EPA*, 829 F.3d at 433 (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200,

220-21, (1994) (Scalia, J., concurring in part and in the judgment)); *see also id*. at 434 ("Here Petitioners have raised threatened harms—including unemployment and the permanent closure of plants—that would arise during the litigation if a stay is not granted, that are irreparable, and that are great in magnitude.").

110.   These harms are irreparable to Industry Plaintiffs' members and to the State Plaintiffs. Just as when the Obama Administration tried to place a moratorium on drilling, "the effect on employment, jobs, loss of domestic energy supplies caused by the moratorium as the plaintiffs (and other suppliers, and the rigs themselves) lose business, and the movement of the rigs to other sites around the world will clearly ripple throughout the economy in this region." *Hornbeck*, 696 F. Supp. 2d at 639. And because sovereign immunity prevents Plaintiffs from recovering monetary losses caused by the federal government, Plaintiffs' and their members' economic harms are irreparable. *See Wages & White Lion Invs*., 16 F.4th at 1142 ("Complying with an agency order later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs ... because federal agencies generally enjoy sovereign immunity for any monetary damages." (cleaned up)).

111.   The public interest and balance of equities weigh in favor of granting a preliminary injunction or stay. Simply put, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Louisiana v. Biden*, 55 F.4th 1017, 1035 (5th Cir. 2022). This "invalid agency decision … simply cannot justify the immeasurable effect on the [States], the local economy, the Gulf region, and the critical present-day aspect of the availability of domestic energy in this country." *Hornbeck*, 696 F. Supp. 2d at 639. And while Plaintiffs would suffer irreparable harm if this Court does not enjoin the Rule, the only harm to Defendants from an injunction would be having to wait for Congress to

grant them authority to act. *See Louisiana*, 622 F. Supp. 3d at 298. Indeed, as noted above, BOEM itself is unable to identify any quantifiable benefit from the Final Rule. Finally, "[t]he public interest is also served by maintaining our constitutional structure ... even, or perhaps particularly, when those decisions frustrate government officials." *BST Holdings, LLC v. OSHA*, 17 F.4th 604, 618-19 (5th Cir. 2021). The public interest and balance of harms thus weigh sharply in Plaintiffs' favor. *See Hornbeck*, 696 F. Supp. 2d at 639 ("An invalid agency decision to suspend drilling of wells in depths of over 500 feet simply cannot justify the immeasurable effect on the plaintiffs, the local economy, the Gulf region, and the critical present-day aspect of the availability of domestic energy in this country.").

112.    This Court should enjoin or stay the entire Rule. An agency's "inclusion of an express severability clause is 'an aid merely; not an inexorable command.'" *Texas v. United States*, 2023 WL 5951196, at *17 (S.D. Tex. Sept. 13) (quoting *Reno v. ACLU*, 521 U.S. 844, n. 49 (1997)). Before a court can sever a rule, it must first find that the rule satisfies two conditions. "First, the court must determine that 'the agency would have adopted the same disposition regarding the unchallenged portion [of the regulation] if the challenged portion were subtracted.'" *Id.* (quoting *Sierra Club v. FERC*, 867 F.3d 1357, 1366 (D.C. Cir. 2017)). "Second, the parts of the regulation that remain must 'function sensibly without the stricken provision.'" *Id.* (quoting *Carlson v. Postal Regulatory Comm'n*, 938 F.3d 337, 351 (D.C. Cir. 2019)).

113.    BOEM included a boilerplate severability statement. But the rulemaking record confirms that the Rule would not exist without the provisions precluding BOEM from considering predecessor liability when determining supplemental financial assurance levels. BOEM expends much effort rejecting alternatives that would remove or

modify those provisions. And BOEM expressly states that "[t]he difference between the 2020 proposed rule," which it rejected, and the Rule "is the reliance on predecessors for determining if supplemental financial assurance from the current lessee is required." *Response* at 32. In short, BOEM expressly rejected proposals to adopt a Rule that retained the predecessor provisions. These decisions confirm that BOEM would not have proceeded with the Rule if this provision were severed. *Texas*, 2023 WL 5951196, at *18 (severance inappropriate when agency "expressly rejected" proposals to remove challenged provisions from final rule). Indeed, BOEM acknowledged it was "worried that the case re: severability may be rather weak in places" and included the severability language at the White House's insistence.

114.    Severability is inappropriate for another reason. BOEM viewed the refusal to consider predecessor liability as central to its regime, such that the other parts of the Rule could not function without it. BOEM repeatedly states that considering predecessor liability would not accomplish its rulemaking objective of protecting taxpayers. Plaintiffs obviously disagree with that view. But the record confirms that BOEM's position is that the Rule could not function without this provision. *Cf. Belmont Mun. Light Dep't v. FERC*, 38 F.4th 173, 187 (D.C. Cir. 2022) ("[W]hether an agency order is severable turns on the agency's intent."). Because BOEM makes clear throughout the record that it did not think a regime allowing the Regional Director to consider predecessor liability would adequately protect the taxpayer, this provision is not severable. *See State of N.C. v. FERC*, 730 F.2d 790, 796 (D.C. Cir. 1984) (Scalia, J.) ("Where there is substantial doubt that the agency would have adopted the same disposition regarding the unchallenged portion if the challenged portion were subtracted, partial affirmance is improper.").

**CLAIMS FOR RELIEF**

**COUNT I**
**The Final Rule Is Contrary to Law**
**(5 U.S.C. §706; 43 U.S.C. §1334(a); 43 U.S.C. §1344(a))**

115.    Plaintiffs repeat and incorporate by reference each of the Complaint's allegations stated above.

116.    A reviewing court must vacate a rule that is "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. §706(2)(A), (C).

