**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAKE CHARLES DIVISION**

LOUISIANA, *et al*.,

                    Plaintiffs,

               v.

DEB HAALAND in her official capacity
as Secretary of the Interior; *et al*.,

                  Defendants.

Case No. 2:24-cv-00820-JDC-TPL

Hon. Judge James D. Cain, Jr.

---

**[PROPOSED] DEFENDANT-INTERVENOR AMERICAN PETROLEUM INSTITUTE'S**
**OPPOSITION TO PLAINTIFFS' MOTION FOR STAY OR**
**PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 3

STANDARD OF REVIEW .................................................................................................. 4

I. Plaintiffs Fail to Demonstrate That They Will Suffer Immediate, Irreparable Harm from
the Rule. ............................................................................................................................ 4

    A.   The Rule Does Not Expand BOEM's Authority or Plaintiffs' Obligations Regarding
OCS Financial Assurance. ............................................................................... 4

    B.   Plaintiffs' Claimed Harms from the Rule Are Speculative and Overstated. ................... 8

    C.   A Merits Decision in This Case Likely Will Precede Rule Implementation. .................. 12

II. Plaintiffs Fail to Demonstrate that They Are Likely to Succeed on the Merits. ..................... 14

    A.   Joint and Several Liability for OCS Obligations Is Neither Universal
Nor a Substitute for Financial Assurance by Current Interest Holders. .......................... 14

    B.   The Rule Is Consistent with BOEM's Longtime Regulations and Position. ................... 17

    C.   Plaintiffs Disregard the Varied and Complex Business Realities on the OCS. ............... 20

III. The Balance of Equities and Public Interest Favor Denial of Interim Relief. ....................... 23

CONCLUSION .................................................................................................................. 25

## TABLE OF AUTHORITIES

**Cases**

*Action on Smoking & Health v. Civil Aeronautics Bd.*,
713 F.2d 795 (D.C. Cir. 1983) .................................................................................... 5

*Enterprise Intern., Inc. v. Corporacion Estatal Petrolera Ecuatoriana*,
762 F.2d 464 (5th Cir. 1985) ................................................................................... 4, 5

*Franciscan All. Inc. v. Azar*,
414 F. Supp. 3d 928 (N.D. Tex. 2019) ....................................................................... 5

*In re Fieldwood Energy LLC*,
No. 20-33948, (Bankr. S.D. Tex. June 25, 2021) ..................................................... 24

*Louisiana by and through Landry v. Biden*,
64 F.4th 674 (5th Cir. 2023) ................................................................................... 8, 9

*Nken v. Holder*,
556 U.S. 418 (2009) ............................................................................................... 4, 23

*Paulsen v. Daniels*,
413 F.3d 999 (9th Cir. 2005) ...................................................................................... 5

*Sepulvado v. Jindal*,
729 F.3d 413 (5th Cir. 2013) ...................................................................................... 4

*Texas v. United States*,
40 F.4th 205 (5th Cir. 2022) ....................................................................................... 5

*Texas v. United States*,
523 U.S. 296 (1998) .................................................................................................. 10

*Univ. of Tex. v. Camenisch*,
451 U.S. 390 (1981) .................................................................................................. 13

*Winter v. Nat. Res. Def. Council*,
555 U.S. 7 (2008) ........................................................................................................ 4

**Statutes**

26-003 Miss. Code R. § OS-1.11 ............................................................................... 12

43 U.S.C. § 1337(g)(2) .............................................................................................. 12

La. Admin. Code tit. 43 § XIX-104 ........................................................................... 12

Pub. L. 109-432, Division C, Title I .................................................................... 12

Texas Nat. Res. Code §§ 91.104, 91.105, 91.9041, 91.9042 .................................... 12

**Regulations**

30 C.F.R. part 556 subparts G and H ..................................................................... 6

30 C.F.R. part 250 subpart N ............................................................................. 19

30 C.F.R. § 250.1700(d) .................................................................................. 15

30 C.F.R. § 250.1701(a) .................................................................................. 15

30 C.F.R. § 250.1702(a)-(c) ............................................................................. 15

30 C.F.R. § 250.1708(c) .................................................................................. 18

30 C.F.R. § 256.62(f) ..................................................................................... 16

30 C.F.R. § 550.143(b) .................................................................................... 6

30 C.F.R. § 550.147(a) .................................................................................. 18

30 C.F.R. § 556.105 ........................................................................................ 6

30 C.F.R. § 556.710 .................................................................................. 15, 18

30 C.F.R. § 556.805 ...................................................................................... 18

30 C.F.R. § 556.900(h) .................................................................................. 19

30 C.F.R. § 556.901 ........................................................................................ 1

30 C.F.R. § 556.901(d) .................................................................................... 9

30 C.F.R. § 556.901(d)(1)-(4) ........................................................................... 6

30 C.F.R. § 556.901(d)(1)(i)-(v) ........................................................................ 7

30 C.F.R. § 556.901(d)(1)(ii) ............................................................................ 7

30 C.F.R. § 556.901(d)(1)(iv)(A) ....................................................................... 7

30 C.F.R. § 556.901(h) .................................................................................. 12

30 C.F.R. § 556.902(a).............................................................................................. 6, 7

30 C.F.R. § 556.904 ..................................................................................................... 10

30 C.F.R. § 556.905(b) ................................................................................................ 11

58 Fed. Reg. 45,255 (August 27, 1993) ....................................................................... 5, 7

62 Fed. Reg. 27,948 (May 22, 1997) .......................................................................... 7

76 Fed. Reg. 64,432 (Oct. 18, 2011) ............................................................................ 7

81 Fed. Reg. 18,112 (Mar. 30, 2016) ........................................................................... 7

85 Fed. Reg. 65,904 (Oct. 16, 2020) ............................................................................ 20

89 Fed. Reg. 31,544 (Apr. 24, 2024) ................................................................... passim

89 Fed. Reg. 47,080 (May 31, 2024) ............................................................................ 13

**Other Authorities**

BOEM, *Risk Management and Financial Assurance Rule Implementation Timeline* (June 28, 2024), https://www.boem.gov/newsroom/notes-stakeholders/boem-risk-management-and-financial-assurance-rule-implementation ................................................................... 13

BOEM Summary, https://www.boem.gov/oil-gas-energy/energy-economics/gulf-mexico-energy-security-act-gomesa .............................................................................................. 12

## INTRODUCTION

Plaintiffs cannot justify emergency relief from the Bureau of Ocean Energy Management's ("BOEM") final rule they challenge here ("Rule").[1]  That Rule is neither novel nor remarkable, and violates no legal standard.  It merely updates BOEM's prior regulations to clarify the circumstances when BOEM "may" choose to exercise its longstanding authority to demand that current holders of interests in Outer Continental Shelf ("OCS") oil and gas leases and grants provide supplemental financial assurance to BOEM to ensure performance of their obligations, including decommissioning of wells, platforms, pipelines, and other facilities.  Plaintiffs mischaracterize the Rule's true nature, and cannot prove any—let alone all—of the elements required for a stay or preliminary injunction.

