# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF LOUISIANA
# LAKE CHARLES DIVISION

| | |
|---|---|
| LOUISIANA, ET AL.,<br><br>PLAINTIFFS,<br><br>v.<br><br>DEB HAALAND in her official capacity as Secretary of the Interior; et al.,<br><br>DEFENDANTS. | Civil Action No. No. 2:24-cv-00820 |

### SUPPLEMENTAL MEMORANDUM IN SUPPORT OF MOTION FOR A STAY UNDER 5 U.S.C. §705 OR FOR A PRELIMINARY INJUNCTION

Plaintiffs respectfully submit this post-hearing supplemental brief to clarify three points about the equitable factors in support of their motion for a preliminary injunction.

**1.** Plaintiffs share the Court's apparent view expressed during the hearing that Plaintiffs' claims should be resolved on the merits as soon as possible. But two things make it unlikely that the Court and the parties can have an expedited trial on the merits before BOEM can start issuing demand letters next year.

*First*, it's unlikely that any trial will occur in this case. Because Plaintiffs' claim arises under the Administrative Procedure Act, it is likely that the case will be resolved at summary judgment rather than through a trial. "APA cases are often resolved at summary judgment because whether an agency's decision is arbitrary and capricious is a legal question that the court can usually resolve on the agency record." *Amin v. Mayorkas*, 24 F.4th 383, 391 (5th Cir. 2022). Under settled precedent, "the focal point for judicial review" in APA cases "should be the administrative record already in existence, not some new

record made initially in the reviewing court." *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985) (cleaned up). The reviewing court's "task" is "to apply the appropriate APA standard of review, 5 U.S.C. §706, to the agency decision based on the record the agency presents to the reviewing court." *Id.* at 743-44. So while Plaintiffs do not concede that an actual trial would not serve some purpose here, under settled administrative law, the parties' motions for summary judgment—rather than a trial—are likely to be the mechanism by which this case is ultimately resolved.

*Second*, if that's correct—*i.e.*, if this case ends on the merits after summary judgment based on the administrative record—the key timing facts are *when* Defendants produce the administrative record and what that means for a summary judgment briefing schedule. Before the hearing, Defendants represented to Plaintiffs that they cannot produce the administrative record until December 6, 2024. Plaintiffs requested that Defendants produce the administrative record by September 13, but the *earliest* that Defendants would agree to produce the administrative record was December 6—over seven months after the publication of the Rule.[1] On the shortest timeline that Defendants would agree to, the parties would not even propose a summary judgment briefing schedule itself until January 31, 2025. That best-case-scenario timeline assumes that Plaintiffs do not need to move to supplement or complete the administrative record—a likely outcome in this case because private parties participated in the rulemaking process.

All of this means that BOEM could start issuing demand letters before summary judgment motions are briefed and decided. BOEM's own estimate is that it will start issuing demand letters within "several" months after it receives responses to compliance

---

[1] Emails negotiating these dates with counsel for Defendants are on file with Plaintiffs' counsel and available upon request.

letters in February. Doc. 58 at 13-14. And the first payments on demand letters can be due only 60 days after that—not three years. 89 Fed. Reg. 31,544, 31,598 (2024).

In short, assuming the ordinary processes in APA cases will apply here, it is unlikely this case will be finally resolved on the merits before BOEM can start issuing demand letters. A stay or preliminary injunction is the only way to preserve the status quo.

**2.** In any case, BOEM's demand letters are not the relevant irreparable harms driving Plaintiffs' need for a stay or preliminary injunctive relief. Industry Plaintiffs have consistently briefed and argued three irreparable harms that occur even if BOEM never issues a single demand letter. Each is undisputed by Defendants and amply supported by the declarations attached to Plaintiffs' motion.

- <u>Supplemental demands from sureties</u>: Well before BOEM issues demands, surety companies are demanding millions of dollars in collateral from Industry Plaintiffs. The record contains evidence of demands issuing to more than one Industry Plaintiff, with the surety companies themselves confirming as much.[2] Far from there being only one such demand letter, Industry Plaintiffs' members have reported receiving other similar demand letters since the Rule's publication. The surety demand attached to Plaintiffs' Reply Brief (Doc. 76) as Exhibit M should not be taken as the only example of such a demand, but rather as a representative example of the collateral demand letters that sureties have been issuing to Industry Plaintiffs' members since the Rule's publication.

