UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

| | |
|---|---|
| **STATE OF LOUISIANA ET AL** | **CASE NO. 2:24-CV-00820** |
| **VERSUS** | **JUDGE JAMES D. CAIN, JR.** |
| **DEB HAALAND ET AL** | **MAGISTRATE JUDGE LEBLANC** |

## MEMORANDUM ORDER

Before the court are a Motion for Preliminary Injunction, Motion to Stay, and Motion to Expedite [doc. 6] filed by plaintiffs Gulf Energy Alliance, Independent Petroleum Association of America, Louisiana Oil & Gas Association, U.S. Oil & Gas Association, and the States of Louisiana, Mississippi, and Texas. Defendants U.S. Department of the Interior; the Bureau of Ocean Energy Management ("BOEM"); Deb Haaland, in her official capacity as Secretary of the Interior; Elizabeth Klein, in her official capacity of Director of the Bureau of Ocean Energy Management; and Steve Feldgus, in his official capacity as Principal Deputy Assistant Secretary for Land & Minerals Management (collectively, "the government"/"defendants") oppose the motion. Doc. 58. The following entities have filed briefs as *amici curiae* in opposition to plaintiffs' motions: American Petroleum Institute, Louisiana Mid-Continent Oil & Gas Association, Center for Biological Diversity, Healthy Gulf, Ocean Conservancy, and Oceana. Docs. 65, 66, 74.

# I.
## INTRODUCTION

This suit arises from a Final Rule issued by the Bureau of Ocean Energy Management ("BOEM"), issued on April 24, 2024, and effective as of June 29, 2024. The rule requires oil and gas lessees in the Gulf of America to obtain financial assurance bonds covering the cost of potential future liability for decommissioning their structures as a condition of exercising their lease rights. *See Risk Management and Financial Assurance for OCS Lease and Grant Obligations*, 89 Fed. Reg. 31,544 (Apr. 24, 2024). Plaintiffs challenge the government's departure from its former approach of joint and several liability for decommissioning. They maintain that small- and mid-sized lessees will be unable to obtain such bonds and thus "face potentially existential consequences." Doc. 6, att. 1, p. 14. Accordingly, they seek review under the Administrative Procedures Act ("APA"), 5 U.S.C. § 704. The government opposes the motions, arguing that plaintiffs cannot meet their burden of showing (1) a substantial likelihood of success on the merits, (2) a threat of irreparable injury, and (3) that the balance of equities and public interests favor an injunction. Doc. 58.

# II.
## BACKGROUND

### A. Supplemental Bonding Authority & Background

Through the Outer Continental Shelf Lands Act of 1953 ("OCSLA"), the Department of the Interior leases areas of the Outer Continental Shelf for oil and gas exploration and development. *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 472 (D.C. Cir. 2009). After the 1970s OPEC oil embargo, Congress amended

OCSLA to "establish policies and procedures for managing the oil and natural gas resources of the Outer Continental Shelf." 43 U.S.C. § 1802(1). These policies and procedures "are intended to result in expedited exploration and development of the Outer Continental Shelf in order to achieve national economic and energy policy goals, assure national security, reduce dependence on foreign sources, and maintain a favorable balance in world trade." *Id.* OCSLA vests the Secretary of the Interior with authority to

> prescribe and amend such rules and regulations as he determines to be necessary and proper in order to provide for the prevention of waste and conservation of the natural resources of the outer Continental Shelf, and the protection of correlative rights therein, and, notwithstanding any other provisions herein, such rules and regulations shall, as of their effective date, apply to all operations conducted under a lease issued or maintained under the provisions of this subchapter.

43 U.S.C. § 1334(a). Within the scope of this authority are regulations relating to the assignment or relinquishment of leases. *Id.* at § 1334(a)(3). While the statute does not expressly authorize the Secretary to demand financial assurance, it does provide instruction for the forfeiture of such securities.[1] *Id.* at § 1338a.