117.    The Rule is not a permissible exercise of BOEM's authority under OCSLA. To exercise authority under OCSLA, BOEM must prove that its action is "necessary and proper in order to provide for the prevention of waste and conservation of the natural resources of the outer Continental Shelf, and the protection of the correlative rights therein." 43 U.S.C. §1334(a). The necessary-and-proper limitation "at a minimum requires that [the Rule's] benefits reasonably outweigh its costs." *Mexican Gulf Fishing Co. v. Commerce*, 60 F.4th 956, 965 (5th Cir. 2023).[2]

118.    BOEM fails to show how the Rule is necessary and proper to any statutory goal. The Rule is not necessary and proper to the "prevention of waste," the "conservation of the natural resources of the outer Continental Shelf," or "the protection of the correlative rights therein." 43 U.S.C. §1334(a). The Rule also does not assure "national security," *id.* §1334(a)(2)(A), "reduce dependence on foreign sources," *id.* §1802(1), ensure the "expedited exploration and development of the Outer Continental

---

[2] Courts have long observed that the terms "necessary and proper" and "necessary and appropriate" convey the same meaning. *See, e.g.*, *United States v. Whaley*, 577 F.3d 254, 260 (5th Cir. 2009) ("As the Court said in the *Shreveport Rate Cases*, the Necessary and Proper Clause does not give 'Congress ... the authority to regulate the internal commerce of a State, as such,' but it does allow Congress 'to take all measures necessary or appropriate to' the effective regulation of the interstate market, 'although intrastate transactions ... may thereby be controlled.'").

Shelf to achieve national economic and energy policy goals," *id.*, "maintain a favorable balance of payments in world trade," *id.*, or advance any other statutory purpose, *see* Pub.L. 95-372 (1978); *see also Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 593-94 (D.C. Cir. 2015). BOEM never once shows how the Rule is reasonably related to a single statutory goal.

119.    BOEM fails to show that the Rule is necessary and proper to anything because it does not establish that the "expected costs associated with the" Rule are "reasonably related to its expected benefits." *Mexican Gulf Fishing*, 60 F.4th at 966. BOEM's own numbers show how disproportionate the Rule's costs are to its benefits. By BOEM's own calculations, the quantitative benefit of the Rule is zero. 89 Fed. Reg. at 31,575; RIA 56-57; *see also Report Under 5 U.S.C. §801(a)(2)(A) on a Major Rule*, *supra* ("BOEM did not provide quantified benefits."). At most, the Rule responds to the $391 million in total risk for leases without an investment grade company in the chain of title. *See Opportune Study* 23. By contrast, BOEM estimates direct industry costs over the next two decades of $5.9 billion to $8.5 *billion*. RIA at 6. That equals $559 million to $573 million every year, falling mostly on small entities. RIA at 7-8. An independent cost-benefit analysis revealed that the Rule will result in about $10 *billion* in net cost to the taxpayer from decreased production, lost exploration and development, and resulting lost royalties and jobs. *Opportune Study* 24. The Rule will result in approximately 36,000 lost Gulf jobs, $2.8 billion in lost revenue for the Gulf alone, 55 million barrels-of-oil-equivalent less production, and "nearly $573 million in lost royalties to the federal government." *Id.* at 24.[3]

---

[3] BOEM does not dispute these numbers or point out any flaws in the underlying study. Quite the opposite, BOEM accepted that Opportune's analysis was based on sounder data than its own initial analysis, and employed it in its final analysis. RIA at 28.

120.    Although "the cost of compliance" may not be "unreasonable if the [regulation] in fact alleviates a grave danger," there is not "in fact" a grave danger to BOEM here. *Mexican Gulf Fishing Co.*, 60 F.4th at 966. By BOEM's own accounting, only $391 million in decommissioning liabilities are not covered by a surety or investment-grade predecessor. *Opportune Study* 23. The remaining liabilities that the Rule targets pose no risk to BOEM. Worse, the Rule itself *increases* whatever risk it purports to address because it will cause the bankruptcies that lead to those liabilities going unpaid. As a result of these injuries, the Rule significantly increases the chance that the small and mid-size companies will not be able to afford decommissioning liabilities when they do arise. An appropriate rule would avoid imposing these billions of dollars in costs, such as by limiting supplemental financial assurance to leases without an investment-grade company in the chain of title. *See* Bennett & Isaac, *supra* ("Why impose billions of dollars in extra costs to solve a problem that so far has only cost in the tens of millions?"). Because the Rule's costs are not reasonably related to any benefit, it violates OCSLA's "necessary and proper" limitation. *Mexican Gulf Fishing Co.*, 60 F.4th at 966.

121.    This is an independent ground for vacatur.

## Count II
### The Final Rule Is Contrary to Law
### (5 U.S.C. §706; 43 U.S.C. §1802(1))

122.    Plaintiffs repeat and incorporate by reference each of the Complaint's allegations stated above.

123.    A reviewing court must vacate a rule that is "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. §706(2)(A), (C).

124.    Congress enacted OCSLA to provide for the "expedited exploration and development of the Outer Continental Shelf." 43 U.S.C. §1802(1); *see Ensco Offshore Co.*,

781 F. Supp. 2d at 339 (in OCSLA, Congress enacted an "overriding policy of expeditious development"). It did so "in order to achieve national economic and energy policy goals, assure national security, reduce dependence on foreign sources, and maintain a favorable balance of payments in world trade." 43 U.S.C. §1802(1). OCSLA makes OCS "resources available to meet the Nation's energy needs as rapidly as possible" and seeks "to preserve and maintain free enterprise competition." *Id.* §1802(2). Congress directed the Secretary to make OCS resources "available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs." *Id.* §1332(3). "Interior has a statutory obligation to make the Shelf available for development to meet national energy needs." *Gulf Restoration Network v. Haaland*, 47 F.4th 795, 800 (D.C. Cir. 2022).

125.   The Rule disobeys OCSLA's express requirements for expedited development of the OCS's oil and gas resources. 43 U.S.C. §1802(1); §1332(3). BOEM never once mentions those requirements. In fact, BOEM repeatedly admits that the Rule does the opposite. BOEM confesses that its "action may *adversely affect[] in a material way the productivity, competition, or prices in the energy sector*." 89 Fed. Reg. at 31,585 (emphasis added). BOEM added that "[b]y increasing industry compliance costs, the regulation could adversely make the U.S. offshore oil and gas sector less attractive than regions with lower operating costs." *Id.* BOEM also admitted that the increased costs the Rule imposes "may depress the value of offshore assets or cause continuing production to become uneconomic sooner, leading to shorter-than otherwise useful life and potentially a loss of production." *Id.* And given the Rule's higher compliance costs, Industry Plaintiffs' "resources could also become uneconomic more quickly, leading to an earlier-than-otherwise cessation of production and a potential loss of production and royalties." *Id.* at

73-74. BOEM's admissions establish from its own mouth that the Rule is not "consistent with the maintenance of competition," will not "result in expedited exploration and development of the Outer Continental Shelf," and will not make OCS "resources available to meet the Nation's energy needs as rapidly as possible." 43 U.S.C. §1802(2). By consciously defying statutory objectives, BOEM acted contrary to law.