First, Plaintiffs' lack of proven harm—much less immediate, concrete, and irreparable harm—is alone fatal to their Motion, and the Court's inquiry should proceed no further.  Plaintiffs face no such harm from the Rule because BOEM's prior financial assurance regulations (which Plaintiffs seek to reinstate through a stay or vacatur of the Rule) *already* enable BOEM to demand the same supplemental financial assurance about which Plaintiffs complain under the Rule.  *E.g.*, 30 C.F.R. § 556.901 (2023).[2]  The prior regulations also neither instructed BOEM to withhold, nor allowed current interest holders to avoid their duty to satisfy, a supplemental financial assurance demand on the basis that a financially stronger predecessor exists in the chain of title for a federally issued OCS oil and gas lease or grant.  Moreover, the Rule does not mandate BOEM to request supplemental financial assurance from anyone, but only clarifies the circumstances when BOEM "may" do so.  And as BOEM has recently

---

[1] *Risk Management and Financial Assurance for OCS Lease and Grant Obligations*, 89 Fed. Reg. 31,544 (Apr. 24, 2024).

[2] Citations herein include "(2024)" for the Rule and "(2023)" for the prior regulations.

confirmed, even without Court-ordered interim relief, the Rule likely will not yield actual supplemental financial assurance demands or required compliance with such demands before this case is decided on the merits.

Second, if the Court deems it necessary to reach the merits of Plaintiffs' claims for purposes of their present Motion, Plaintiffs are unlikely to prevail.  As a limited modification to long-standing prior regulations, the Rule's supplemental financial assurance provisions are within BOEM's authority and reasonable.  At base, Plaintiffs' fixation on predecessor lease and grant interest holders' "joint and several liability" for decommissioning of OCS oil and gas facilities is a distraction, because the Rule does not alter the liability of anyone (whether current or predecessor OCS interest holders), and because current lease and grant interest holders *always* have been *solely* responsible to supply financial assurance to protect the government and taxpayer.  Plaintiffs also utterly ignore liabilities for which predecessors have *never* had any responsibility whatsoever, including wells and other infrastructure installed *after* assignment of their OCS lease or grant interests.  The liability that predecessors may have for certain decommissioning if current interest holders do not meet their obligations is neither a new nor credible reason to enjoin the Rule.  That is, a predecessor's obligation to BOEM has no bearing on whether a current lessee or grantee provides adequate assurance to BOEM for its own regulatory obligations.

Plaintiffs' meager attempts to satisfy the final two prerequisites for interim emergency relief fail as well.  Plaintiffs' claimed harms are entirely speculative based on how BOEM may exercise its direction to impose additional security demands in the future on a lease-by-lease basis—discretion that the agency has long included in its regulations.  In any event, any such claimed harms are outweighed by the decommissioning responsibilities that Plaintiffs attempt to

dodge.  Plaintiffs' purported "harms" are best characterized as potentially being ordered to provide assurances that they can actually perform the contractual and regulatory decommissioning obligations that they freely assumed.  Far from Plaintiffs suffering any real harm, the broader oil and gas industry and the taxpayer are at risk when current interest holders cannot perform their obligations.  The public interest favors BOEM having adequate financial assurance in place for performance of OCS obligations, and the Rule provides more objective and clear standards for when BOEM may seek needed financial assurance.

At most, Plaintiffs raise a policy dispute with the Rule, which does not constitute a legal violation or grounds for a stay or preliminary injunction.  To be sure, this Rule is not the war on oil and gas that Plaintiffs portray.  Furthermore, ensuring that current lessees can satisfy their lease obligations does not pit smaller operators against "big oil."  Ensuring that *all* current OCS lessees and grantees can satisfy their decommissioning and other obligations has been BOEM's regulatory focus for *decades*.  Indeed, BOEM has *always* had discretion to require, when appropriate, current lessees to provide supplemental financial assurance, and the Rule is consistent with that longstanding discretion.  The offshore oil and gas industry is no different than any other industry in that there is a wide range of stakeholders with diverse views and different business models, and the Rule strikes an appropriate balance of ensuring that BOEM and federal taxpayers receive reasonable financial assurance from current lessees and grantees in exchange for the opportunity to operate on the OCS.  The public at large benefits from BOEM ensuring that lessees and grantees are fiscally responsible for their operations on the OCS.

For any or all of these reasons, Plaintiffs' Motion should be denied.

## BACKGROUND

To avoid duplication, [Proposed] Defendant-Intervenor American Petroleum Institute ("API") does not repeat the background discussion that presumably will be covered in Federal

Defendants' brief in response to Plaintiffs' Motion, but addresses relevant legal and factual

background in its arguments below.

## STANDARD OF REVIEW

Plaintiffs cannot obtain a preliminary injunction unless they establish that: (1) they are

"likely to succeed on the merits" of their claim; (2) they are "likely to suffer irreparable harm in

the absence of preliminary relief"; (3) "the balance of equities tips in [their] favor"; and (4) "an

injunction is in the public interest." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008); *see*

*also Sepulvado v. Jindal*, 729 F.3d 413, 417 (5th Cir. 2013) (listing factors).  The same four

factors are required for a "stay" of agency action.  *Nken v. Holder*, 556 U.S. 418, 434 (2009).

Plaintiffs' failure to meet "any one" of the four factors means that "a preliminary injunction may

not issue and, if issued, will be vacated on appeal." *Enterprise Intern., Inc. v. Corporacion*

*Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985) (citations omitted) (reversing

preliminary injunction involving oil and gas financial security instruments).[3]

## I.   PLAINTIFFS FAIL TO DEMONSTRATE THAT THEY WILL SUFFER IMMEDIATE, IRREPARABLE HARM FROM THE RULE.

### A.   The Rule Does Not Expand BOEM's Authority or Plaintiffs' Obligations Regarding OCS Financial Assurance.

The central fiction in Plaintiffs' Motion is that the Rule somehow created new BOEM

authority and altered Plaintiffs' (or anyone else's) obligations to provide financial assurance or

perform OCS decommissioning.  *E.g.,* Motion at 63 (alleging that "The Rule vests the Regional

Director with authority to demand the new crushing levels of supplemental bonds.  Without that

authority, the Regional Director could not issue demand letters for the crushing levels of

---

[3] Plaintiffs' Motion, ECF No. 6, is an almost verbatim copy of Plaintiffs' Complaint, ECF No. 1. While Plaintiffs fail to even state a claim upon which relief can be granted under Fed. R. Civ. P. 12(b)(6), they certainly fail to carry their much higher burden for emergency relief.

financial assurance authorized by the Rule, which in turn causes Plaintiffs' other injuries."). It did not. Thus, all of Plaintiffs' alleged harms stemming from the Rule are illusory. The Rule's lack of harm to Plaintiffs is fatal to their Motion, without the Court even needing to reach other factors. *Enterprise*, 762 F.2d at 472 ("When the movant fails to prove that, absent the injunction, irreparable injury will result, therefore, the preliminary injunction should be denied.").