- <u>Compliance costs</u>: Industry Plaintiffs are spending significant sums on analytical tools and thousands of hours on compliance work, with attendant costs.[3]

---

[2] *See* Ex. M ($7.5 million surety demand on W&T ten days after Rule went into effect); Ex. E, ¶30 ("Sureties have already informed us that they will be demanding increased collateral on existing bonds due to the Rule. Arena has already received partial collateral demands on part of its existing bond portfolio as surety companies seek to either exit the non-investment grade energy surety sector entirely or reduce their exposure to this market."); Ex. C, ¶17 ("As a result of the financial stress put on our company by the Rule, sureties have already required 100% collateral on any new bonding requested and informed us that they will be demanding increased collateral on our existing bonds if the Rule goes into effect."); Ex. G ¶8 (surety company president agreeing); Ex. F ¶5 (surety company vice president agreeing).

[3] Ex. E ¶35 ("hundreds of hours analyzing" the Rule's proxy credit model; "thousands of employee hours we have had to dedicate to the Rule"; expending funds to "subscribe[]

3

- <u>Alterations to business plans and lost production</u>: Industry Plaintiffs are losing investments, declining to re-invest, and halting production because of the Rule.[4]

The unrebutted evidence also confirms that Industry Plaintiffs are suffering these harms in part because they will *not* be able to escape the Rule through the exceptions. Ex. C ¶10 ("We will *not* satisfy the agency's investment grade credit rating threshold or proxy credit rating equivalent."); Ex. C ¶11 ("For most of our operations, we will *not* meet the 3-to-1 ratio of the value of proved reserves to decommissioning liability."); Ex. E ¶23 ("for some of our leases, we will *not* meet the 3-to-1 ratio of the value of proved reserves to the decommissioning liability associated with those reserves); Ex. D ¶15 ("For the majority of our operations, we do *not*, and we are unlikely in the foreseeable future to, meet the criteria for an exception to the requirement of financial assurance.") (emphases added). Again, every single one of these harms has gone uncontested by Defendants.

Finding that these irreparable harms warrant injunctive relief comports fully with Fifth Circuit precedent. The irreparable harm standard is low. *See Paulsson Geophysical Ser. v. Sigmar*, 529 F.3d 303, 312 (5th Cir. 2008) ("The plaintiff need show only a significant threat of injury from the impending action, that the injury is imminent, and that money

---

to financial data platforms" and provide "significant analysis" to sureties and potential credit counterparties "as a direct result of the rule"); *accord* Ex. B. ¶31; *see also* 89 Fed. Reg. at 31,578-80 (BOEM confirming immediate compliance costs); Doc. 59-3 at 52 (BOEM estimating $80 million in compliance costs in 2024 alone, prior to any demand letter).

[4] Ex. C ¶¶22-27 ("We are scrambling to come up with as much collateral as possible to comply with the Rule's financial assurance requirements. This means significantly reducing other activities. … We cannot reinvest in the company because we have to hold capital back. We have to limit the amount of our development work to maintain our credit rating/cash balance as long as possible."); Ex. B ¶23 ("The Final Rule has already scared potential purchasers from moving forward with a bid because of the uncertainty, the unknown future cost, and the potential to severely impact liquidity."); Ex. E ¶34 ("Investors will demand a significant risk premium due to the existence of the Rule."); Ex. E paragraph 22 (Rule forces us to "divert[] substantial amounts of capital from production, construction, and drilling operations in the hopes of either maintaining an arbitrary investment grade proxy rating or procuring cost prohibitive supplemental financial assurance."); 89 Fed. Reg. at 31,576 (Rule causes industry "foregone production").