In the decades since the amendment, the Gulf of America has become "the nation's primary offshore source of oil and gas, generating about 97% of all U.S. OCS oil and gas production." BOEM, *Oil & Gas – Gulf of America*, https://www.boem.gov/regions/gulf-america-ocs-region/oil-and-gas-gulf-america (last visited Mar. 10, 2025). These activities generate substantial revenues for both state and federal governments.[2] *Id.* Due to the

---

[1] The parallel Mineral Leasing Act, governing leasing on public lands, authorizes the Secretary of the Interior to "ensure that an adequate bond, surety, or other financial arrangement will be established prior to the commencement of surface-disturbing activities on any lease." 30 U.S.C. § 226(g).
[2] OCSLA awards coastal states 27 percent of bonus bids, ground rent, and production royalties from OCS oil and gas lease sales and production in adjacent waters. 43 U.S.C. § 1337(g)(2). Gulf Coast states are entitled to an additional

technological challenges of early oil and gas operations, major companies dominated offshore activity in the Gulf of America until the 1990s. *Arena Energy LLC Comment*, p. 4, https://www.regulations.gov/comment/BOEM-2023-0027-2096. Beginning in the late 1980s, however, many of these companies sold their shallow water properties to smaller, independent producers in order to pursue more lucrative fields in the Gulf's deeper waters. *Id.* at 4–5. With the transfer of shallow water properties, questions arose as to decommissioning obligations and liabilities.

In 1979, the Department of the Interior added the following to its regulations on the assignment of leases: "(d) The assignor shall be liable for all obligations under the lease accruing prior to the approval of the assignment." 44 Fed. Reg. at 38284, § 3319.1. In 1995, the DOI amended its decommissioning regulations to include:

> (b) The obligations to plug and abandon wellbores, remove platforms or other facilities, and to clear the ocean of obstructions accrue when the well is drilled, the platform or other facility is installed, or the obstruction is created and continue until the requirements of subpart G are fully accomplished. ***These obligations are the joint and several responsibility of all lessees.***

30 C.F.R. 250.110 (1995) (emphasis added). The preamble also emphasized, "When an assignment occurs, the assignor continues to have residual liability should the assignee fail to fully perform obligations that accrued before assignment with respect to wells and structures in existence at the time of the assignment." 60 Fed. Reg. 63011, 63012 (Dec. 8, 1995). Accordingly, major oil companies retained decommissioning liability for structures

---

portion of OCS revenues from areas of the Gulf of America. *See* Pub. L. 109-432, § 105, 120 Stat. 2922, 3004 (2006) (codified at 43 U.S.C. § 1331 Note).

that existed at the time of sale jointly and severally with successor lessees. *See* 88 Fed. Reg. 23,569, 23,572–73 (Apr. 18, 2023).

Both BOEM and the Minerals Management Service ("MMS"), now reorganized as Bureau of Safety and Environmental Enforcement ("BSEE"), have issued regulations requiring Gulf operators and owners to provide financial assurance to Interior for their decommissioning obligations. MMS first enacted a bonding regime in 1993, requiring an operator to obtain a $50,000 surety bond before the issuance of a lease, a $200,000 surety bond before starting exploration activities, and a $500,000 bond before starting development and production. 58 Fed. Reg. 45,255, 45,261–62. It noted that, as the number of platforms being decommissioned grew, "the potential for damage due to lessees' failure to perform required lease abandonment and clearance operations becomes significantly greater." *Id.* at 42,257–58. Accordingly, it also granted the Regional Director discretion to require additional security "to the level necessary to ensure present and future compliance with all lease obligations" when he deemed necessary based on factors like financial ability, record of meeting obligations, and financial strength. *Id.* at 45,256–57.

In 1997 MMS provided additional guidance on when supplemental bonding could be required. 62 Fed. Reg. 27,948. Specifically, it enacted the following at 30 C.F.R. § 256.53(d)(1):

> The Regional Director's determination will be based on his/her evaluation of your ability to carry out present and future financial obligations demonstrated by:
>   (i) Financial capacity substantially in excess of existing and anticipated lease and other obligations, as evidenced by audited financial statements (including auditor's certificate, balance sheet, and profit and loss sheet);

>   (ii) Projected financial strength significantly in excess of existing and future lease obligations based on the estimated value of your existing OCS lease production and proven reserves of future production;
>   (iii) Business stability based on 5 years of continuous operation and production of oil and gas or sulphur in the OCS or in the onshore oil and gas industry;
>   (iv) Reliability in meeting obligations based on:
>     (A) Credit rating(s); or
>     (B) Trade references, including names and addresses of other lessees, drilling contractors, and suppliers with whom you have dealt; and
>   (v) Record of compliance with laws, regulations, and lease terms.