126.    BOEM cannot find any statutory basis for defying Congress's mandate. First, it points to protecting Interior from decommissioning costs. 89 Fed. Reg. at 31,547. Even if the Rule actually would advance that goal, protecting Interior's budget is not a *statutory* objective. And a non-statutory objective cannot be pursued at the cost of statutory objectives; agencies "are bound" by the "purposes Congress has selected." *MCI Telecomm'ns Corp. v. AT&T*, 512 U.S. 218, 230 n.4 (1994); *accord Gresham v. Azar*, 950 F.3d 93, 104 (D.C. Cir. 2020), *vacated on mootness grounds* 142 S.Ct. 1665 (2022) ("While we have held that it is not [unlawful] to prioritize one statutorily identified objective over another, it is an entirely different matter to prioritize non-statutory objectives to the exclusion of the statutory purpose."). Next, BOEM points to President Biden's Executive Order 13990, which calls for review of Trump-era actions based on climate change. But executive orders cannot defeat statutory requirements. *HIAS, Inc. v. Trump*, 985 F.3d 309, 325 (4th Cir. 2021); *Louisiana*, 622 F. Supp. 3d at 289-90. Next, BOEM points to 43 U.S.C. §§1338a and 1344(a)(1). But §1338a simply creates an exception to the Miscellaneous Receipts Act, 31 U.S.C. §3302(b), by allowing forfeited bonds to accrete to BOEM rather than the Treasury. *See* Pub. L. 118-42, 138 Stat 25 (Mar. 9, 2024), *to be codified at* 43 U.S.C. §1338a. And §1344(a)(1) applies only to the Secretary's work on five-year leasing plans, which this Rule is not a part of. Neither provision grants rulemaking authority or licenses BOEM to ignore OCSLA's mandates. Finally, BOEM points to its supposedly longstanding

policy preference that "current leaseholders should be held primarily responsible for the obligations on their leases and that the current leaseholders should have the financial condition to uphold those obligations." *Response* at 34. Even if that preference were longstanding, agency policy preferences cannot trump statutory factors, *see Qwest Corp. v. FCC*, 258 F.3d 1191, 1200 (10th Cir. 2001).

127.   BOEM would have this Court believe that Congress mandated OCS development and simultaneously contradicted itself by giving BOEM the power to throttle that development. Because Congress did no such thing, the Rule is contrary to law.

128.   This is an independent ground for vacatur.

**COUNT III**
**The Final Rule Exceeds Statutory Jurisdiction or Authority**
**(5 U.S.C. §706)**

129.   Plaintiffs repeat and incorporate by reference each of the Complaint's allegations stated above.

130.   A reviewing court must vacate a rule that is "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. §706(2)(A), (C).

131.   Like all agencies, BOEM "'literally has no power to act' … unless and until Congress authorizes it to do so by statute." *FEC v. Cruz*, 596 U.S. 289, 301 (2022) (quoting *La. Publ. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986)). BOEM invokes two statutes as sources of power to issue its new supplemental bonding regime. Neither grants that power.

132.   *First*, BOEM relies on 43 U.S.C. §1334(a), which grants it limited rulemaking authority to issue "necessary" regulations. But such a "grant of authority to promulgate 'necessary' regulations cannot expand the scope of the provisions the agency is tasked

57

with" implementing. *Gulf Fishermens Ass'n v. Nat'l Marine Fishing Servs.*, 968 F.3d 454, 465 (5th Cir. 2020). Congress set out in OCSLA several ends for which BOEM can regulate. Protecting Interior's budget is not one of them. BOEM never even tries to tie its budget-protecting purpose to any statutory goal actually enumerated in OCSLA.

133.   *Second*, BOEM invokes 43 U.S.C. §1338a, which creates a new exception to the Miscellaneous Receipts Act. Section 1338a recognizes that OCS "bond[s]" exist and governs how the receipts from those bonds can be used, but does not grant BOEM any power to require new bonds. *See* §1338a. BOEM also contends that those two provisions put together equal rulemaking authority. But "[t]his nothing-equals-something argument is barred by [Fifth Circuit] precedent." *Gulf Fishermens Ass'n*, 968 F.3d at 460.

134.   OCSLA's other provisions further undermine BOEM's claimed authority to adopt the Rule. "Where Congress has consistently made express its delegation of a particular power, its silence is strong evidence that it did not intend to grant the power." *Marshall v. Gibson's Products of Plano*, 584 F.2d 668, 676 (5th Cir. 1978). In OCSLA, Congress expressly granted BOEM power to require financial assurance in *other* circumstances, but was silent as to the power BOEM claims now. In particular, OCSLA authorizes the Secretary to demand a "performance bond" "with a surety satisfactory to the Secretary" for certain *exploration work commitments*. 43 U.S.C. §1337(a)(7)(A). And OCSLA authorizes the Secretary to demand a "surety bond or other form of security" "for activities *not* otherwise authorized in this subchapter," such as the production of renewable energy. *Id.* §1337(p)(1), (6) (emphasis added). But everyone agrees that these two express powers to demand bonds do not cover the Rule. And that Congress was silent as to any similar power to demand surety bonds beyond these two categories. "It stands to reason that when Congress has made an explicit delegation of authority to an

agency," as it did in the first two provisions, "Congress did not intend to delegate additional authority *sub silentio*," as BOEM claims now. *Texas v. United States*, 497 F.3d 491, 503 (5th Cir. 2007).

135.   Worse, in the parallel statute governing leasing on federal *lands*, Congress explicitly delegated the exact financial assurance authority BOEM is lacking here. "When Congress includes particular language in one statutory provision, and excludes it in another, we generally assume that Congress did so intentionally." *Uniroyal Chem. Co. v. Deltech Corp.*, 160 F.3d 238, 244 n.9 (5th Cir. 1998). The Mineral Leasing Act confirms that Congress knows exactly how to authorize the Secretary to require the decommissioning bonds that BOEM claims it can require here. The MLA expressly authorizes the Secretary to "by rule or regulation, establish such standards as may be necessary to ensure that an adequate bond, surety, or other financial arrangement" is posted "to ensure the complete and timely reclamation of the lease tract, and the restoration of any lands or surface waters adversely affected by lease operations after the abandonment or cessation of oil and gas operations on the lease." 30 U.S.C. §226(g). "Obviously, then, when Congress wished to provide" authority to demand financial assurance, "it knew how to do so and did so expressly." *Touche Ross & Co. v. Redington*, 442 U.S. 560, 572 (1979). Interior therefore cannot derive this same power from OCSLA's absence of any such authority. *See also Nat'l Ass'n of Private Fund Managers v. SEC*, 2024 WL 2836655, at *9-11 (5th Cir. June 5) (holding that SEC lacked statutory authority to regulate private investors under broad generic rulemaking authority covering all "investors" because sister statute imposed more specific authority and clearly did not apply to private investors).