Plaintiffs ask the Court to preliminarily stay or enjoin, and ultimately to permanently vacate, the Rule. *See* Complaint ¶ 194. "The effect of invalidating an agency rule is to reinstate the rule previously in force." *Paulsen v. Daniels*, 413 F.3d 999, 1008 (9th Cir. 2005) (citing *Action on Smoking & Health v. Civil Aeronautics Bd.*, 713 F.2d 795, 797 (D.C. Cir. 1983)); *Texas v. United States*, 40 F.4th 205, 220 (5th Cir. 2022) ("[A] vacatur does nothing but re-establish the status quo absent the unlawful agency action. Apart from the constitutional or statutory basis on which the court invalidated an agency action, vacatur neither compels nor restrains further agency decision-making."); *Franciscan All. Inc. v. Azar*, 414 F. Supp. 3d 928, 934 (N.D. Tex. 2019) (vacating agency rules "leav[es] their predecessors in place until the agencies can take further action"). Thus, Plaintiffs' requested relief would reinstate BOEM's financial assurance regulations at 30 C.F.R. part 556, subpart I as they existed prior to the Rule. Those prior regulations existed since at least 1993. 58 Fed. Reg. 45,255 (August 27, 1993).

Since those prior regulations already authorize BOEM to require the same level of financial assurance from Plaintiff member lease and grant holders as does the Rule, Plaintiffs cannot demonstrate *any* harm, much less immediate and irreparable harm, attributable to the Rule. Indeed, Plaintiffs' Motion fails to engage with the actual text of the Rule or BOEM's prior regulations. Accordingly, Plaintiffs' Motion (and underlying lawsuit) would not ameliorate the Rule's purported harms (even if they existed, which they do not).

Though uncited in their Motion, the Rule provision with which Plaintiffs take most umbrage is 30 C.F.R. § 556.901(d), addressing "supplemental financial assurance" (analogously "additional security" under the prior regulations).  The Rule allows (but does not mandate) BOEM to order supplemental financial assurance only from current interest holders in contractual and regulatory privity with BOEM, i.e., "you, as record title owner, operating rights owner, grant holder, or operator."  30 C.F.R. § 556.902(a) (2024).[4]  Plaintiffs attack the Rule's simplified, more objective criteria for determining when BOEM "may" (not must) require supplemental financial assurance from current interest holders.  Under the Rule, BOEM will not require supplemental financial assurance if at least one of the current interest holders has an investment-grade credit rating, or there exists a greater than 3:1 ratio of proven remaining oil and gas reserves value (for a lease, unit, or field) to estimated decommissioning costs.  30 C.F.R. § 556.901(d)(1)-(4) (2024).  If no current interest holder meets the credit rating standard, or if the reserves standard is unmet, then BOEM "may" require current interest holders to provide supplemental financial assurance for decommissioning and other financial obligations.  Thus, the change that the Rule adopted was to clarify the standards for when BOEM would *not* require additional security from existing interest holders.

---

[4] The "record title owner" is the recipient or current assignee of all or part of a federally issued lease.  30 C.F.R. § 556.105 ("you" includes "lessee (record title owner)").  "Operating rights" are "an interest created by sublease out of the record title interest in an oil and gas lease, authorizing the owner to explore for, develop, and/or produce the oil and gas contained within a specified area and depth of the lease (*i.e.*, operating rights tract)."  *Id.*  The term "lessee" means the current record title and operating rights owners.  *Id.*  BOEM must approve all assignments of record title or operating rights.  30 C.F.R. part 556 subparts G and H.  The lessee also may designate an "operator" to fulfill its lease obligations.  30 C.F.R. §§ 556.105, 550.143(b).  A "grant" means a pipeline right-of-way or a right-of-use and easement to utilize the OCS where the holder does not own a lease interest.  30 C.F.R. § 556.105.  A "predecessor" record title or operating rights owner or grant holder is *not* a "lessee," operating rights owner," or "grant holder."  *Id.*

But any lessee (or group of co-lessees) that cannot satisfy either of those two criteria also was potentially subject to additional security demands under the prior regulations.  Like the Rule, the prior regulations subjected only current interest holders to additional security demands.[5]  30 C.F.R. § 556.902(a) (2023) ("you, as lessee, operating rights owner or operator"); *see also* 58 Fed. Reg. at 45,256 ("This [1993] final rule also *retains* the provision under which the authorized officer *may* require additional security in the form of a supplemental bond or bonds or require an increase in the coverage of an existing bond when additional security is deemed necessary . . . .") (emphasis added); Declaration of Holly Hopkins ("Hopkins Decl.") ¶ 9.  The prior regulations contained five criteria for BOEM to consider regarding whether supplemental financial assurance was required from the existing interest holders, including "financial capacity, projected financial strength, business stability, reliability in meeting obligations based on credit rating or trade references, and record of compliance with laws, regulations, and lease terms[.]" 89 Fed. Reg. at 31,545, 31,548; 30 C.F.R. § 556.901(d)(1)(i)-(v) (2023).  Those prior criteria, like the Rule, also specifically authorized BOEM to consider "credit rating" and "estimated value of your existing OCS lease production and proven reserves for future production" in "excess of existing and future lease obligations."  30 C.F.R. § 556.901(d)(1)(ii), (iv)(A) (2023).  The Rule *removed* other prior criteria (e.g., compliance history) that BOEM upon further consideration found did not relate to a need for more financial assurance.  89 Fed. Reg. at 31,550.  Most

---

[5] The regulation now at 30 C.F.R. § 556.901 was originally promulgated in 1993 at 30 C.F.R. § 256.61(d).  58 Fed. Reg. at 45,257-58, 45,262.  It was recodified without substantive change in 1997 at 30 C.F.R. § 256.53(d).  62 Fed. Reg. 27,948, 27,951, 27,956 (May 22, 1997).  It was recodified again without substantive change in 2011 at 30 C.F.R. § 556.53, after BOEM and BSEE were each created out of the former Minerals Management Service in 2010.  76 Fed. Reg. 64,432, 64,450 (Oct. 18, 2011).  It was recodified yet again without substantive change in 2016 at 30 C.F.R. § 556.901.  81 Fed. Reg. 18,112, 18,115-19 (Mar. 30, 2016).  The Rule in 2024 did not modify the most recently preceding numbering for this regulation.

importantly, *nothing* in the prior regulations enabled BOEM to consider the existence or financial strength of predecessors in the chain of title when determining whether it needed to demand supplemental financial assurance from a current interest holder.