4

damages would not fully repair the harm."). The Fifth Circuit caselaw is unmistakable. *Restaurant Law Center v. Dep't of Labor*, 66 F.4th 593 (5th Cir. 2023) (reversing district court's preliminary injunction denial because 8-10 hours per week of compliance costs was irreparable harm); *Career Colleges & Schools of Tex. v. Dep't of Educ.*, 98 F.4th 220, 237-38 (5th Cir. 2024) (reversing district court's preliminary injunction denial because "altered business operations and missed opportunities" were irreparable harm). After all, "[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Jonibach Mgmt. Trust v. Wartburg Enters., Inc.*, 750 F.3d 486, 491 (5th Cir. 2014). And the Supreme Court just confirmed—when deciding a preliminary injunction brought by a regulated entity, as long as "each side has strong arguments about the harms they face and equities involved," the preliminary decision must "ultimately tur[n] on the merits and the question who is likely to prevail at the end of this litigation." *Ohio v. EPA*, 144 S. Ct. 2040, 2053 (2024). That's why relying on the facts above to find irreparable harm here does not mean that a preliminary injunction would be appropriate in every future APA case; the inquiry still requires a plaintiff to show likelihood of success on the merits (which Plaintiffs have done here).

**3.** The balance of harms and public interest do not favor leaving a likely unlawful regulation in place because every day the Rule is in force, it deepens the undisputed irreparable harms Plaintiffs are facing right now. And "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Louisiana v. Biden*, 55 F.4th 1017, 1035 (5th Cir. 2022). This is particularly the case where, as here, Plaintiffs are simply attempting to preserve the status quo until judicial review can be completed. *Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1143 (5th Cir. 2021) ("We've explained that 'the maintenance of the status quo is an important consideration in granting a stay.'").

Dated: October 8, 2024

**ELIZABETH B. MURRILL**
**Attorney General of Louisiana**

/s/ Zachary Faircloth
Zachary Faircloth (La. #39875)
Principal Deputy Solicitor General
Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, Louisiana 70804
Tel: (225) 421-4088
FairclothZ@ag.lousisiana.gov

*Counsel for the State of Louisiana*

**KEN PAXTON**
**Attorney General of Texas**
BRENT WEBSTER
First Deputy Attorney General
JAMES LLOYD
Deputy Attorney General for Civil Litigation
KELLIE E. BILLINGS-RAY
Chief, Environmental Protection Division

/s/ Wesley S. Williams
WESLEY S. WILLIAMS (admitted pro hac vice)
Assistant Attorney General
Wesley.Williams@oag.texas.gov
HEATHER COFFEE (admitted pro hac vice)
Assistant Attorney General
Heather.Coffee@oag.texas.gov
OFFICE OF THE ATTORNEY GENERAL OF TEXAS
ENVIRONMENTAL PROTECTION DIVISION
P.O. Box 12548, MC-066
Austin, Texas 78711-2548
(512) 463-2012 | Fax: (512) 320-0911

*Counsel for the State of Texas*

Respectfully submitted,

/s/ Tyler R. Green
Tyler R. Green (admitted pro hac vice)
Daniel Shapiro (admitted pro hac vice)
Jeffrey S. Hetzel (admitted pro hac vice)
**CONSOVOY MCCARTHY PLLC**
222 S. Main Street, 5th Floor
Salt Lake City, UT 84101
(703) 243-9423
tyler@consovoymccarthy.com

/s/ Jimmy R. Faircloth, Jr.
**FAIRCLOTH MELTON SOBEL & BASH, LLC**
Jimmy R. Faircloth, Jr. (La. #20645)
jfaircloth@fairclothlaw.com
Barbara Bell Melton (La. #27956)
bmelton@fairclothlaw.com
Mary Katherine Price (La. #38576)
kprice@fairclothlaw.com
Alexandria, Louisiana 71303
Telephone: (318) 619-7755
Facsimile: (318) 619-7744

Stephen C. Dwight (La. #28345)
stephen@dwightlaw.com
**DWIGHT LAW FIRM, LLC**
P.O. Box 2186
Lake Charles, Louisiana 70602
Telephone: (337) 802-1516

*Counsel for Louisiana Oil & Gas Association, Gulf Energy Alliance, Independent Petroleum Association of America, and U.S. Oil & Gas Association*

**LYNN FITCH**
**Attorney General of Mississippi**

/s/ Justin L. Matheny
Justin L. Matheny (admitted pro hac vice)
Deputy Solicitor General
Mississippi Attorney General's Office
P.O. Box 220
Jackson, MS 39205
(601) 359-3680
justin.matheny@ago.ms.gov

*Counsel for the State of Mississippi*