*Id.* at 27,956. In a 2008 Notice to Lessees ("NTL"), MMS also stated that a supplemental bond should generally be required unless "at least one record title owner or holder of the [Right of Use Easement] or [Right of Way]" met certain conditions determining financial strength and reliability.[3] *See* NTL No. 2008-N07 (Aug. 28, 2008), *available at* https://www.boem.gov/sites/default/files/regulations/Notices-To-Lessees/2008/08n07.pdf. These included (1) a net worth of greater than $65 million; (2) cumulative decommissioning liability less than or equal to 50 percent of the most recent independent calculation of net worth; and (3) demonstrated record of reliability based on number of years of operation; credit ratings, trade references, and verified published sources; a record of compliance with governing regulations and lease terms; **and** "other factors that indicate financial strength or liability." *Id.* at 2–3. The lessee or holder must also either produce a certain quantum of oil from the lease or meet a higher threshold of debt-to-equity ratio based on its potential decommissioning liability. *Id.*

---

[3] Plaintiffs maintain that "Interior did not fully enforce the 2008 NTL out of concern that it would lead to an increase in bond demands that would, in turn, exacerbate the increase in bankruptcies due to the oil price collapse of the mid-2010s." Doc. 6, att. 1, p. 29.

### B. 2015 GAO Report and Attempts to Revise Financial Assurance Procedures

In December 2015, the GAO released a report in response to the House Committee on Natural Resources' request "to review Interior's management of potential federal liabilities associated with the decommissioning of offshore oil and gas infrastructure." Doc. 58, att. 2, p. 8. GAO identified concerns with BOEM's administration of financial assurance meant to cover decommissioning costs, noting that "less than 8 percent of estimated decommissioning liabilities in the Gulf are covered by financial assurance mechanisms such as bonds." *Id.* at 29. To that end, BOEM had waived supplemental bonding requirements for $33 billion in decommissioning liabilities based on factors associated with the lessees' financial strength. *Id.* at 29–30. But the GAO found "that the use of financial strength tests and corporate guarantees in lieu of bonds poses financial risks to the federal government" because of the risk of subsequent financial deterioration by a lessee. *Id.* at 32. It also found that BOEM placed too much value on net worth as an indicator of financial strength, though representatives from credit rating agencies stated that the factor was "backward looking" and could be "skewed by the volatile nature of commodity prices, among other factors." *Id.* at 33. Instead, these agencies recommended looking to factors that emphasized the evaluation of cash flow such as debt-to-earnings and debt-to funds from operations. *Id.* Additionally, BOEM recognized the risks associated with its current financial assurance procedures. It informed GAO that it intended to "eliminate the use of financial strength tests to completely waive lessees from the requirement of supplemental bonding" and instead conduct a financial review that would result in credit being awarded, which could be applied against the supplemental bonding

requirement. *Id.* GAO thus recommended that BOEM complete its plan to revise financial assurance procedures, and Interior advised that it generally agreed with the findings and accepted the recommendation. *Id.* at 39, 41–42.

BOEM issued a new NTL in September 2016, "Requiring Additional Security." *See* NTL No. 2016-N01 (Sep. 12, 2016), *available at* https://www.boem.gov/sites/default/files/documents/renewable-energy/BOEM-NTL-2016-N01_0.pdf. BOEM acknowledged, however, that this NTL was never fully implemented. 85 Fed. Reg. 65,904, 65,906 (Oct. 16, 2020). Accordingly, BOEM and BSEE issued a Notice of Proposed Rulemaking, "Risk Management, Financial Assurance and Loss Prevention," in October 2020. *Id.* at 65,904. The notice referenced the history of bonding regulations and guidance, including the terms of the 2008 NTL and the 2015 GAO report. *Id.* at 65,905–06. It also recognized that 30 OCS lessee bankruptcies since 2009 had involved unbonded decommissioning liabilities, which led the agencies to conclude "that BOEM's regulations and the waiver criteria in NTL No. 2008-N07 were inadequate to protect the public from potential responsibility from OCS decommissioning liabilities, especially during periods of low hydrocarbon prices." *Id.* at 65,906. Accordingly, it proposed to eliminate two prior criteria for financial strength (business stability and record of compliance) and combine two of the remaining criteria (financial capacity and reliability) into a single test for creditworthiness. *Id.* at 65,910–11. Under this standard, Interior would not require supplemental financial assurance if the lessee or another entity in the chain of title could demonstrate financial strength through a credit rating or proxy measure. *Id.* at 65,913. Additionally, supplemental financial assurance would not be required if the lessee could

demonstrate a 3:1 ration of the value of reserves to decommissioning costs. *See id.* at 65,914.