136.   Even if BOEM had authority to require some amount of financial assurance, BOEM cannot use this incidental power to fundamentally transform Gulf

leasing in a way that destroys OCSLA's enumerated ends. A delegation of "general rulemaking power" does not imply that Congress has "delegated its authority to settle or amend major social and economic policy decisions." *West Virginia v. EPA*, 597 U.S. 697, 730 (2022) (cleaned up). Rather, when an agency claims the power to "restructure the American energy market," as BOEM does, it must point to "something more than a merely plausible textual basis for the agency action;" it must point to "clear congressional authorization for the power it claims." *Id.* at 723-24 (cleaned up); *see also Biden v. Nebraska*, 143 S.Ct. 2355, 2375 (2023) (when an executive action raises "a question of deep 'economic and political significance,'" courts do "not assume that Congress entrusted that task to an agency without a clear statement to that effect"). The balance between protecting Interior from decommissioning cost and expeditiously developing the Gulf is among "[t]he basic and consequential tradeoffs" that the Constitution reserves for Congress. *West Virginia*, 597 U.S. at 730. Because Congress did not clearly authorize BOEM to require financial assurance with the potential to cripple the industry, the Rule exceeds BOEM's statutory authority. *Id.* at 730.

137.    This is an independent ground for vacatur.

**COUNT IV**
**The Final Rule Is Arbitrary and Capricious**
**(Relies on Flawed Cost-Benefit Analysis)**
**(5 U.S.C. §706)**

138.    Plaintiffs repeat and incorporate by reference each of the Complaint's allegations stated above.

139.    The APA commands courts to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. §706(2)(A). "[D]ue deference to agencies does not make arbitrary and capricious

review 'toothless'; rather, it has 'serious bite.'" *Louisiana v. DOE*, 90 F.4th 461, 470 (5th Cir. 2024).

140.   BOEM's cost-benefit analysis makes the Rule "arbitrary and capricious" because BOEM failed to properly "consider[] the costs and benefits associated with the regulation." *Mexican Gulf Fishing Co.*, 60 F.4th at 973; *Chamber of Com. v. SEC*, 85 F.4th 760, 776 n.22 (5th Cir. 2023) ("An agency's decision to rely on a cost-benefit analysis as part of its rulemaking can 'render the rule unreasonable' if the analysis rests on a 'serious flaw.'") (cleaned up). BOEM did not (because it could not) quantify *any* benefit from the Rule. Meanwhile, the Rule imposes breathtaking costs, with estimates ranging from $6.2 billion to more than $10 billion. Rather than explain how the Rule could be reasonable despite that cosmic disparity between benefits and costs, BOEM "inconsistently and opportunistically framed the costs and benefits of the rule; failed adequately to quantify the certain costs or to explain why those costs could not be quantified; neglected to support its predictive judgments; contradicted itself; and failed to respond to substantial problems raised by commenters." *Bus. Roundtable v. SEC*, 647 F.3d 1144, 1148-49 (D.C. Cir. 2011). The Rule's "insignificant benefits"—read: nonexistent benefits—"do not bear a rational relationship to the" self-evidently "serious" costs it imposes. *Mexican Gulf Fishing*, 60 F.4th at 973. "As a result," the Rule "is arbitrary and capricious." *Id.*

141.   This an independent ground for vacatur.

**COUNT V**
**The Final Rule Is Arbitrary and Capricious**
**(Solution in Search of a Problem)**
**(5 U.S.C. §706)**

142.   Plaintiffs repeat and incorporate by reference each of the Complaint's allegations stated above.

143.    The Rule is a solution in search of a problem because it ignores the bedrock joint-and-several liability system that has protected American taxpayers from decommissioning costs since Gulf drilling began. "Rules are not adopted in search of regulatory problems to solve; they are adopted to correct problems with existing regulatory requirements that an agency has delegated authority to address." *N.Y. Stock Exch. v. SEC*, 962 F.3d 541, 556-57 (D.C. Cir. 2020). A regulation is arbitrary and must be vacated when an agency cannot show there is "actually a problem" that the regulation solves. *Chamber of Com.*, 85 F.4th at 777; *see also N.Y. Stock Exch.*, 962 F.3d at 556 (regulations "must be designed to address identified problems").

144.    BOEM fails to clear that starting block. As explained, the possibility that Interior must bear decommissioning obligations for properties with an investment-grade company in the chain of title is at best theoretical: That has *never happened* in more than 70 years of offshore oil and gas production. Due to joint and several liability, every penny in decommissioning obligations Interior has assumed has arisen from leases without an investment-grade company in the chain of title. There's *no risk* that Interior will bear decommissioning liabilities for properties with an investment grade rated oil and gas company in the chain of title. BOEM's Rule requires supplemental bonding in those circumstances, so it solves no actual problem. It purports "to fix what wasn't broken." Hebert & Schube, *supra*.

145.    And the risk is naturally diminishing. Of the 6,900 oil and gas structures that have ever been installed in the Gulf, about 5,300 structures have *already* been decommissioned—leaving merely 1,600 active structures. Kaiser, *supra***.** "[T]he industry is removing platforms at a rate of 111 platforms each year, which is being conducted almost entirely by independent oil and gas companies." *GEA et al. Comment* 10. Even

allowing for the agency's predictive judgment against the evidence, there is simply no problem for the new Rule to remedy. *N.Y. Stock Exch.*, 962 F.3d at 554 (vacating a rule because the agency failed to explain "what problems with the existing regulatory requirements it meant for the Rule to correct").



146.   As designed, the Rule is oblivious to the de minimis risk it seeks to address. "A reasoned response to uncertainty about matters of low probability or low magnitude should be markedly different from those of high probability and magnitude." *Chamber of Com.*, 85 F.4th at 778. BOEM's "solution" of $6.9 billion in new surety requirements implies an underlying $6.9 billion problem. But the unrebutted evidence demonstrates that the extent of the problem is (at most) in the tens of millions, not billions. "Tolerance of uncertainty varies depending on considerations of likelihood and severity." *Id.* Here, because of the joint-and-several liability regime, the likelihood and severity of any harm to Interior is vanishingly low—orders of magnitude lower than $6.9 billion.