The net result is that the Rule merely *shrinks* the universe of current interest holders from whom BOEM may require supplemental financial assurance.  In other words, the Rule clarifies from whom BOEM will *not* seek supplemental financial assurance, because BOEM determined that their investment grade credit ratings or substantial net reserves present a sufficiently low risk of default on their obligations.  The Rule puts no additional OCS interest holder on the hook for financial assurance or for a greater amount of financial assurance than previously allowed.  Moreover, neither the prior regulations nor the new Rule excuses a current interest holder from supplemental financial assurance based on predecessor considerations.  Plaintiffs' Complaint thus amounts to a criticism not of what is in the Rule itself, but rather of BOEM's election to reject novel regulatory changes to implicate predecessors in BOEM's decisions on whether to seek supplemental financial assurance from current interest holders.  Because Plaintiffs' "alleged harms would have occurred with or without [the challenged Rule]," they cannot support emergency relief.  *Louisiana by and through Landry v. Biden*, 64 F.4th 674, 682 (5th Cir. 2023).

### B.     Plaintiffs' Claimed Harms from the Rule Are Speculative and Overstated.

Plaintiffs further claim that the Rule will lead to economic ruin for them, but that is hyperbolic conjecture.  In fact, Plaintiffs do not allege that the Rule will yield *any* specific supplemental financial assurance demand to any Plaintiff member, or that oil and gas production will cease from "any specific lease or project."  *Louisiana*, 64 F.4th at 683.  Nor do Plaintiffs support their speculation that the floodgates will suddenly open and "throttle oil and gas production on the Gulf."  Motion at 64.  "Allegations of possible future injury will not suffice." *Louisiana*, 64 F.4th at 681 (citation and internal quotation omitted).  Because the Rule is "not

certain to spawn the alleged harms," Plaintiffs' "hypothetical harms" cannot even demonstrate injury in fact for standing, much less their far higher burden to show irreparable harm for emergency relief. *Id.* at 682-83.

Plaintiffs acknowledge but then overlook the Rule's key term that BOEM "may" determine supplemental financial assurance is necessary when a current lessee or grantee does not meet the criteria for being excepted from supplemental financial assurance. 30 C.F.R. § 556.901(d) (2024); Motion at 39 ("For everyone else, BOEM *may* now demand that lessees and grant holders provide new financial assurance . . . .") (emphasis added). The term "may" is inherently discretionary, not compulsory. To be sure, in commenting on the 2023 proposed version of § 556.901(d) likewise containing "may," API urged BOEM to use "will" and make the requirement mandatory on BOEM. API Comment Letter at 13-14 (September 7, 2023)[6] ("Separately, BOEM should amend the last sentence of proposed subsection (d) to clarify that if the Regional Director makes the determination that existing financial assurance is insufficient to cover lease obligations, then the Regional Director *will* (not 'may') require existing lease interest holders to provide supplemental financial assurance unless they can meet the requirements of paragraphs (d)(1)—(4).") (emphasis in original). However, in the final Rule, BOEM retained "may," to Plaintiffs' benefit. Consistently, BOEM highlighted the significance of the term "may" elsewhere in the Rule to convey BOEM's "discretion" in contrast to the term "would." 89 Fed. Reg. at 31,568.

Plaintiffs thus cannot specify with any certainty what, if any, supplemental financial assurance demands will flow to any of their members from the Rule. Rather, their claims are not even ripe until BOEM issues a demand to a specific lessee or grant interest holder, and no

---

[6] *See* https://www.regulations.gov/comment/BOEM-2023-0027-2006; Hopkins Decl. ¶ 7.

reasonable supplemental financial assurance option is available.  *Texas v. United States*, 523 U.S. 296, 300 (1998) ("A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'") (citation omitted).  Despite their voluminous filings to this Court, Plaintiffs do not allege with any specificity what burdens will be borne by Plaintiffs and their members, individually or collectively.

To support their claims of harm, Plaintiffs point to BOEM's aggregate, conservative cost estimates in its regulatory impact analysis, but they are just that—estimates of future obligations years down the road.  Motion at 65.  As addressed in the next section *infra*, BOEM itself does not know what supplemental financial assurance will be necessary until it receives more information and completes additional analysis of individual company financial information, which BOEM expects to take months or years.  Similarly misleading is Plaintiffs' claim that "financial assurance costs will be on the order of $6.9 billion."  *E.g.*, Motion at 27 (citing 89 Fed. Reg. at 31,544).  What BOEM actually said is that it "estimates" that total amount of "new supplemental financial assurance."  89 Fed. Reg. at 31,544.  However, the *costs* of actually providing that level of additional supplemental financial assurance are far less.  Despite Plaintiffs' insinuations, the Rule does not require upfront cash covering the full cost of decommissioning.  Thus, for example, the additional costs may only consist of "premiums" that "vary substantially by entity" and are far less than the surety amount.  *Id.* at 31,563-64, 31,576. Tellingly, Plaintiffs fail to acknowledge that the Rule also allows establishment of "decommissioning accounts," which are a longer-term option that current interest holders may select to satisfy a supplemental financial assurance demand.  30 C.F.R. § 556.904.  These accounts allow current lessees and operators to fund decommissioning accounts over time using proceeds from production as it is generated.  *Id.*  Nor do Plaintiffs mention the Rule's option for

possibly lower costs via a third-party guarantee for all or part of a lease or grant obligation.  30 C.F.R. § 556.905(b).[7]

Nor can Plaintiffs presently show that the Rule will disproportionately affect them or their members.  Indeed, it is unclear Plaintiffs' members are the small businesses they allege will be harmed, as many of them are funded by large private equity investors.  For example, twice-bankrupt Fieldwood Energy, a founding member of Plaintiff Gulf Energy Alliance ("GEA"),[8] was backed with nearly $2 billion in funding from private equity investors.[9]  Arena Energy, another GEA founding member,[10] was bought out of bankruptcy in 2020 by another private equity investor.[11]  In any event, the Rule's future impact is uncertain, at best.

The Motion also overstates the Rule's purported harms to the Plaintiff States—all of which are premised on the other Plaintiffs' speculative claims that production will be reduced.  *E.g.*, Motion at 10-11, 66-67.  Under the Outer Continental Shelf Lands Act ("OCSLA"), the States of Texas, Louisiana, and Mississippi receive 27 percent of the royalties the federal government collects from oil and gas production occurring from federal leases only in the first

---

[7] Further contradicting their claimed billions of dollars of harms from the Rule due to OCS decommissioning liability not covered by financial assurance, Plaintiffs simultaneously assert that the Rule is "arbitrary and capricious" because it "significantly overstates the amount of decommissioning liability in the Gulf of Mexico."  Motion at 6.  That argument is also a red herring; what is relevant here is whether current interest holders can meet their obligations.