By executive order dated January 20, 2021, President Biden instructed agencies to review actions taken under the previous administration. Exec. Order No. 13990, 86 Fed. Reg. 7037 (Jan. 20, 2021). Upon that review, BOEM decided not to move forward with the above-described provisions of the 2020 notice of proposed rulemaking. 88 Fed. Reg. 42,136, 42,138 (Jun. 29, 2023). Instead, BOEM issued a new notice of proposed rulemaking in June 2023 to address the longstanding concerns with its financial assurance policies.[4] *Id.* at 42,138.

### C. 2023 Proposed Rule

The 2023 proposed rule mirrored the 2020 proposed rule in updating the financial health criteria, described above, which might exempt a lessee from providing supplemental financial assurance. *Id.* at 42,143. It differed from the 2020 proposed rule, however, by omitting the condition that a lessee could avoid supplemental financial assurance based on its predecessor's creditworthiness or proven reserves threshold. In the final rule, BOEM explained

> Omitting the existence of predecessor lessees from the analysis of whether to waive the requirement of supplemental financial assurance for a current lessee—the approach being finalized here—addresses several associated issues. It ensures that the current lessees have the financial capability to fulfill their decommissioning obligations. It also eliminates the incentive to use joint and several liability as an excuse to delay setting aside funds to pay for predictable decommissioning costs. This approach does not change or undermine joint and several liability; it retains BOEM's and BSEE's

---

[4] The provisions of the 2020 proposed rule addressing BSEE procedures in response to the 2015 GAO report were ultimately finalized in a separate rule, not challenged here. *See* 88 Fed. Reg. 23,569 (Apr. 18, 2023).

>   authority to pursue predecessor lessees for the performance of decommissioning.

89 Fed. Reg. 31,544, 31,549 (Apr. 24, 2024). In recognition of the potential impact of the new regulations on affected companies, however, the 2023 proposed rule provided that any new financial assurance requirements would be phased in over three years for existing leaseholders. 88 Fed. Reg. 42,136, 42,148.

The 2023 proposed rule received 2,151 public comments, but only 161 of these were identified as unique (as opposed to form letters or "not germane" comments) and 95 of those as substantive. Response to Public Comments Received on the June 29, 2023, Notice of Proposed Rulemaking, Docket No. BOEM-2023-0027 ("Response to Comments"), *available at* https://www.regulations.gov/document/BOEM-2023-0027-2187. Opponents of the proposed rule discussed concerns with negative and financially burdensome effects on the oil and gas industry, and related impacts on the economy, smaller and mid-sized businesses, U.S. energy independence, American consumers and taxpayers, and environmental implications. *Id.* at 14. In response BOEM noted that, since 2009, more than 30 corporate bankruptcies had occurred involving offshore oil and gas lessees that did not have sufficient financial assurance to cover their decommissioning obligations. *Id.* at 14–15. According to BOEM, these bankruptcies had "highlighted a weakness in BOEM's current supplemental financial assurance program" and the amendments in the proposed rule would better protect the taxpayer from bearing the costs of decommissioning and other financial risks associated with OCS development. *Id.*

The substantive comments also included favorable remarks from both industry groups and environmentalists. They expressed support for Interior's efforts to protect the taxpayer by ensuring current lessees provide adequate financial assurance to meet their decommissioning obligations. *See id.* at 12. In response, BOEM noted that the rule finalized amendments to existing provisions and increased regulatory clarity about financial obligations "to better protect the taxpayer from potentially bearing the cost of facility decommissioning and other financial risks associated with OCS development, such as environmental remediation." *Id.*

BOEM issued a final rule in April 2024, largely adopting the elements of the proposed rule. *See* Risk Management and Financial Assurance for OCS Lease and Grant Obligations, 89 Fed. Reg. 31,544 (Apr. 24, 2024); 30 C.F.R. §§ 556.900–556.907 (codification of relevant provisions). Plaintiffs filed suit in this court on June 17, 2024, and moved for a preliminary injunction or stay under 5 U.S.C. § 705 shortly thereafter. Docs. 1, 6. They maintain that the rule is both contrary to law and arbitrary and capricious. The government opposes the motions, arguing that plaintiffs fail to carry their burden on each of the requirements for obtaining a preliminary injunction. Doc. 58.