147.    And even if Interior faces a risk of paying decommissioning costs, BOEM's Rule bears no rational connection to that risk. Its exemption of investment-grade companies acknowledges that there is no risk as to the vast majority of leases, for which investment-grade companies are jointly and severally liable. And it disregards how few properties lack an investment-grade company in the chain of title. Only about "7 percent" of remaining decommissioning liability is "associated with properties in which the Majors and Large Independents are not part of the current ownership or previous chain-of-title." *Opportune Study* 6. That decommissioning liability is for a maximum of $1.2 billion, but of that, "about $761 million in bonding has *already* been posted (to the benefit of BOEM) … leaving an estimated uncovered risk to the taxpayer of $391 million." *Id.* Every dime Interior has ever paid for offshore decommissioning has resulted from properties without an investment-grade company in the chain of title. By definition, those properties do not benefit from the joint-and-several liability regime that covers the vast majority of outstanding Gulf decommissioning liabilities. Because those leases alone have given rise to Interior payments, any rational rule would focus only on those properties.

148.    This an independent ground for vacatur.

**COUNT VI**
**The Final Rule Is Arbitrary and Capricious**
**(Ignores Statutory Factors)**
**(5 U.S.C. §706)**

149.    Plaintiffs repeat and incorporate by reference each of the Complaint's allegations stated above.

150.    Agencies must consider and address "relevant factor[s]" in the "statutory scheme." *Louisiana*, 90 F.4th at 473. Merely "stating that a factor was considered … is not a substitute for considering it." *Id.* BOEM did not engage with OCSLA's statutory factors.

151.   BOEM itself acknowledges that the Rule will have detrimental impacts on virtually every statutory consideration—development, competition, the balance of trade, and the Nation's energy supply. Yet BOEM still elevates its concern with a nonstatutory factor—decommissioning costs—above Congress's factors. *Ala.-Tombigbee Rivers Coal. v. Kempthorne*, 477 F.3d 1250, 1254 (11th Cir. 2007) (action arbitrary and capricious when "the agency has relied on factors which Congress has not intended it to consider"); *see also Qwest Corp.*, 258 F.3d at 1200 (agency may not "depart from" statutory principles "altogether to achieve some other goal").

152.   By abandoning the statutory factors, BOEM also silently departed from its past policy of balancing the need for financial assurance with OCSLA's expeditious development command. *See, e.g.*, 58 Fed. Reg. 45,255, 45,256 (Aug. 27, 1993). That departure from past policy alone is arbitrary and capricious. *Louisiana*, 90 F.4th at 469.

153.   BOEM frankly admits to seeking to shield predecessors from decommissioning liability, but never explains how doing so advances OCSLA's goals. BOEM does not address the obvious concern, raised persistently by commentors such as the Small Business Administration, that the Rule systematically targets small businesses with crushing new regulatory requirements while exempting and bailing out massive producers. *See, e.g.*, *SBA Comment.* BOEM admits that the Rule will protect the predecessor majors and have an adverse impact on small business, *see* RIA at 73-74, and seems to relish this outcome as a purge of "high risk" companies, by which it means all non-major producers, 89 Fed. Reg. at 31,560. Yet BOEM never explains how this insulation of major oil and gas companies from competition by independent producers advances the statutory goal "to preserve and maintain free enterprise competition." 43 U.S.C. §1802(2). That failure is no surprise; the Rule *upends* competition.

154.     This is an independent ground for vacatur.

**COUNT VII**
**The Final Rule Is Arbitrary and Capricious**
**(Failure to Consider Surety Market)**
**(5 U.S.C. §706)**

155.   Plaintiffs repeat and incorporate by reference each of the Complaint's allegations stated above.

156.   As part of the "searching and careful" arbitrary-and-capricious review, courts must ensure that the agency did not "entirely fail[] to consider an important aspect of the problem" that it seeks to address. *Univ. of Texas M.D. Anderson Cancer Ctr. v. HHS*, 985 F.3d 472, 475 (5th Cir. 2021). "Put simply, [courts] must set aside any action premised on reasoning that fails to account for 'relevant factors' or evinces 'a clear error of judgment.'" *Id.* Mere "conclusory statements … do not constitute adequate agency consideration of an important aspect of a problem." *Louisiana*, 90 F.4th at 473. BOEM failed to consider several important aspects of the problem. Each standing alone warrants vacatur.

157.   BOEM based the Rule on fictional assumptions about the surety market. Surety industry comments made clear that the surety market does not have the capacity for an additional $6.9 billion in bonding. *CAC Specialty Comment* 3; *SFAA Comment* 7-8. BOEM ignores that the surety market has sustained significant loses—over $2 billion—in recent years and that sureties are increasingly reluctant to maintain even the current levels of bonding, much less a massive increase. *GEA et al. Comment* 23; *CAC Specialty Comment* 3; *SFAA Comment* 7-8.

158.   BOEM either disregards or does not understand the nature of the surety market. BOEM assumes that increased pricing will provide adequate incentive for sureties to add capacity to the OCS bonding market. True, in many markets, price

increases typically increase supply. But this assumption does not apply to the surety market. Unlike the international insurance market, sureties do not pool risk. In fact, the law precludes sureties from pooling risk. In determining whether to write bonds, and at what cost, sureties do not account for a pool of risks where liability is spread across underwriters and claimants. Instead, sureties underwrite each specific risk based on a zero-loss framework. That means the surety industry will likely not provide the additional bonds without the lessee posting substantial cash collateral. The surety market cannot generate additional capacity, and lessees will not be able to source the necessary collateral to induce sureties to write new bonds totaling $6.9 billion. Even if both of those hurdles were cleared, the cost of both the collateral and the bonds would dwarf the actual risk to BOEM and would substantially erode the underlying economics of offshore development, to the detriment mostly of small businesses.

159.    BOEM also ignored comments from the surety industry about the industry's inability to provide enough bonding capacity and the inability of the targeted companies to provide enough collateral. BOEM instead insists, without evidence, that lessees can rely upon Treasury securities, a decommissioning account, third-party guarantees, or other form of security in addition to surety bonds. 89 Fed. Reg. at 31,562. But those forms of security, raised for the first time in the Rule, have the same problem as sureties—the lack of sufficient collateral available to lessees. And now that BOEM has confirmed that "[w]e would be going to those financial assurance requirements before we went to predecessors," *Examining the President's FY 2025 Budget Request*, *supra* [1:02:15 in video], surety companies will certainly refuse to provide the required bonds.