[8] *See* https://gulfenergyalliance.com/independent-energy-producers-launch-new-gulf-energy-alliance/ ("Founding members of the Gulf Energy Alliance include Fieldwood Energy, Talos Energy, Energy XXI, and Arena Energy.").

[9] *See* Maria Chutchian, *Fieldwood Energy Faces Pushback to Reorganization Plan from Oil Producers*, Reuters (June 3, 2021), https://www.reuters.com/legal/transactional/fieldwood-energy-faces-pushback-reorganization-plan-oil-producers-2021-06-03/.

[10] *See supra* note 8.

[11] *See* Luis Garcia, *Lime Rock Partners Reunites with Arena Energy*, The Wall Street Journal (Oct. 1, 2020), https://www.wsj.com/articles/lime-rock-partners-reunites-with-arena-energy-11601591421.

three nautical miles of the OCS—not undefined "adjacent waters" as Plaintiffs claim.  43 U.S.C. § 1337(g)(2); Motion at 10-11, 50.  The Gulf of Mexico Energy Security Act of 2006 similarly provides for royalty and revenue sharing with four of the Gulf States from certain newly-issued leases in specified OCS sale areas, not Gulf-wide.  Pub. L. 109-432, Division C, Title I; *see also* https://www.boem.gov/oil-gas-energy/energy-economics/gulf-mexico-energy-security-act-gomesa (BOEM summary).  Plaintiffs nowhere show that the Rule jeopardizes the relevant portions of production royalty.  As Plaintiffs also concede, most of the States' claimed benefits from OCS production are ascribable to companies not represented by Plaintiffs—including API members.  Motion at 8 (asserting that "Independent oil and gas companies like the Industry Plaintiffs' members produce over one-third of Outer Continental Shelf oil and natural gas and offshore revenues to the federal government."); Hopkins Decl. ¶ 17.  Plaintiff States' supposed concerns with the Rule are also at odds with their own laws that require lessees to provide financial assurance for oil and gas operations within offshore State waters, which (like BOEM's Rule) contain no exclusion based on the financial wherewithal of predecessors.  *See* 26-003 Miss. Code R. § OS-1.11; Texas Nat. Res. Code §§ 91.104, 91.105, 91.9041, 91.9042; La. Admin. Code tit. 43 § XIX-104.

### C.     A Merits Decision in This Case Likely Will Precede Rule Implementation.

Plaintiffs' claimed harms also are not "immediate" to warrant emergency relief.  As Plaintiffs concede, the Rule affords up to three years after receipt of a supplemental financial assurance demand for the recipient to fully comply with that obligation.  30 C.F.R. § 556.901(h) (2024).  What is more, BOEM has publicly communicated that it does not plan to immediately issue demands that start the up to three-year full compliance period.  Rather, per BOEM, "[i]t is estimated to take up to 24 months from the [Rule's effective date on June 29, 2024] that Notices

to Companies are distributed . . . ."[12]  That is because BOEM first must request, collect, and analyze company-specific and property-specific information to determine if the Rule's criteria in 30 C.F.R. § 556.901(d) are met.  If BOEM determines that neither of those criteria is met, it then "may" determine supplemental financial assurance is necessary and issue certain demands.  *Id.*  Plaintiffs tender no basis for their contrary suggestion that BOEM will be demanding widespread supplemental financial assurance "[i]mmediately upon the Rule's effective date."  Motion at 65.  Indeed, that date has already passed, with no such fallout.  *See* 89 Fed. Reg. 47,080 (May 31, 2024) (technical correction of effective date to June 29 rather than June 24, 2024, as initially published).

Emergency relief is intended to preserve the status quo only while a case is pending (to the extent that the Rule even meaningfully changes the status quo, which it does not).  *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).  The converse is that emergency relief is unwarranted when the Court can render a merits decision in the normal course before implementation of the challenged agency action.  There is no reason that this case cannot be fully briefed and decided within the approximately two years BOEM estimates it will take to even start issuing supplemental financial assurance demands under the Rule.  This case presenting claims under the Administrative Procedure Act ("APA") will involve Federal Defendants' filing of the administrative record and subsequent merits briefing, without discovery or trial.  No one has advocated delay in full resolution of this case, and API is amenable to completing merits briefing and any oral argument on an expedited basis if appropriate.

---

[12] *See* BOEM, *Risk Management and Financial Assurance Rule Implementation Timeline* (June 28, 2024), https://www.boem.gov/newsroom/notes-stakeholders/boem-risk-management-and-financial-assurance-rule-implementation.

Because Plaintiffs have failed to demonstrate immediate, irreparable harm from the Rule, their Motion should be denied on that basis alone.

## II.   PLAINTIFFS FAIL TO DEMONSTRATE THAT THEY ARE LIKELY TO SUCCEED ON THE MERITS.

If the Court deems it necessary to address the other requisite factors for emergency relief, Plaintiffs cannot carry their burden there either.  API acknowledges that this Court and other courts have rightly enjoined preliminarily or permanently a number of agency actions that unlawfully and immediately limited oil and gas activities, including on the OCS.  The Rule here, however, is not one of those actions.  API here supplements Federal Defendants' anticipated arguments on likelihood of success on the merits by refuting key premises of Plaintiffs' claims to the contrary.

### A.   Joint and Several Liability for OCS Obligations Is Neither Universal Nor a Substitute for Financial Assurance by Current Interest Holders.

Plaintiffs' core contention is that "joint and several liability" among current interest holders and predecessors for decommissioning is a substitute for current interest holders' obligation to provide supplemental financial assurance to BOEM and the taxpayer.  At the outset, that argument is a red herring because the Rule does *not* affect any entity's existing decommissioning liability, and Plaintiffs do not argue otherwise.  *E.g.*, Motion at 11-13.  Joint and several liability and financial assurance are two different concepts that Plaintiffs improperly conflate.  For decades, BOEM's financial assurance requirements for current interest holders have coexisted with any joint and several liability for predecessors.  As the Rule recognizes, BOEM's sister agency, the Bureau of Safety and Environmental Enforcement ("BSEE"), in 2023 amended 30 C.F.R. part 250 subpart Q "to formalize BSEE's policies regarding performance by predecessors ordered to decommission OCS facilities."  89 Fed. Reg. at 31,547.  By contrast, this

case involves *only* BOEM's separate financial assurance regulations for current interest holders at 30 C.F.R. part 556 subpart I.

Even if joint and several liability were salient to the merits of the BOEM Rule (which it is not), Plaintiffs misrepresent the scope of predecessor liability as covering all "infrastructure" on an extant lease or grant. *E.g.*, Motion at 11. That is wrong. As a matter of law, predecessors are only responsible for their "accrued" obligations. 30 C.F.R. §§ 250.1700(d), 250.1701(a). Under BSEE regulations not at issue in this case, obligations "accrue" when a lessee or grantee "drill[s] a well," "install[s] a platform, pipeline, or other facility," or "create[s] an obstruction to other users of the OCS." 30 C.F.R. § 250.1702(a)-(c); Motion at 9, 14-15 (admitting same). Rights to conduct activities that accrue obligations exist only while holding a lease or grant interest; predecessors forfeit such rights upon assigning their interests.