### III.
### LAW & APPLICATION

To obtain a preliminary injunction, the movant must show (1) a substantial likelihood of success on the merits of its claims; (2) a substantial threat of irreparable injury if the injunction is not granted; (3) that the threatened injury to the movant outweighs the harm the injunction may do to the nonmovant; and (4) that granting the injunction will not

disserve the public interest. *Anderson v. Jackson*, 556 F.3d 351, 360 (5th Cir. 2009). "The grant of injunctive relief is an extraordinary remedy which requires the movant to unequivocally show the need for its issuance." *Valley v. Rapides Par. Sch. Bd.*, 118 F.3d 1047, 1050 (5th Cir. 1997). The decision lies within the district court's discretion. *Allied Mktg. Grp., Inc. v. CDL Marketing, Inc.*, 878 F.2d 806, 809 (5th Cir. 1989).

Both the industry plaintiffs as well as the plaintiff states argue that they face a threat of irreparable harm if the preliminary injunction is not granted. To satisfy this prong a party must show (1) a threat of injury, (2) that the injury is imminent, and (3) that money damages would not undo the harm. *Portee v. Morath*, 683 F.Supp.3d 628, 636 (W.D. Tex. 2023) (citing *Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*, 804 F.2d 1390, 1394 (5th Cir. 1986)); *Burgess v. FDIC*, 871 F.3d 297, 304 (5th Cir. 2017). Financial costs provide sufficient injury under this prong if they cannot be recovered due to the government's sovereign immunity. *Wages & White Lions Invs., LLC v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2016). Plaintiff's showing, however, must be more than "speculative injury . . . [based on] an unfounded fear on the part of the applicant." *Ryan LLC v. Fed. Trade Comm'n*, __ F.Supp.3d __, 2024 WL 3297524 (N.D. Tex. July 3, 2024) (quoting *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011)).

As noted supra, the rule will be phased in. Any company receiving a demand for supplemental financial assurance will only have to post a third of the required amount by the deadline listed in the demand letter and need not post the full amount of the demand for three years. 89 Fed. Reg. at 31,560. Industry plaintiffs present declarations from several member operators arguing that they will likely be impacted once these demand letters do

go out. State plaintiffs' arguments are premised on their resulting loss of royalties and impacts on jobs and gross domestic product. At the hearing on this matter, however, the government represented that the first demand letters would not go out until the middle of 2025 at the earliest.[5] While these harms may be likely, a preliminary injunction can only be issued if the threatened harm is also imminent. In other words, plaintiffs must show a likelihood of irreparable injury "in the absence of such interlocutory relief, i.e., before a decision on the merits can be rendered." *Louisiana v. Dep't of Homeland Sec.*, __ F.Supp.3d __, 2024 WL 1328434, at *20 (E.D. La. Mar. 28, 2024) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). The court will set this matter for contradictory hearing on an expedited basis. It can then reach a final decision on the merits before the demand letters are issued and plaintiffs incur any resulting costs. Accordingly, plaintiffs' threatened injury does not warrant a preliminary injunction.

Industry plaintiffs also argue that these members are already incurring compliance costs by, according to one entity, "subscrib[ing] to financial data platforms to better understand the proxy credit model" that will determine if an entity is subject to the rule and "analyzing the model through sensitivity analysis of [their] corporate model under a wide

---

[5] In January 2025, plaintiffs also submitted a supplemental memorandum pointing to a surety demand issued to industry plaintiff member W&T Offshore ("W&T"). Doc. 94. The evidence comes from a first amended complaint filed by W&T in a suit in the United States District Court for the Southern District of Texas. *See W&T Offshore v. Endurance Assurance*, No. 4:24-cv-3047, doc. 36 (S.D. Tex. Dec. 11, 2024). There W&T alleges, in relevant part, that defendant surety companies have unlawfully "conspired to use a change in government rules as a pretext to extract outrageous sums from smaller oil and gas companies like W&T" even though "[t]he rule *did not* alter existing bonds previously issued to W&T by the Sureties nor alter the underlying contract terms." *Id.* at doc. 36, ¶ 3. Accordingly, it appears that any nexus between the challenged rule and the unfair surety demands is broken by W&T's own allegation of illegal behavior by the sureties. Additionally, as the government notes, the facts alleged in W&T's petition remain disputed by the defendants in that suit, who maintain that W&T's recent financial performance prompted the new demands. *Id.* at doc. 30, pp. 9–10.