160.    This an independent ground for vacatur.

## COUNT VIII
### The Final Rule Is Arbitrary and Capricious
### (Arbitrarily Targets Small Companies)
### (5 U.S.C. §706)

161.   Plaintiffs repeat and incorporate by reference each of the Complaint's allegations stated above.

162.   The Rule arbitrarily picks winners and losers without regard to OCSLA's expeditious development requirement. The Rule does not make the taxpayer the winner. Rather, the Rule singles out as big winners the massive oil companies—large, sophisticated, international companies that sold their leases to smaller independents knowing that they remained jointly and severally liable for decommissioning obligations. *See* Richards, *Biden's New Offshore Ally: Oil Majors*, Politico (Dec. 11, 2023), perma.cc/3D22-T72U (noting that major oil companies support Rule because it "stiffen[s] regulation of the nation's oil and gas program," helps "major oil companies like Chevron, Shell, and BP" while hurting the "midsize oil companies"). Indeed, these major oil companies helped develop the Rule. *See* McGinnis, *Despite Warnings, Biden Admin Finalizes Rule That Could Cripple Many Offshore Oil Companies*, RealClearPolitics (May 29, 2024) ("Records obtained via the Freedom of Information Act show private meetings between Interior officials and representatives of the major oil companies as they cooperated on this rule."). The Rule requires nothing from those companies, which have an average net worth of $115 billion, and in fact bails them out from the future decommissioning costs that they knowingly and voluntarily assumed.

163.   By the government's own logic there is no need for additional security on any property in which there is an investment-grade company in the chain of title, let alone security that can be called before those major predecessors are asked to pay. Its decision

to treat such properties differently based solely on whether the *current* lessee is a small or mid-size company is arbitrary and capricious and fails to hold up upon any examination:

- BOEM exempts investment-grade current lessees from the Rule because it has concluded that potential defaults by those companies pose no material risk to the taxpayer.

- The overwhelming majority of decommissioning liability in the Gulf has an investment-grade company in the chain of title.

- Under the law of joint and several liability that controls in the Gulf, investment-grade companies have the same legal obligation to perform decommissioning whether as current lessees or predecessors.

- By the government's own logic, there is no material risk to the taxpayer for decommissioning defaults on any property in which an investment-grade company is in the chain of title, regardless whether as current lessees or predecessors.

- Therefore, no additional bonding is required to protect taxpayers from defaults on any properties that have investment-grade companies in the chain of title.

Yet the Rule requires enormous additional bonding for exactly those properties if the current lessee or co-lessee is not an investment grade-rated company. The Rule's own justification proves that it was designed not to help taxpayers, but to drive out small and mid-size independent lessees. *See* Bennett & Isaac, *supra*.

Requiring independents to post supplemental bonds under these circumstances benefits only the large investment-grade oil and gas companies to the detriment of the independents. The Rule re-trades decades of private commercial transactions to the majors' benefit. Because major companies remained jointly and severally liable, they considered the assignee's contractual promise to perform the required decommissioning a material part of the overall purchase price. Certain transactions required relatively high levels of private party security, which resulted in the lowest relative upfront cash proceeds price for the underlying assets because the cost of that future private security

was quantified and discounted from the total purchase price. Alternatively, other sellers sought to maximize near-term cash and required less private party security, in which case the assignee would pay more upfront cash and the sellers retained more future contractual counterparty risk. These private transactions have resulted in $3 billion in private bonds in existence today to secure decommissioning liability. *Arena Energy LLC Comment* 17. Unfortunately, a large portion of these private bonds are not recognized by BOEM, and assets already covered by private bonds would have to be double-bonded per the Rule. *Id.*

164.    The Rule is especially punitive toward independents by ignoring these billions in private bonds and instead mandating double-bonding for the same liabilities. Independents who were forced to purchase bonds to protect predecessors from decommissioning costs as part of the sale now must purchase additional bonds to cover this same liability, just to protect the same party—major predecessors. That BOEM picked the majors as winners is all the more surprising since major oil and gas companies actually have higher incidences of failure to comply with BSEE safety regulations.

165.    This an independent ground for vacatur.

**COUNT IX**
**The Final Rule Is Arbitrary and Capricious**
**(Ignores Reliance Interests)**
**(5  U.S.C. §706)**

166.    Plaintiffs repeat and incorporate by reference each of the Complaint's allegations stated above.

167.    The Rule upsets the legitimate reliance interests extensively detailed in comments. *See DHS. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 31-32 (2020) (agency's failure to account for reliance interests arbitrary and capricious). As discussed above, majors and independents have conducted decades of commercial oil and gas transactions—

70

transferring leases from the former to the latter—in reliance on the longstanding joint-and-several liability regime. Predecessor sellers entered those transactions knowing that they remained jointly and severally liable for decommissioning the infrastructure after the sale, as BOEM itself has explained. *See* 58 Fed. Reg. at 45,257 ("Typically an assignment agreement between an assignor and assignee will require the assignee to meet these obligations, and to provide a performance bond or indemnity agreement to protect the assignor from potential liability to the lessor or the regulatory body for their performance."). As a result, in every transaction, the critical deal point for sellers of those assets was the tradeoff between near-term cash proceeds (price) and longer-term counterparty risk mitigation (private party financial assurance).

168.   The Rule's imposing a sudden demand for $6.9 billion in new bonds, to come before the predecessors' liability, unravels each of those commercial choices made in reliance on the longstanding joint and several regime. And it does not release the assignee bond holders' obligation to continue to maintain these private bonds per the sale agreements with the assignors. BOEM does not recognize these reliance interests, so the Rule is arbitrary and capricious.