Importantly, Plaintiffs omit that under BOEM and BSEE regulations predecessors have *never* accrued any liability to decommission infrastructure installed *after* the predecessors no longer hold the lease or grant interest. *Id.*; 30 C.F.R. § 556.710; 89 Fed. Reg. at 31,549 ("This transferor liability applies, however, only to those obligations existing at the time of transfer."). Rather, *solely* assignees (whether the immediate assignee or a subsequent assignee) accrue liability to decommission infrastructure *they* install, as well as infrastructure already present on a lease or grant area when they obtain their OCS lease or grant interests. 89 Fed. Reg. at 31,549 ("New facilities, or additions to existing facilities, that were not in existence at the time of any lease transfer are not obligations of a predecessor company but are only considered obligations of the party that built such new facilities and its co- and successor lessees."); Hopkins Decl. ¶ 10. This limitation on accrued obligations poses a twofold problem when the current interest holder fails to meet its decommissioning responsibilities—there are decommissioning costs the

government must shoulder alone because no predecessor has obligations that accrued for those later costs, and BOEM and BSEE also face a potential logistical nightmare sorting out which decommissioning costs can be allocated to which predecessors.  In many cases it would require a painstaking well-by-well or facility-by-facility analysis.  Plaintiffs' silence on this key issue and others[13] undercut their attempt to force BOEM's broad reliance on joint and several liability in lieu of current interest holders providing their own financial assurance for decommissioning all extant facilities on the lease or grant area.

Also unavailing is Plaintiffs' insinuation that any regulatory joint and several liability backstops bankruptcy courts.  *E.g.*, Motion at 54 ("In each bankruptcy BOEM cites, the taxpayer has not borne any decommissioning cost. Why not? Joint and several liability.").  Bankruptcy proceedings adhere to the statutes, court rules, and case law specifically governing bankruptcies, over which BOEM has little control.  Outcomes of bankruptcy proceedings involving current OCS interest holders are not the result of existing regulatory joint and several liability, but of specific bankruptcy proceedings, negotiations, and orders.  Hopkins Decl. ¶ 16.  These proceedings are rarely consistent, orderly, or equitable, and not every creditor (including the United States) receives the highest priority.  As the Rule recognizes, "[s]ome of the corporate bankruptcies involving offshore oil and gas lessees since 2009 have involved decommissioning liabilities not covered by bonds or other forms of financial assurance."  89 Fed. Reg. at 31,564.  And bankruptcies have increased recently, underscoring the need for the clearer Rule on financial assurance.  Moreover, the full effect of the most recent bankruptcies remains to be seen.

---

[13] For example, Plaintiffs further ignore that predecessor liability was not codified until 1997—and even that is subject to a condition precedent of current lessees failing to perform their lease and regulatory obligations.  *See* 30 C.F.R. § 256.62(f) (1997).

Put simply, bankruptcies are not a substitute for BOEM's management of risk exposure upfront via adequate financial assurance.

In sum, joint and several liability is irrelevant to the Rule's legality under the APA. Despite Plaintiffs' fretting that the Rule supposedly "replaced" any predecessor joint and several liability, the Rule does no such thing. *E.g.*, Motion at 30. And as further discussed *infra*, Plaintiffs misportray factual realities on the OCS. Plaintiffs desire to baselessly obtain the Court's imprimatur to eschew their obligations for OCS decommissioning and financial assurance, and instead freely operate on the backs of predecessors and taxpayers.

**B.     The Rule Is Consistent with BOEM's Longtime Regulations and Position.**

Plaintiffs' claim that the Rule is a "change in BOEM's position" is also incorrect. *E.g.*, Motion at 51-52. BOEM has consistently required assignees of lease or grant interests to assume all duties to the lessor under the lease or grant terms and regulations. For decades, BOEM also has required current interest holders to provide financial assurance as a prerequisite to acquisition and operations on newly issued or assigned OCS leases and grants. Similarly, BSEE has always imposed its operational requirements, including the obligation to decommission, initially on current interest holders, and then has looked to any obligated predecessors only when those current entities failed to perform. Plaintiffs cite no regulatory provision to the contrary.

The Rule preserves this basic regulatory paradigm. Hopkins Decl. ¶ 14. For example, the Rule's preamble recognizes: "*If* the current lessee fails to perform decommissioning of its OCS facilities, the burden to decommission OCS facilities may fall to other obligated parties, such as co-lessees or predecessor lessees, and failing that, the Federal Government and U.S. taxpayers." 89 Fed. Reg. at 31,564 (emphasis added). That approach mirrors other BOEM and BSEE regulations—unchanged by the Rule and unchallenged by Plaintiffs here—placing primary decommissioning responsibility on current interest holders. For example, in addressing

17

"[w]ho is responsible for fulfilling leasehold obligations," the regulations prescribe that "[w]hen you are not the sole lessee, you and your co-lessee(s) are jointly and severally responsible for fulfilling your obligations . . . ," including decommissioning.  30 C.F.R. § 550.147(a).  Moreover, "BOEM or BSEE may require you [an assignor of record title or predecessor] to bring the lease into compliance *if* your assignee or any subsequent assignee fails to perform any obligation under the lease . . . ."  30 C.F.R. § 556.710 (emphasis added).  That same regulation also states that "*[u]ntil* there is a BOEM-approved assignment of interest, you, as the assignor remain liable for the performance of all lease obligations that accrued while you held record title interest, until all such obligations are fulfilled."  *Id.* (emphasis added).  The corollary is that once BOEM approves such assignment, that initial performance obligation shifts to the assignee.  Likewise, for operating rights owners, "BOEM or BSEE may require the assignor to bring the lease into compliance *if* the assignee or any subsequent assignee fails to perform any obligation under the lease . . . ."  30 C.F.R. § 556.805 (emphasis added).  BSEE's regulations similarly do not discharge current interest holders' obligations even when they fail to perform.  30 C.F.R. § 250.1708(c) ("BSEE's issuance of orders to any predecessors will not relieve any current lessee or grant holder, or any other predecessor, of its obligations to comply with any prior decommissioning order or to satisfy any accrued decommissioning obligations.").