variety of scenarios." Doc. 6, att. 7, ¶ 35. The same entity estimates that it has expended "thousands of employee hours" and paid "significant amounts" to outside counsel and other vendors for these studies, "at a great cost and distraction to [its] corporate mandate." *Id.* But it provides no evidence of these expenditures, beyond a generalized and self-serving declaration.[6]

Compliance costs must be more than *de minimis* to support a preliminary injunction. *Rest. L. Ctr. v. U.S. Dep't of Labor*, 66 F.4th 593, 600 (5th Cir. 2023) (citing *Louisiana v. Biden*, 55 F.4th 1017, 1055 (5th Cir. 2022)). Additionally, there is scant caselaw supporting the idea that legal fees constitute compliance costs. *Second Amendment Fdn., Inc. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 702 F.Supp.3d 513, 539–40 (N.D. Tex. 2023). The Fifth Circuit has accepted declarations enumerating the specific steps an entity is taking to meet a rule's requirements, such as new record-keeping policies, communication monitoring, and staff training to comply with a rule allowing student loan borrowers to discharge their debt if the school misled the borrower or engaged in deceptive or aggressive recruitment tactics. *Career Colleges and Schools of Tex. v. U.S. Dep't of Education*, 98 F.4th 220, 235–7 (5th Cir. 2024). The declaration in this matter, vaguely

---

[6] The Regulatory Impact Analysis forecasted "compliance costs" between $81.4 million and $84.5 million for 2024. *See Regulatory Impact Analysis: Risk Management and Financial Assurance for OCS Lease and Grant Obligations*, Dep't of Interior, RIN:1010-AE14, at 24 (Apr. 2024), *available at* https://www.regulations.gov/document/BOEM-2023-0027-2172. But that calculation appears tied to enforcement, i.e. demand letters, beginning in calendar year 2024 and the compliance costs referenced there appear to be the supplemental security itself rather than the overhead costs described by plaintiffs. *Id.* at 51. In its brief filed on August 13, 2024, the government asserted that the first requests for financial information were due to issue to lessees on August 29 and that responses would only be due 180 days thereafter. Doc. 58, pp. 20–21. After receiving this information, BOEM would then have to determine which lessees meet either the credit rating or 3:1 reserves criterion before demanding supplemental financial assurance. The government maintains that this analysis will likely take several months, consistent with its representation at the hearing that demand letters would not issue until mid-2025 at the earliest.

referencing compliance measures taken even before demand letters have been issued, falls far short of this standard.

A preliminary injunction should only issue if movant "has clearly carried the burden of persuasion on all four . . . prerequisites." *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985). Because plaintiffs have not met their burden on the threat of irreparable harm, the motion will be denied and the court need not consider the other factors. At the hearing on this matter, however, several questions arose as to the merits of the case. These unresolved issues prevent the court from finding that plaintiffs have a "substantial likelihood of success on the merits" so as to warrant injunctive relief. They include but are not limited to (1) the number of entities who might qualify under the credit rating or 3:1 reserves exceptions, (2) the data behind the government's predictions for escalating decommissioning costs, and (3) the data behind the government's assessment of bankruptcy risks among shallow-water operators. The court is not satisfied that these can be answered by arguments of counsel or self-serving declarations. Instead, the parties should present their best possible proof in a contradictory hearing. Accordingly, the matter will be set for resolution on an expedited basis.

## IV.
### CONCLUSION

For the reasons stated above, the court hereby **ORDERS** that the Motion for Preliminary Injunction and Motion for Stay [doc. 6] be **DENIED**. The Motion to Expedite [doc. 6] is hereby **DENIED AS MOOT**. The matter will be set for telephone status conference at 2:00 pm on March 25, 2025, before the undersigned to determine next steps.

**THUS DONE AND SIGNED** in Chambers on the 10th day of March, 2025.

_____
**JAMES D. CAIN, JR.**
**UNITED STATES DISTRICT JUDGE**