169.   This is an independent ground for vacatur.

### COUNT X
### The Final Rule Is Arbitrary and Capricious
### (Ignores Royalty Payments)
### (5 U.S.C. §706)

170.   Plaintiffs repeat and incorporate by reference each of the Complaint's allegations stated above.

171.   BOEM ignores the Rule's effect on royalty payments to the federal government and the States. The Rule endangers billions in royalty payments. *Opportune Study* 24. This loss of royalties not only harms federal taxpayers but also undermines

71

Congress's system of mandatory State royalty payments. OSCLA awards coastal states 27 percent of bonus bids, ground rent, and production royalties from OCS oil and gas lease sales and production in adjacent waters. 43 U.S.C. §1337(g)(2). And GOMESA entitles some States—including Plaintiff States—to 37.5 percent of OCS revenues from areas of the Gulf of Mexico. *See* Pub. L. 109-432, §105, 120 Stat. 2922, 3004 (2006) (codified at 43 U.S.C. §1331 note). States and localities rely on royalty payments to fund coastal improvement programs and as part of their budget. BOEM had evidence before it of the magnitude of losses to statutorily entitled State royalty payments. *Opportune Study* 24. Louisiana alone is projected to lose $521 million in royalty payments from the Rule over the next decade. Mississippi is projected to lose $178 million in royalty payments from the Rule over the next decade. Texas is projected to lose $320 million.

172.    Yet BOEM failed to consider and provide reasons why the losses of these statutorily-mandated royalties were justified by the minimal reduction in risk to Interior's budget. The statutory royalty entitlements Congress has enacted and BOEM's previous concern with the effect of its rules on royalties make clear that this is an important aspect of the problem, so BOEM was required to consider it. *Chamber of Com.*, 85 F.4th at 777. It did not.

173.    This is an independent ground for vacatur.

**COUNT XI**
**The Final Rule Is Arbitrary and Capricious**
**(Unexplained Change in Position)**
**(5 U.S.C. §706)**

174.    Plaintiffs repeat and incorporate by reference each of the Complaint's allegations stated above.

175.    The APA requires an agency to "display awareness that it *is* changing position," which means it must "explicitly acknowledge the old policy and explain why

its new one was better." *Wages & White Lion*, 90 F.4th at 381-82 (quotation omitted). BOEM fails to frankly admit that the Rule fundamentally changes its longstanding financial assurance regime, which is premised on joint and several liability. In fact, BOEM contests that conclusion, repeatedly stating that it is not altering the previous regime or changing policy. *See, e.g.*, *Response* at 17, 180 ("This rule does not establish any new policy but simply implements a longstanding policy."). Nothing could be further from the truth.

176.    Until now, if current lessees went insolvent, BOEM would rely primarily upon the joint and several obligations of financially strong predecessors as a backstop. The Rule turns BOEM's regime 180 degrees. It makes smaller current lessees preemptively guarantee that payment by purchasing supplemental financial assurance, even where majors are already bound by common law and regulation to pay if current lessees are unable to do so. For decades private parties priced transactions and allocated risks assuming that current lessees and predecessors would be jointly and severally liable. As a result, sellers required financial assurance from purchasers, or chose to get a better purchase price by forgoing such assurance. BOEM's refusal to address this issue in the Rule, while putting these new bonds *before* those predecessors in the chain of title, is most puzzling since BOEM separately admits that "[u]nder current partial implementation (baseline), no bond demands are issued for OCS properties that have a Tier 1 company in the chain of title." RIA 44. Because BOEM merely "glosses over" and "swerves from" the prior regime "without discussion," the Rule is arbitrary and capricious. *Wages & White Lion,* 90 F.4th at 381.

177.    This an independent ground for vacatur.

## COUNT XII
### The Final Rule Violates the Regulatory Flexibility Act
### (5 U.S.C. §601 et seq. & 5 U.S.C. §706)

178.    Plaintiffs repeat and incorporate by reference each of the Complaint's allegations stated above.

The Rule is arbitrary and capricious and separately a violation of the Regulatory Flexibility Act because BOEM failed to explain why it did not select the proposed alternative that would be less stringent on small business. Although the "RFA is a procedural rather than substantive agency mandate," courts must review "to determine whether an agency has made 'a reasonable, good-faith effort' to carry out the mandate of the RFA." *Alenco Commc'ns v. FCC*, 201 F.3d 608, 625 (5th Cir. 2000). Furthermore, agencies must always consider any "significant and viable and obvious alternative" that would avoid crushing costs to the industry. *10 Ring Precision, Inc. v. Jones*, 722 F.3d 711, 724 (5th Cir. 2013) (cleaned up); *see also Wages & White Lion*, 16 F.4th at 1139 ("[W]hen an agency rescinds [or alters] a prior policy[,] its reasoned analysis must consider the alternatives that are within the ambit of the existing policy." (quoting *Regents of the Univ. of Ca*l., 591 U.S. at 30)). BOEM failed in its obligation to make a reasonable and good faith effort to consider less detrimental alternatives.

179.    BOEM is required to "descri[be] … the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes." 5 U.S.C. §604(a)(5). BOEM elsewhere acknowledges that the Rule is "more burdensome on [smaller companies] than on the larger companies that have historically developed the OCS, as assets would likely be sold to companies for which bond acquisition is more costly," making small business properties "less valuable or more difficult to sell." RIA at 73. But it failed to frankly face up to the crushing costs

74

the Rule will have on small businesses, outlined extensively above, and thereby fails to identify steps the agency has taken to minimize these crushing impacts. BOEM thus did not rationally consider how to minimize the Rule's "economic impacts because the agency fundamentally misapprehended the unraveling economic effect of its regulations on small businesses." *S. Offshore Fishing Ass'n v. Daley*, 995 F. Supp. 1411, 1436-37 (M.D. Fla. 1998); *see also N. Carolina Fisheries Ass'n, Inc. v. Daley*, 27 F. Supp. 2d 650, 661 (E.D. Va. 1998) ("The Secretary's conscious refusal to recognize the economic impacts of his regulatory actions calls into question the agency's willingness to consider less severe alternatives.").

180.    BOEM is required to "includ[e] a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected." 5 U.S.C. §604(a)(6). Initially, BOEM's countervailing reason against considering the joint and several liability of majors in the chain of title to lessen the impact on small business was "moral hazard." RIA at 50. Yet in the RIA, BOEM admitted that comments invalidated the moral hazard justification. *Id.* BOEM then put forth no alternative justification. *Id.* Accordingly, BOEM has not provided the required statement. 5 U.S.C. §604(a)(6).