The agencies look to current interest holders before predecessors for good reason.  At base, companies that obtain OCS oil and gas leases and grants should have the financial capacity to address, on a realistic timeline, all obligations legally assumed or created under the lease or grant.  Plaintiffs assert that predecessors are trying to "re-trade" deals, but that is misleading and ignores the realities of obligations current lessees willingly assumed in their commercial contracts.  Ordering predecessors to come back to decommission properties that they have not

18

owned or operated for decades poses practical problems as well.  A predecessor often lacks familiarity with recent operations or the state of facilities years or even decades after assignment, and critical records regarding the facilities were often transferred when those assets were sold.  That concern is exacerbated when the OCS lease or grant has since changed hands multiple more times.  Furthermore, a predecessor must obtain and analyze voluminous records and data from more recent interest holders to assess new infrastructure installed post-assignment for which the predecessor has no liability to decommission.  A predecessor also must obtain from BOEM the authority to reenter the relevant OCS area, because it has not had the right to do so under a lease, often for decades.  By contrast, these concerns do not exist for current co-lessees and co-grantees, who maintain direct rights and are involved in ongoing operational decisions.  Hopkins Decl. ¶ 15.

In reality, it is *Plaintiffs* who urge the Court to force BOEM to turn the decommissioning regime on its head by instead relying on predecessors to shield current interest holders from their obligations.  Indeed, Plaintiffs are promoting a regime whereby current interest holders could operate with impunity by dedicating their financial resources solely to their own economic return and budgeting nothing for decommissioning.  To be sure, under Plaintiffs' preferred approach, even current interest holders capable of obtaining financial assurance or funding decommissioning could simply avoid any such obligations by relying on the joint and several liability of their predecessors.  Though current interest holders could face "civil penalties" or other remedies under the Rule or BSEE regulations by failing to perform, they might make the financial calculation that those remedies are commercially less expensive and more acceptable than bearing the cost of decommissioning.  *See* 30 C.F.R. § 556.900(h); 30 C.F.R. part 250 subpart N; Motion at 2.

BOEM and BSEE's regulations have never adopted such a reckless approach, and BOEM's Rule here is no different.  Though BOEM floated such an approach for public comment in its 2020 proposal (85 Fed. Reg. 65,904 (Oct. 16, 2020)), BOEM subsequently rejected it as unsound via its 2023 proposed and 2024 final Rule.  As Plaintiffs admit, that was not the first time BOEM rejected such an approach, as the agency did so in its 1993 financial assurance rule too.  Motion at 14 ("MMS rejected a proposal to excuse an assignee from furnishing a bond if the assignor agreed to liability because under the joint-and-several liability system, the assignor remained liable regardless of whether it agreed to liability.").  Plaintiffs also fail to mention or reconcile the internal contradictions that their novel approach would generate within BOEM's and BSEE's regulations.[14]  The Court should decline Plaintiffs' invitation to engage in such novel policymaking, and deny their present Motion for emergency relief from the Rule.

## C.    Plaintiffs Disregard the Varied and Complex Business Realities on the OCS.

Plaintiffs proffer a facile and homogenous portrayal of business holdings and transactions on the OCS to argue that they should no longer be required to furnish financial assurance to BOEM.  *E.g.*, Motion at 49 (alleging "double bonding").  Once again, even under the prior regulations, any private arrangements regarding assignments did not preclude BOEM from

---

[14] Plaintiffs also incorrectly suggest that the Rule is inconsistent with (non-binding) recommendations of the U.S. Government Accountability Office ("GAO"), which BOEM's Rule did take into account.  Motion at 19, 29-30, 55.  For example, a December 2015 GAO report recommended that "BOEM complete its plan to revise its supplemental financial assurance procedures, including the use of alternative measures of financial strength."  89 Fed. Reg. at 31,547 (citing https://www.gao.gov/products/gao-16-40).  A February 2024 GAO report similarly recommended completion of BOEM's proposed rulemaking, and warned that low prior decommissioning costs to the government did not reliably predict potential future losses.  *Id.* at 31,548 (citing same).  BOEM's adoption of the Rule fulfilled these recommendations.  And Plaintiffs' citation of a May 2024 GAO letter to Congress simply certified BOEM's compliance with the Congressional Review Act in adopting the Rule.  *See* Letter from Managing Assoc. Gen. Counsel, to The Honorable Joe Manchin (May 14, 2024), perma.cc/6YY9-A6ZB.

demanding (or excuse current interest holders from providing) supplemental financial assurance. In any event, the diverse and multifaceted realities on the OCS undercut Plaintiffs' Motion.

First, Plaintiffs suggest that every OCS interest transfer agreement contained a private surety or economic consideration from the assignee to benefit the assignor. As an initial matter, Plaintiffs' sweeping assertions and anecdotal declarations regarding the "typical" practice of selected companies (among the many that Plaintiffs purport to represent) does not establish such a uniform practice. *E.g.*, Motion at 15. More importantly, in the experience of API and its members, the *opposite* is often true. Traditionally, OCS leases divested decades ago were sold to companies with substantial OCS assets in their portfolios, and agency regulations were in place to ensure that the buyers (i.e., the current owners) provided financial security to BOEM to safeguard compliance with their decommissioning obligations. Sellers reasonably and justifiably relied on the agency regulations requiring assignees to have adequate financial security, and often did *not* require private financial security as a condition of the sale. Rarely did these buyers seek bankruptcy protection or otherwise default on their decommissioning obligations in earlier decades. Today, circumstances are different. Many OCS interest buyers in the secondary market, often backed by large private equity lenders, create limited liability companies ("LLCs") to hold their leasehold interests. Often these LLCs are created only for a specific lease or field. When producing properties are sold, the purchase price is often *reduced* because of the decommissioning liabilities being assumed by the purchaser. Excusing current interest holders from supplemental financial assurance based on predecessors' financial strength thus would penalize *predecessors* via increased risk that *they* would have to pay for decommissioning twice—once when selling the property at a reduced price that accounted for the buyer's decommissioning obligations, and a second time when the buyer defaults on its

decommissioning obligations.  Of course, predecessors are now powerless to structure those long-completed transactions differently to account for such a novel approach.  Hopkins Decl. ¶ 13.

Second, Plaintiffs understate the universe of "sole liability properties" as Plaintiffs define them.  Motion at 19 ("those without an investment-grade party—typically a major company—in the chain of title as either a predecessor or co-lessee").  Contrary to Plaintiffs' assertions (e.g., Motion at 5), not every OCS lease or grant chain of title contains a company that would be exempt from the Rule's supplemental financial assurance requirements if it still held its OCS interest.  More specifically, Plaintiffs' repeated reference to "major" companies (e.g., Motion at 4) erroneously assumes that all subsidiaries of major oil and gas companies are exempt from providing supplemental financial assurance under the Rule.  In many circumstances, the predecessor entity was *not* a major company with an investment-grade credit rating, but was an affiliated entity of the major company that did not and does not itself hold an investment-grade credit rating.[15]  Moreover, many of those prior lease interest holders that were affiliated with a major oil company when the prior lease or grant interest was held may no longer exist and assigned away their interests years or even decades ago.  Hopkins Decl. ¶ 11.