181.    This is an independent ground for vacatur.

## COUNT XIII
### The Final Rule Is Arbitrary and Capricious
### (Ignores Comments)
### (5 U.S.C. §706)

182.    Plaintiffs repeat and incorporate by reference each of the Complaint's allegations stated above.

183.    The Rule never acknowledges several material and negative comments. "[T]o determine whether the agency considered the relevant factors, the court must decide whether the agency addressed any 'significant points ... raised by the public comments.' 'Comments are significant, and thus require response, only if they raise points which, if true ... and which, if adopted, would require a change in an agency's proposed rule.'" *Mexican Gulf Fishing Co.*, 60 F.4th at 971 (quoting *Huawei Techs. USA v. FCC*, 2 F.4th 421, 449 (5th Cir. 2021)). Examples abound: BOEM ignored comments explaining how it would undermine expeditious development of the Gulf. *See, e.g.*, *Opportune Study* 7. BOEM ignored numerous comments from the surety industry making clear that there is no surety-market capacity to cover the financial assurance this Rule requires. *CAC Specialty Comment* 2-3; *SFAA Comment*. And BOEM did not engage with comments urging it to target the actual source of the problem: leases without financially strong lessees in the chain of title who are jointly and severally liable.

184.    This is an independent ground for vacatur.

**COUNT XIV**
**The Final Rule Is Arbitrary and Capricious**
**(Pretext)**
**(5 U.S.C. §706)**

185.    Plaintiffs repeat and incorporate by reference each of the Complaint's allegations stated above.

186.    "The reasoned explanation requirement of administrative law … is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public. Accepting contrived reasons would defeat the purpose of the enterprise. If judicial review is to be more than an empty ritual, it must demand something better than the explanation offered for the action taken in this case." *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2575-76 (2019). Accordingly, a rule

is arbitrary when there is "a significant mismatch between the decision the [agency] made and the rationale [it] provided." *Id.*

187.    The savings to the taxpayer rationale of the Final Rule is clearly a pretext to cover the Administration's real goal of reducing domestic oil and gas production to fight climate change.

188.    The Rule's infinitesimal and unquantifiable benefits cannot justify the agency's conclusion that it is necessary to protect the taxpayer. Moreover, the agency's failure to consider the obvious alternative of focusing on sole-liability properties—those with no investment-grade parties in the chain of title—demonstrates that the real goal is not taxpayer protection. Instead, the real goal is advancing the Administration's goal of fighting climate change. Additionally, the agency's shifting and contradictory positions are further evidence of pretext. As is the suppressed evidence of White House involvement from the Office of Information and Regulatory Affairs. *See supra* n. 1.

189.    The agency's own cost benefit analysis revealed that the Rule had no quantifiable benefits whatsoever and would significantly harm Gulf oil and gas development. Because BOEM's "explanation for [its] agency action [] is incongruent with what the record reveals about the agency's priorities and decisionmaking process," the Rule is arbitrary and capricious. *Id.* at 2575.

190.    This is an independent ground for vacatur.

**COUNT XV**
**The Final Rule Is Arbitrary and Capricious & Unlawful**
**(Appeal Bond Requirement)**
**(5 U.S.C. §706)**

191.    Plaintiffs repeat and incorporate by reference each of the Complaint's allegations stated above.

192.    The Final Rule forecloses any meaningful ability to obtain IBLA review of a financial assurance demand letter by requiring a lessee to post an appeal bond in the amount of the estimated decommissioning liability set forth in the demand letter. This requirement is impossible for independents to meet. By foreclosing any meaningful review, the Final Rule violates lessees' due process rights, is arbitrary and capricious, and violates OCSLA's requirements.

193.    This is an independent ground for vacatur.

## PRAYER FOR RELIEF

194.    Plaintiffs therefore request that the Court enter an order and judgment that grants the following relief, which it is authorized to do under 5 U.S.C. §§703, 705-06; 28 U.S.C. §2201, and Federal Rules of Civil Procedure 57 and 65:

a.   Declare that the Final Rule is contrary to law and in excess of statutory authority under the APA;

b.   Declare that the Final Rule is arbitrary and capricious and unlawful under the APA;

c.   Declare that the Final Rule violates the RFA;

d.   Hold unlawful, vacate, and set aside the Final Rule as unlawful;

e.   Preliminarily and permanently enjoin, without bond, Defendants from implementing the Final Rule;

f.   Grant all other relief to which Plaintiffs are entitled, including but not limited to attorneys' fees and costs.

Dated: June 17, 2024

Respectfully submitted,

**ELIZABETH B. MURRILL**
**Attorney General of Louisiana**

/s/ Zachary Faircloth
Zachary Faircloth (La. #39875)
Principal Deputy Solicitor General
Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, Louisiana 70804
Tel: (225) 326-6705
FairclothZ@ag.louisiana.gov

*Counsel for the State of Louisiana*

**LYNN FITCH**
**Attorney General of Mississippi**

/s/ Justin L. Matheny
Justin L. Matheny*
Deputy Solicitor General
Mississippi Attorney General's Office
P.O. Box 220
Jackson, MS 39205
(601) 359-3680
justin.matheny@ago.ms.gov

*Counsel for the State of Mississippi*

**KEN PAXTON**
**Attorney General of Texas**
BRENT WEBSTER
First Deputy Attorney General
JAMES LLOYD
Deputy Attorney General for Civil
Litigation
KELLIE E. BILLINGS-RAY
Chief, Environmental Protection Division

/s/ Wesley S. Williams
WESLEY S. WILLIAMS*
Assistant Attorney General
Wesley.Williams@oag.texas.gov
HEATHER COFFEE*
Assistant Attorney General
Heather.Coffee@oag.texas.gov
OFFICE OF THE ATTORNEY GENERAL OF
TEXAS

/s/ Jimmy R. Faircloth, Jr.
**FAIRCLOTH MELTON SOBEL & BASH, LLC**
Jimmy R. Faircloth, Jr. (La. #20645)
jfaircloth@fairclothlaw.com
Barbara Bell Melton (La. #27956)
bmelton@fairclothlaw.com
Mary Katherine Price (La. #38576)
kprice@fairclothlaw.com
Alexandria, Louisiana 71303
Telephone: (318) 619-7755
Facsimile: (318) 619-7744

Tyler R. Green*
Daniel Shapiro*
Jeffrey S. Hetzel*
**CONSOVOY MCCARTHY PLLC**
222 S. Main Street, 5th Floor
Salt Lake City, UT 84101
(703) 243-9423

*Counsel for Louisiana Oil & Gas Association,*
*Gulf Energy Alliance, Independent Petroleum*
*Association of America, and U.S. Oil & Gas*
*Association*

79

ENVIRONMENTAL PROTECTION DIVISION
P.O. Box 12548, MC-066
Austin, Texas 78711-2548
(512) 463-2012 | Fax: (512) 320-0911

*Counsel for the State of Texas*

*pro hac vice applications forthcoming