Third, Plaintiffs offer no proof that any of their members will fail to meet the Rule's criteria to obviate any supplemental financial assurance, will actually receive specific BOEM supplemental financial assurance demands, or will be unable to satisfy such demands through the multiple available compliance options.  Smaller or independent lessees may meet the credit

---

[15] The same is true for many current interest holders on the OCS that are subsidiaries or affiliates of companies with an investment-grade credit rating but do not themselves have such a rating; accordingly, under the Rule, those current interest holders may be required, like the Plaintiff organizations' members, to provide supplemental financial assurance.  As noted above, many of Plaintiffs' members set up their OCS entities in the same way.

rating requirements or have adequate proved reserves to avoid supplemental financial assurance

obligations, or alternately may be able to obtain supplemental financial assurance that BOEM

may order in the future (or meet supplemental financial assurance requirements by establishing a

decommissioning account using a portion of revenues from ongoing sales).  That likelihood is

increased by the fact that Plaintiffs' members predominantly operate in shallower water (*see*

Motion at 8) with lower decommissioning costs than in deeper water.  Thus, any ordered

supplemental financial assurance should be less, and the required reserves to satisfy the 3:1

reserves value-to-decommissioning cost ratio should also be less.  Hopkins Decl. ¶ 18.  Finally,

any costs of the Rule do not fall solely on Plaintiffs, but also on some of API's members and

their affiliates holding current OCS interests.  *Id.* ¶ 12.

## III.   THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR DENIAL OF INTERIM RELIEF.

In the single paragraph that Plaintiffs devote to the final two factors for preliminary

relief, Plaintiffs fail to carry their burden.  Motion at 67.  Indeed, Plaintiffs merely rehash their

misplaced arguments about their own irreparable harm and likelihood of success on the merits.

These final two factors warrant denial of Plaintiffs' Motion.

The balance of equities and public interest factors merge here because the federal

government is an opposing party.  *Nken*, 556 U.S. at 435.  Plaintiffs' assertion (Motion at 67)

that the public interest disfavors "unlawful agency action" is immaterial since, as explained

above, the Rule is neither a change in agency position nor unlawful.  BOEM need not "wait for

Congress to grant them authority to act" as Plaintiffs claim (Motion at 67) because BOEM's

authority for the Rule is the same as for BOEM's prior regulations that Plaintiffs never

challenged.  Under both the Rule and prior regulations, BOEM may require and call the same

supplemental financial assurance.  Indeed, the Rule *advances* the public interest by more

efficiently carrying out BOEM's legal obligations for administering financial assurance for OCS oil and gas activities. It establishes clear and reasonable standards for when BOEM will *not* order supplemental financial assurance. It also confirms decades-long agency practice holding current interest holders accountable to provide adequate financial security to BOEM and protect taxpayers for current interest holders' operations on OCS leases and grants. To be sure, it is of paramount importance to the public interest that each current lessee and grantee demonstrate its financial capability to meet all of its lease and grant obligations, including decommissioning.

Moreover, Plaintiffs' Motion ignores the inequities it would force on predecessors. The Rule once again rejected the inequity of converting predecessors into involuntary sureties to excuse current interest holders from financially assuring their own compliance with their obligations. That rejected approach would invariably incentivize more operators to maximize profit, allocate nothing for decommissioning, file for bankruptcy, and leave BOEM to eventually issue decommissioning orders to predecessors that have not operated the grants and leases for years, creating higher administrative burdens for the government and system as a whole. It would also leave taxpayers to shoulder decommissioning costs for facilities where no viable predecessor had accrued all of the liability. To realize the potential dangers, the Court need look no further than Plaintiffs' own members and their history. For example, Fieldwood Energy, a founding member of Plaintiff GEA, twice went bankrupt, and in the process abandoned billions of dollars of its decommissioning liabilities.[16] Further, while Plaintiffs complain about the

---

[16] *See* Eighth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors, *In re Fieldwood Energy LLC*, No. 20-33948, (Bankr. S.D. Tex. June 25, 2021), ECF No. 1731; Christopher Matthews, *Oil Companies Are Ordered to Help Cover $7.2 Billion Cleanup Bill in Gulf of Mexico*, The Wall Street Journal (July 6, 2021), https://www.wsj.com/articles/oil-companies-are-ordered-to-help-cover-7-2-billion-cleanup-bill-in-gulf-of-mexico-11625569200 ("A federal judge ruled last month that Fieldwood Energy LLC,

opportunity cost of addressing decommissioning in lieu of investing in greater oil and gas production, predecessors likewise face opportunity cost by being forced to subsidize current interest holders who fail to perform their obligations.  In fact, in deeper water where major producers predominantly operate, production volumes are larger and generate more royalty and other revenue.  Thus, the rejected approach that Plaintiffs advocate would also be harmful to energy development efforts.  Hopkins Decl. ¶ 19.

## CONCLUSION

For the above reasons, API respectfully requests that this Court deny Plaintiffs' Motion.


Dated: August 13, 2024                   Respectfully submitted,

                                         */s/ Kennard B. Davis*
                                         Kennard B. Davis
                                         BEVERIDGE & DIAMOND, P.C.
                                         201 North Charles Street, Suite 2210
                                         Baltimore, MD 21201
                                         Telephone: (410) 230-1318

                                         James M. Auslander (pro hac vice)
                                         Peter J. Schaumberg (pro hac vice)
                                         BEVERIDGE & DIAMOND, P.C.
                                         1900 N Street, NW, Suite 100
                                         Washington, DC 20036
                                         Telephone: (202) 789-6000
                                         Fax: (202) 789-6190

                                         *Attorneys for [Proposed] Defendant-Intervenor*
                                         *American Petroleum Institute*

---

a privately held company that currently controls the old wells and had sought bankruptcy protection, could pass on hundreds of millions of dollars in environmental liabilities to prior owners and insurers of the wells as part of its reorganization plan."); Allister Thomas, *Apache Corp Takes £326million Decommissioning Hit Over Long-Sold Gulf of Mexico Assets*, Energy Voice (Apr. 11, 2021), https://www.energyvoice.com/oilandgas/americas/decom-americas/361938/apache-corp-decommissioning-gulf-of-mexico/ ("A judge ruled earlier this year that Fieldwood could seek bankruptcy protection in the states, passing part of costs for the $7.2 billion total liability for hundreds of oil wells to previous owners and insurers.").

**CERTIFICATE OF SERVICE**

I hereby certify that on August 13, 2024, I electronically filed the foregoing document

with the Clerk of Court by using the CM/ECF system, which will send notice of electronic filing

to the parties' attorneys of record.

*/s/ Kennard B. Davis*
Kennard B. Davis
BEVERIDGE & DIAMOND, P.C.
*Attorney for [Proposed] Defendant-Intervenor*
*American Petroleum Institute*